**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KEISHA BROWN, As Administratrix** : | |
| **of the Estate of Aaron Jenkins** : | |
| *Plaintiff*, : | **Case No. 2:20-cv-05532-CMR** |
| v. : | |
| : | JURY TRIAL DEMANDED |
| **CITY OF PHILADELPHIA**, *et al.* : | |
| *Defendant*. : | |

<u>**PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S FRONTIER AIRLINES, INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT UNDER F.R.C.P. 12(b)(6)**</u>

Plaintiff, Keisha Brown as Administratrix of the Estate of Aaron Jenkins, respectfully moves the Court for entry in favor of Plaintiff's Motion in Opposition to Defendant's Motion to Dismiss Plaintiff's Amended Complaint.

Respectfully submitted,

STAMPONE O'BRIEN DILSHEIMER LAW

BY:  ___*/s/Prince Holloway*_____
　　　　　PRINCE HOLLOWAY, ESQUIRE
　　　　　*Attorney for Plaintiff*
　　　　　I.D. No. 209591
　　　　　500 Cottman Avenue
　　　　　Cheltenham, PA 19112
　　　　　Phone: 215-663-0400/Fax: 215-663-9112
　　　　　pholloway@stamponelaw.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT                                  5

STATEMENT OF THE FACTS                                6

LEGAL STANDARD                                        7

LEGAL ARGUMENT                                        8

   1.   LIABILITY

        A.  Frontier Owed Aaron Jenkins a
             Duty under a premises liability theory         8

        B.  Frontier's Duty Owed to Aaron Jenkins arises from     11
             its contractual Duty to Lease Terminal E from the
             City of Philadelphia

        C.  Frontier is responsible for the Foreseeable Violent
             Acts of a Third Party due to their own Negligent
             Security/Screening                              13

        D.  The Plaintiff's Claim for Punitive Damages Should
             Not be Stricken                                14

CONCLUSION                                            16

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992).                                    7

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);                                               7

*Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).                                       7

*Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011);                                           7

*Revene v. Charles Count Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989)                         7

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).                             8

*Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142, n. 1 (3d Cir. 1992).                8

*Moyer v. Berks Heim Nursing Home*, 2014 WL 1096043,  (E.D. Pa., Mar. 20, 2014)             8

*Victaulic v. Tieman*, 499 F.3d 227 (3d Cir. 2007)                                           8

*Newell v. Montana West, Inc*., 154 A.3d 819, 821-22 (Pa. Super. 2017)                       9

*T.A. v. Allen*, 669 A.2d 360 (Pa. Super. 1995)                                              9

*Paliometros v. Loyola*, 932 A.2d 128, 133 (Pa. Super. 2007)                                 9

*Ott v. Unclaimed Freight Co*., 395 Pa.Super. 483, 488, 577 A.2d 894, 896 (1990).           9

*Truax v. Roulhac*, 126 A.3d 991, 997-98 (Pa. Super. 2015)                                  10

*Gushlaw v. Milner*, 42 A.3d 1245, 1251 (R.I. 2012)                                         11

*Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 6 (1st Cir. 2018).                             11

*Hilbert v. Roth*, 149 A.2d 648, 652 (Pa. 1959);                                    14

*Nix v. Temple Univ.*, 596 A.2d 1132, 1138 (Pa. Super. Ct. 1991)                    14

*Martin v. Johns-Mannville Corp.*, 494 A.2d 1088, 1096 (Pa. 1985).                  14

*SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991)             14

*Field v, Philadelphia Electric Co.*, 565 A.2d 1170, 1182 (Pa.Super.1989)          15

*G.J.D. v. Johnson*, 713 A.2d 1127, 1129 (Pa. 1998)                                 15

*Burke v. Maasen*, 904 F.2d 178, 182 (3d Cir. 1990)                                 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KEISHA BROWN, As Administratrix of the Estate of Aaron Jenkins *Plaintiff*, v. CITY OF PHILADELPHIA, *et al.* *Defendant*. | **Case No. 2:20-cv-05532-CMR** JURY TRIAL DEMANDED |

## PRELIMINARY STATEMENT

Plaintiff, Keisha Brown, as Administratrix of the Estate of Aaron Jenkins ("Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendant's Frontier Airlines, Inc. ("Defendant") Motion to Dismiss Plaintiff's Complaint and ask this Court to rule in favor of Plaintiff, for reasons set forth below.

Through its Motion, the Defendant attempts to escape liability for its failure in allowing airport employees and independent contractors (baggage claim workers) to bypass security, and allowing such individuals to enter the airport terminals with prohibited weapons. This failure ultimately led to the killing of the decedent, Aaron Jenkins.

Plaintiff has properly alleged claims for negligence against the Defendant as it relates to negligence and lack of security. First, the Defendant is subject to liability for failing to implement a security policy requiring all workers and independent contractors to go through security in their terminal. Second, the Defendant had a contractual duty to provide property security by way of the Airport Airline lease agreement between Frontier Airlines and the City of Philadelphia. *See Airport Lease attached as Ex. "A".* Said contract/lease states that Frontier will be responsible for the willful conduct of their employees and/or independent contractors. The Defendant's failures in

providing adequate security directly resulted in the slow death of Mr. Aaron Jenkins.  For these reasons, the Court should deny Defendant's Motion.

## STATEMENT OF THE FACTS

Aaron Jenkins ("Decedent") was employed as a baggage handler by Worldwide Frontier Services. As an employee he was responsible for unloading and loading cargo onto commercial airplanes. Worldwide flight services entered into an agreement with the Defendant Frontier Airlines, Inc. ("Frontier") in which Worldwide Flight Services was responsible for the baggage handling needs of Frontier. Additionally, Worldwide Flight Services had the exclusive possession of the baggage handling areas of Terminal E consistent with their contract/lease with Frontier.

On May 3, 2018, the Decedent was asleep during his lunch break within the break room in the baggage handling area of Terminal E. Terminal E is under the exclusive control of the Defendant Frontier Airlines Inc. The assailant, an employee of Worldwide Flight Services  showed up to work  with a knife and was able to bypass security. The assailant engaged in an altercation with the Decedent. The assailant and the Decedent had previous altercations as Decedent was bullied and/or tormented without relief from the Defendant. There were multiple complaints regarding workplace violence and/or harassment, however the assailant and other employees had personal relationships with management preventing any disciplinary actions. During the altercation with Decedent, the assailant brandished a knife and stabbed Decedent. Decedent was dead upon arrival to the hospital.

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Keisha Brown, as Administratrix of the Estate of Aaron Jenkins ("Plaintiff"), does hereby move for the denial of Defendant Frontier Airlines, Inc ("Defendant") Motion to Dismiss and asks this Court to rule in favor of Plaintiff, for the reasons set forth below.

**LEGAL STANDARD**

The Defendant  has filed the instant motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 12, a defendant bears the burden of demonstrating that a plaintiff's complaint is deficient as a matter of law.  The Third Circuit Court of Appeals has established that the evaluation of the sufficiency of a complaint under a Rule 12(b)(6) challenge involves three steps: "1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint 'not entitled' to the assumption of truth; and (3) determine whether any 'well-pleaded factual allegations' contained in the complaint 'plausibly give rise to an entitlement for relief.'"  With respect to the third step, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).  The issue is not whether a plaintiff will ultimately prevail but whether the complainant is entitled to offer evidence to support the claims in the complaint.  *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011); *see also Revene v. Charles Count Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989) ("In actions under 42 U.S.C. § 1983, as generally, a motion to dismiss pursuant to Rule 12(b)(6) should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts to support her allegations.").  In determining the

sufficiency of a complaint, the court must first "separate the factual matters averred from the legal conclusions asserted," and then "determine whether the factual matters averred are sufficient to show the plaintiff has a 'plausible claim for relief'." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The complaint need not include "detailed factual allegations," and the court must accept all of the complaint's well-pleaded facts as true while construing all "disputed facts in favor of the plaintiff." *Id.*; *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142, n. 1 (3d Cir. 1992). "If the facts alleged are sufficient to 'raise a right to relief above the speculative level' such that the plaintiffs' claim is 'plausible on its face,' a complaint will survive a motion to dismiss." Moyer v. Berks Heim Nursing Home, 2014 WL 1096043, at *2 (E.D. Pa., Mar. 20, 2014) (citing Bell Atlantic v. Twombly, 550 U.S. 544 (2007); Victaulic v. Tieman, 499 F.3d 227 (3d Cir. 2007).

## LEGAL ARGUMENT

### A.    FRONTIER OWED AARON JENKINS A DUTY UNDER A PREMISES LIABILITY THEORY

Under Pennsylvania law, in order to hold a defendant liable for negligence, the plaintiff must prove the following four elements: (1) a legally recognized duty that the defendant conform to a standard of care; (2) the defendant breached that duty; (3) causation between the conduct and the resulting injury; and (4) actual damage to the plaintiff. *Newell v. Montana West, Inc.*, 154 A.3d 819, 821-22 (Pa. Super. 2017).

The Defendant believes the Plaintiff's negligence claims fail to satisfy the first element, duty. As they harshly state, they owed no duty to the decedent. Here, the Defendant owed a duty to take reasonable precautions against the potential dangerous acts of third parties like the assailant. The Defendant also had a contractual duty with the City of Philadelphia to have a security program

for the operation of its air transportation business. The Defendant had a duty to protect against acts of third persons. The Plaintiff seeks to hold Frontier responsible for the death of Aaron Jenkins because they failed in their duty and were negligent in allowing their employees/ independent contractors/ baggage handlers to not go through any security screening.

"Generally, there is no duty to control the acts of a third party unless the Defendant stands in some special relationship with either the person whose conduct needs to be controlled or with the intended victim of the conduct, which gives the intended victim a right to protection." Paliometros v. Loyola, 932 A.2d 128, 133 (Pa. Super. 2007) (citation and internal quotation marks omitted). A "special relationship" exists between a business and its invitee. Id. (citing T.A. v. Allen, 669 A.2d 360 (Pa. Super. 1995) (en banc), appeal denied, 676 A.2d 1201 (Pa. 1996);

According to the Restatement (Second) of Torts § 314A(2)-(3) (1965)). An invitee is described as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business dealings with the possessor of the land. Restatement (Second) of Torts § 332. *Ott v. Unclaimed Freight Co*., 395 Pa.Super. 483, 488, 577 A.2d 894, 896 (1990).

Aaron Jenkins was invited by the Defendant  to enter and to remain at Terminal E. Plaintiff's well pled complaint indicates that Mr. Jenkins was killed on Frontier's premises as he was employed by Worldwide Flight Services as a baggage handler for the Defendant.. By nature

9

of the decedent's employment he had a special relationship with the Defendant Frontier Airline Inc.. Pennsylvania Courts have examined the duty to protect business invitees from the intentional or negligent acts of third parties in *Truax v. Roulhac*, 126 A.3d 991, 997-98 (Pa. Super.), appeal denied, 129 A.3d 1244 (Pa. 2015). The Court observed the duty is expressed in Section 344 of the Restatement (Second) of Torts, which states:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

> (a) discover that such acts are being done or are likely to be done, or

> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

The Court in *Truax* explained the duty to protect business invitees against third party conduct arises only if the owner has reason to anticipate such conduct and since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some

particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection. Restatement (Second) of Torts § 344.

For the reasons set forth in detail below and viewing the evidence in the light most favorable to the Plaintiff; Aaron Jenkins was a business invitee and a glaring defect exists in the Defendant's argument that it owed no duty to the decedent. The Defendant had an affirmative duty to screen all their employees and independent contractors (baggage handlers) to make the premises safe to all invitees and people similarly situated as the decedent.

### B.  FRONTIER'S DUTY TO AARON JENKINS ARISES FROM ITS UNDERTAKING AND CONTRACTUAL DUTY TO LEASE TERMINAL E FROM THE CITY OF PHILADELPHIA.

Whether a defendant is under a legal duty is a question of law to be decided by the court on a case-by-case basis. *Gushlaw v. Milner*, 42 A.3d 1245, 1251 (R.I. 2012). While no "clear cut rule" exists to determine duty, the court will examine "all relevant factors," including (1) the relationship between the parties, (2) the closeness of connection between the defendant's conduct and the injury suffered, (3) the burden to be imposed upon the defendant, (4) public policy considerations, (5) notions of fairness, (6) foreseeability of harm to the plaintiff, and (7) the degree of certainty that the plaintiff suffered an injury. *Id.* At 1251; *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 6 (1st Cir. 2018). This "ad hoc" approach will turn on "the particular facts and circumstances of a given case." *Gushlaw*, 42 A.3d at 1256. Careful analysis of these factors favors imposing a duty on Frontier.

Viewing the evidence in the light most favorable to the Plaintiff, not only did the Defendant  owe Aaron Jenkins a duty under a theory of premise liability, but it also owed the decedent a duty under contractual theory of liability. Aaron Jenkins was dependent upon

Frontier's ability to provide reasonable and safe security accommodations. The assailant, a baggage handler like the decedent,  entered Terminal E and was able to kill the decedent because Frontier did not have proper security screening for its employees and independent contractors.

Frontier owed a contractual duty to Aaron Jenkins. *See City of Philadelphia Lease attached as Ex. B*. Their contract/lease with the City of Philadelphia outlines in section 3:04  the requirements and duty imposed upon Frontier:

## 3.04 Airport Security Program

**A. TSA Program.** In accordance with regulations issued by the FAA, the U.S. Department of Transportation and the U.S. Department of Homeland Security, Transportation Security Administration ("TSA") and found at 49 Code of Federal Regulations ("CFR") Part 1542, airports are required to have TSA-approved security programs. These programs are designed to control access to certain areas of airports and to control the movement of people and vehicles within those areas.

C. **Airline Compliance.** City has a TSA-approved security program for the Airport. **Airline must have a security program for the operation of its Air Transportation Business at the Airport at all times during the Term of this Agreement.** At all times during the Term of this Agreement, Airline's security program must be in compliance with 49 CFR Part 1544 or 1546 and all other applicable laws and regulations from time to time enacted or promulgated, must be consistent and compatible in all respect with City's overall security program for the Airport, and must be acceptable to City and the TSA.

D. Indemnification. **Airline shall be responsible for any breach of security on the Airline's Leased Premises which occurs as a result of the negligence and/or willful misconduct of Airline, its agents, employees, contractors, subtenants, Affiliates, or invitees,** not including passengers, and Airline further agrees to indemnify and hold harmless City from and against any and all damages, penalties, fines, claims and costs resulting directly or indirectly from the breach of Airline's responsibilities, covenants and agreements as set forth in this Section 3.04.C. City shall provide Airline notice of and consult with Airline regarding any claims that City has knowledge of and are related to Airline. City shall defend all alleged security violations. The indemnification contained in this Section 3.04.C applies to this Section 3.04.C only.

### D. FRONTIER IS RESPONSIBLE FOR THE FORESEEABLE VIOLENT ACTS OF A THIRD PARTY FROM THEIR OWN NEGLIGENT SECURITY

### C.   FRONTER IS RESPONSBIELF OR THE FORSEEABLE VIOLENT ACTS OF A THIRD PARTY DUE TO THEIR OWN NEGLIGENCE/SECR

The killing of Aaron Jenkins was entirely foreseeable. Plaintiff pled the defendant knew of the long-standing history between the assailant and the decedent.  Averment 15 in the Plaintiff's Amended Complaint states:

"15. During employment, employee Kevin Emanuel bullied and tormented the Plaintiff with no relief from Defendants."

Plaintiff's well pled complaint satisfies the notice requirement and everyone knows if you fail to screen people in an airport something bad is going to happen. Under these circumstances, Frontier had a duty to ensure the safety of its employees/ independent contractor and frankly all people in the airport similarly situated. Requiring the Defendant to have their airline employees/ independent contractors  undergo physical screenings when they enter the airports is not unduly onerous and they should not be able to place blame on anyone else for their own independent failures. Public policy favors all airport employees working in a safe and secure  environment; this policy outweighs the cost  of Frontier finding a duty.

Defendant is liable to Plaintiff for negligent security and their lack of a consistent security plan. The Plaintiff does not have to prove notice at the outset because Frontier was aware, or should have been aware of their own defect which was a lack of a security policy in allowing their employees/ independent contractors to bypass security and not get screened for weapons. In essence, Frontier created the defect as they took no action in making sure Terminal E was safe even though they had a contractual  duty to do so. If Frontier had taken reasonable measures, they would have taken the weapons off the assailant when he showed up for work and the altercation

(which occurred on Defendant's premises) would have maybe ended with a bloody nose, not a fatality.  Frontier's negligent security directly led to the killing of Aaron Jenkins.

## D. THIS COURT SHOULD SUSTAIN PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

In this matter, the Plaintiff has satisfied his burden of pleading facts sufficient for the imposition of punitive damages.  Accordingly, the Defendant's motion should be overruled in its entirety. Plaintiff's Amended Complaint sets forth well-supported and well-pleaded claims for punitive damages against Frontier.  Under Pennsylvania law, the right to punitive damages is a "mere incident to a cause of action." Hilbert v. Roth, 149 A.2d 648, 652 (Pa. 1959); see also Nix v. Temple University, 596 A.2d 1132, 1138 (Pa. Super. Ct. 1991) (stating that "[a] request for punitive damages does not constitute a cause of action in and of itself.").  Punitive damages are appropriate where a defendant's conduct is outrageous, either because of an evil motive or because of a reckless indifference to the rights of others.  See Martin v. Johns-Mannville Corp., 494 A.2d 1088, 1096 (Pa. 1985).  Punitive damages "are proper when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct."  See SHV Coal, Inc. v. Continental Grain Co., 587 A.2d 702, 704 (Pa. 1991).

The Restatement (Second) of Torts Section 908 (2) has been adopted as law in Pennsylvania, and provides:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the right of others.  In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Field v, Philadelphia Electric Co., 565 A.2d 1170, 1182 (Pa.Super.1989) (quoting the Restatement (Second) of Torts Section 908).  Section 500 of the Restatement (Second) of Torts further refines the perimeter of reckless conduct:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

 Martin, 494 A.2d at 1097 (quoting the Restatement (Second) of Torts § 500 (1965) and noting how it informs Section 908 (2)).  Punitive damages are appropriate to provide an additional deterrent for a defendant who is found to have acted in a fashion that is especially egregious.  See G.J.D. v. Johnson, 713 A.2d 1127, 1129 (Pa. 1998).

Thus, when there is evidence that the defendant "realized the risk and acted in conscious disregard or indifference to it," there is a sound basis for imposing punitive damages.  Burke v. Maasen, 904 F.2d 178, 182 (3d Cir. 1990) (applying Pennsylvania law).  Under Pennsylvania law, therefore, a plaintiff may state a claim for punitive damages by alleging that the defendant had actual knowledge of the risk imposed to the health and welfare of another, and, in the face of that knowledge, acted, or failed to act, in conscious disregard of the risk.

Here, the Amended Complaint sets fourth a series of reckless acts by Frontier that warrant punitive damages. The Amended Complaint merely needs to allege a factual basis that Defendants realized a risk of harm to Aaron Jenkins and others similarly situated and that they acted in conscious

disregard or indifference to it.  Taking all of Plaintiff's  averments as true and resolving all doubts

in Plaintiff's favor, there can be no question that  the Plaintiff has alleged facts in his Amended

Complaint that support the imposition of punitive damages against Moving Defendants

## <u>CONCLUSION</u>

Plaintiff's well-plead Complaint must be heard by this honorable Court. Plaintiff

respectfully demands Defendant's motion to dismiss, pursuant to rule 12(b)(6), be denied.

Respectfully submitted,

STAMPONE O'BRIEN DILSHEIMER LAW


BY:___*/s/Prince Holloway*_____
        PRINCE HOLLOWAY, ESQUIRE
        *Attorney for Plaintiff*
        I.D. No. 209591
        500 Cottman Avenue
        Cheltenham, PA 19112
        Phone: 215-663-0400/Fax: 215-663-9112
        pholloway@stamponelaw.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | : | |
| **KEISHA BROWN, As Administratrix** | : | |
| **of the Estate of Aaron Jenkins** | : | |
| *Plaintiff*, | : | **Case No. 2:20-cv-05532-CMR** |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| **CITY OF PHILADELPHIA**, *et al.* | : | |
| *Defendant*. | : | |
| _____ | : | |

**ORDER**

AND   NOW,   this   _____   day   of   _____,   upon

consideration of Defendant, Frontier Airlines Inc.'s, Motion to Dismiss, and any response thereto,

the Motion is DENIED.

BY THE COURT:

_____
                                                            J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KEISHA BROWN, As Administratrix** : | |
| **of the Estate of Aaron Jenkins** : | |
| *Plaintiff*, : | **Case No. 2:20-cv-05532-CMR** |
| v. : | |
| : | JURY TRIAL DEMANDED |
| **CITY OF PHILADELPHIA**, *et al.* : | |
| *Defendant*. : | |
| : | |

## CERTIFICATE OF SERVICE

      I, PRINCE HOLLOWAY, ESQUIRE, the undersigned, do hereby certify that I have this 24th day of September, 2021, served a true and correct copy Plaintiffs' Response to Motion to Dismiss of Defendant, Frontier Airline, Inc. upon all counsel via service by the Court's Electronic Filing System and/or electronic mail.


                STAMPONE O'BRIEN DILSHEIMER LAW


                 */s/Prince Holloway*
                PRINCE HOLLOWAY, ESQUIRE
                Attorney for Plaintiff(s)


Dated:  September 24, 2021

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **KEISHA BROWN, As Administratix** | : | |
| **of the Estate of Aaron Jenkins** | : | |
| *Plaintiff*, | : | **Case No. 2:20-cv-05532-CMR** |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| **CITY OF PHILADELPHIA** | : | |
| 1515 Arch Street, 14th Floor | : | |
| Philadelphia, PA 19102 | : | |
| and | : | |
| | : | |
| **PHILADELPHIA AIRPORT** | : | |
| a/k/a Philadelphia International Airport | : | |
| 800 Essington Avenue | : | |
| Philadelphia, PA 19153 | : | |
| and | : | |
| | : | |
| **Worldwide Flight Services, Inc**. | : | |
| Room361 – B151, E. Hangar Road | : | |
| Cargo Area A, JFK International Airport | : | |
| Jamaica, NY 11430 | : | |
| | : | |
| and | : | |
| | : | |
| **Frontier Airlines** | : | |
| 4545 Airport Way | : | |
| Denver, CO 80239 | : | |
| *Defendant*. | : | |
| | : | |

### AMENDED COMPLAINT

Plaintiff, Keisha Brown as the Administratrix of the Estate of Aaron Jenkins, a decedent by and through her attorneys, Mu'min F. Islam and Brittany Gardner, alleges as follows:

### PARTIES

1. Keisha Brown ("Plaintiff") is the Administrator of the Estate of Aaron Jenkins, with a residence of 1923 W. Sparks Street, Philadelphia, PA 19141.

2. Defendant, City of Philadelphia ("City"), having its principal place of business at 1515 Arch Street, 14th Floor, Philadelphia, PA 19102.

1

3. Defendant, Philadelphia Airport, a/k/a Philadelphia International Airport, ("PHL") is the primary airport serving Philadelphia, which is owned by the City of Philadelphia. Having its principal place of business at 800 Essington Avenue, Philadelphia, PA 19153.

4. Defendant, Worldwide Flight Services, ("WFS") is a ground handling organization providing cargo, passenger, premium, ramp, baggage, and technical services across a network spanning over 179 locations in more than 22 countries on five continents. Having its principal place of business at Room361 – B151, E. Hangar Road, Cargo Area A, JFK International Airport, Jamaica, NY 11430.

5. Defendant, Frontier Airlines, Inc., ("Frontier") is an American carrier headquartered in Denver, Colorado having its principal place of business at 4545 Airport Way, Denver, CO 80239.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, as Plaintiff's claims arise under the Fourteenth Amendment to the United States Constitution and U.S.C. §1983.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants can be found in, reside, or transact business in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because the event sor omissions giving rise to the claim occurred in this District.

## MATERIAL FACTS

9. On September 28, 2018 Plaintiff was duly qualified as Administrator of the Estate of Aaron Jenkins.

10. Aaron Jenkins ("Decedent") was pronounced dead on May 3, 2018 at Presbyterian Hospital from a stabing.

11. Decedent was a 28-year-old resident of Philadelphia County, residing at 126 West Roselyn Street, Philadelphia, PA 19120.

12. Plaintiff brings this suit as Administrator of the Estate of Aaron Jenkins, as personal representative of Aaron Jenkins.

13. At all times relevant to this cause of action, WFS, Frontier, PHL, and City (collectively referred to as "Defendants"), engaged in business within the Commonwealth of Pennsylvania and the City and County of Philadelphia on a regular, systematic, continuous and substantial basis controlling the operations of the airport.

14. At all times relevant to this cause of action, Plaintiff was an employee of WFS during his employment at PHL in the City of Philadelphia.

15. The City and PHL are responsible for operation and control of the Philadelphia International Airport including but not limited to, issuance of policies, rules and regulations, implementation of security measures and compliance with all federal and local rules.

16. Defendant's Philadelphia International Airport's Rules and Regulations Manual, published under the authority contained in Sections 4-500(c) and 8-407 of the Philadelphia Home Rule Charter, empowers the City of Philadelphia's Department of Commerce to make regulations governing the use and control of the Airport.

17. Since December 2016, the City's Department of Commerce Division of Aviation Rules and Regulations for the airport set forth a prohibition for any person "except duly

3

authorized, active, police officer, federal employees" from possessing firearms and/or other weapons.

18. In support of this prohibition, the City and PHL had a duty to maintain appropriate policies and procedures to ensure compliance with the prohibition of weapons on the airport's property.

19. Upon information and/or belief, during Plaintiff's employment with WFS, it was custom employees of Frontier and WFS to enter Philadelphia International Airport, as well as gate access via the terminals with weapons.

20. In fact, it was widely known amongst WFS' employees and management, that overnight workers would specifically bring weapons to the facility for their travel to and from work.

21. The City and PHL were responsible for managing, coordinating and positioning Transportation Security Administration's ("TSA") officers at appropriate entry points of PHL's terminals.

22. Frontier and WFS' employees and management were aware the City and PHL did not have TSA screening as mandated behind the employee entrances of Terminal E leading to gate access.

23. In addition to TSA, within Terminal E there was the employment of private security to ensure compliance with the weapon prohibition of airport employees.

24. Upon information and belief, defendants City and PHL removed the additional security from the employee access areas of Terminal E.

25. As a result of the custom of allowing individuals into the tarmac and other areas behind Terminal E and the removal of the private security, Plaintiff was exposed to unknown dangers created by the government actors as a violation of the Fourteenth Amendment.

26. Due to Defendants' custom, airport employees bypassed security, and lack thereof, and were permitted to enter the airport and terminals with prohibited weapons.

27. During his employment, employee Kevin Emanuel ("Emanuel") bullied and tormented the Plaintiff with no relief from Defendants.

28. Upon information and/or belief Emanuel had a personal relationship with the human resources manager.

29. As a result of this relationship, previous complaints by Plaintiff and other employees regarding workplace violence were ignored.

30. In fact, there was at least one complaint of a knife being brandished in the breakroom for which WFS management failed to address.

31. On May 3, 2018, consistent with the known custom, Emmanuel entered the premises of Terminal A with no metal screening and/or internal screening carrying a knife approximately 5 – 10 inches long.

32. During his lunch break, he engaged in an argument with Decedent while Decedent was napping during his scheduled break.

33. Based upon their pre-existing history, Decedent attempted to defend himself from Emmanuel and was ultimately stabbed in his leg causing his death.

**COUNT I**
**CIVIL RIGHTS**
**Keisha Brown, as Administrator of The Estate of Aaron Jenkins v. City of Philadelphia and Philadelphia International Airport**

34. The foregoing paragraphs are incorporated herein by reference.

35. Defendant City of Philadelphia is a Municipality that is subject to suit pursuant to 41 U.S.C. §1983.

5

36. Defendant Philadelphia International Airport is a municipal entity that is subject to 41 U.S.C. §1983.

37. Defendants Philadelphia International Airport and City of Philadelphia's constitutional torts are not governed or limited in any way by 41 Pa. C.S.§8541, *et seq.* or 42 Pa. C.S. §8521, *et seq.*

38. Defendants City of Philadelphia and Philadelphia International Airport violated Decedent's due process right to bodily integrity, which is secured by the Fourteenth Amendment to the Constitution of the United States.

39. At all times material hereto, defendants City of Philadelphia and the Philadelphia International Airport acted under color of state law.

40. The specific harm to which defendants City of Philadelphia and the Philadelphia International Airport exposed Decedent to was foreseeable and direct in that they were aware allowing employees within the Terminal with weapons would result in harm including but not limited to death via stabbings.

41. PHL's willful decision to remove private security and TSA security from Terminal E creates a degree of culpability that shocks the conscience in allowing individuals to have private access to Terminal E without proper security measures, including metal detector screening.

42. PHL's custom in allowing individuals to enter Terminal E without any medical detectors or private screening is contrary to the rules and regulations of the Airport, City of Philadelphia and Federal Aviation Administration.

43. The Decedent as an employee of Frontier and WFS was a member of a discrete class of person subjected to the potential harm brough about by the Defendants City and PHL.

6

44. As a member of this class, Decedent held a special relationship with the City of Philadelphia and the Philadelphia International Airport as he was an employee that used the employee access of Terminal E.

45. PHL affirmatively removed TSA and/or private screening measures for employees within Terminal E in a way that created a danger to Decedent.

46. PHL and the City of Philadelphia's actions constitute a "state-created danger," rendering them liable to Plaintiff for violation of Decedent's civil rights.

47. Despite their awareness of the risk of weapons within the airport by individuals not being screened, policymakers within the City of Philadelphia and the Philadelphia International Airport, deliberately chose not to train their employees and/or agents including Frontier, regarding policies for screening for weapons or acquiesced in a longstanding practice or custom of inaction in this regard.

48. Despite their awareness of the risk of weapons being brought onto the airport without metal detector screening, policy makers within Defendant City of Philadelphia and Philadelphia International Airport deliberately chose not to supervise their employees and/or agents including Frontier regarding policies for screening of weapons or acquiesced in a longstanding practice or custom of inaction in this regard.

49. The Constitutional rights violated by defendants City of Philadelphia and the Philadelphia International Airport consisted of liberty, privacy, and bodily integrity.

50. Defendants City of Philadelphia and the Philadelphia International Airport acted intentionally or with deliberate indifference to the rights of Decedent.

51. As a direct result of the actions of defendants as set forth above, Decedent was caused to suffer the injuries set forth in paragraph 30.

*WHEREFORE*, Plaintiff prays this Honorable Court to enter judgment in his favor, and against the Defendants, and award the following relief:

a.  Actual, special, compensatory, incidental, consequential, and punitive damages in an amount to be determined at trial;

b.  Cost of suit in an amount to be determined at trial; and,

c.  Such additional or further relief as the interest of justice may require

## COUNT II
### Negligence - Premises Liability
**Keisha Brown, as Administrator of The Estate of Aaron Jenkins v. Worldwide Flight Services and Frontier Airlines**

52. The foregoing paragraphs are incorporated herein by reference.

53. PHL entered Into an use and lease agreement with Frontier for the use of lease space within Terminal E of the airport on/or about November 30, 2015.

54. Within the lease agreement for the premises at Terminal E, Frontier was obligated to exercise reasonable control over the conduct, demeanor and appearance of its employees, agents and representatives, contractors, suppliers, vendors, service providers and officers in an orderly and proper manner so as not to harass, irritate, disturb or be offensive to the public and at all times act in accordance with the Rules and Regulations and Airport Security Program.

55. WFS entered Into an agreement with Frontier, service as the baggage handler and other services for Frontier on/or about May 2018 for Terminal E.

56.  Decedent was an employee of WFS.

57. Under personal animus or third-party attack exception to Workers' Compensation Act's exclusivity provision, the exclusivity provision does not preclude damage recoveries by

employee based upon employer negligence in maintaining safe workplace if such negligence is associated with injuries inflicted by coworker for purely personal reasons. 77 P.S. §§ 411(1), 481.

58. Decedent was attacked during his lunch break while an argument ensued with someone for whom he has had previous negative encounters which had nothing to do with his employment.

59. Based upon their pre-existing relationship along with Emanuel's possession of a knife, Decedent was stabbed In his leg solely because of the two parties argument.

60. A Showing of personal animus is not strictly required to implicate personal animus or third party attack exception to Workers' Compensation Act's exclusivity provision; rather, what is required is a showing that a victim was attacked for purely personal reasons unrelated to employment. 77 P.S. §§ 411(1), 481.

61. As an employee of WFS, Decedent was also a business visitor of Frontier while on the premises of Terminal E.

62. A "business visitor" is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land.

63. The duty of care owed to a business invitee or business visitor is the highest duty owed to any entrant upon land; the landowner must protect the invitee not only against known dangers, but also against those which might be discovered with reasonable care.

64. A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he: (1) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, (2) should expect that they will not discover or realize the danger,

9

or will fail to protect themselves against it, and (3) fails to exercise reasonable care to protect them against the danger.

65. Based on Defendants' conduct, they failed to ensure Jenkins' safety at his place of employment by; (1) failing to ensure there were security checkpoints for visitors at PHL; (2) failing to ensure there were security checkpoints for airport staff at PHL; (3) failing to investigate the lack of safety of the employees after Defendants were put on notice prohibited weapons were entering PHL; (4) failing to train and supervise employees on PHL security policies; and (5) failing to protect Decedent from the injury he endured at Defendants' facility resulting in his death by his coworker.

66. Defendant had a duty to act reasonable and use due care while Decedent was an employee at PHL. Defendant breached that duty of due care and acted negligently and/or carelessly, and/or recklessly and/or in reckless disregard to Plaintiff by:

    a. Failing to ensure that there were security checkpoints for visitors at PHL.

    b. Failing to ensure that there were security checkpoints for airport staff at PHL.

    c. Failing to investigate the safety of the employees after Defendants were put on notice that weapons were entering PHL.

    d. Failing to supervise employees.

    e. Failing to protect Plaintiff from the injury he endured at Defendants' facility.

67. As a direct and proximate result of the negligence of Defendants, Plaintiff, was caused to suffer from the stab which led his death.

68. All of the above damages were directly and proximately caused by the aforementioned negligence of Defendants.

WHEREFORE, the Plaintiff prays this Honorable Court to enter judgment in his favor, and against

the Defendant, and award the following relief:

a. Actual, special, compensatory, incidental, consequential, and punitive damages;

b. Cost of suit and attorney's fees; and,

c. Such additional or further relief as the interest of justice may require.

## COUNT IV
### Wrongful Death
### Keisha Brown, as Administrator of The Estate of Aaron Jenkins v. Defendants

69. All preceding paragraphs of this Complaint are incorporate herein by reference.

70. Plaintiff brings this action as the Administrator of the Estate of Aaron Jenkins, on behalf of those entitled by law to recover for his wrongful death, under and by virtue of 42 Pa. C.S.A. § 8301, et seq., commonly known as the Pennsylvania Wrongful Death Act.

71. No action for damages was brought by Decedent during his lifetime as a result of the claims at issue in this case.

72. Plaintiff claims damages for the pecuniary loss suffered by Plaintiff's beneficiaries by reason of his death.

73. Plaintiff claims damages resulting from the deprivation of comfort, aid, assistance and society, and the loss of the guidance and tutelage to Jenkin's family due to his death.

*WHEREFORE*, the Plaintiff prays this Honorable Court to enter judgment in his favor, and against Defendants, and award the following relief:

f. Actual, special, compensatory, incidental, consequential, and punitive damages;

g. Cost of suit and attorney's fees; and,

h. Such additional or further relief as the interest of justice may require.

## COUNT V
### SURVIVAL ACT
### Keisha Brown, as Administrator of The Estate of Aaron Jenkins v. Defendants

74. All preceding paragraphs of this Complaint are incorporated herein by reference.

75. Plaintiff also brings this action under and by virtue of 42 Pa. C.S.A. § 8302, et seq., commonly known as the Pennsylvania Survival Act.

76. The Estate of Aaron Jenkins claims damages for pain and suffering undergone by the decedent as of a result of the Defendant's negligence, up to and including the time of death, and damages for the net amount that Decedent would have earned from the date of his death to the end of his life expectancy.

*WHEREFORE*, the Plaintiff prays this Honorable Court to enter judgment in his favor, and against the Defendant, and award the following relief:

    i.   Actual, special, compensatory, incidental, consequential, and punitive damages;

    j.   Cost of suit and attorney's fees; and,

    k.   Such additional or further relief as the interest of justice may require.

MFI LAW GROUP, PLLC

By: _____

    Mu'min F. Islam, Esquire
    7433 Limekiln Pike, Ste. 210
    Philadelphia, PA, 19138
    Email: mislam@mfilawgroup.com
    *Attorney for Plaintiff*

Date: November 26, 2020

MFI Law Group, PLLC
By: Mu'min Islam, Esquire
Identification No.: 208979

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **KEISHA BROWN, As Administratix** | : | |
| **of the Estate of Aaron Jenkins** | : | |
| *Plaintiff,* | : | **Case No. 2:20-cv-05532-CMR** |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| **CITY OF PHILADELPHIA** | : | |
| 1515 Arch Street, 14th Floor | : | |
| Philadelphia, PA 19102 | : | |
| and | : | |
| | : | |
| **PHILADELPHIA AIRPORT** | : | |
| a/k/a Philadelphia International Airport | : | |
| 800 Essington Avenue | : | |
| Philadelphia, PA 19153 | : | |
| and | : | |
| | : | |
| **Worldwide Flight Services, Inc**. | : | |
| Room361 – B151, E. Hangar Road | : | |
| Cargo Area A, JFK International Airport | : | |
| Jamaica, NY 11430 | : | |
| | : | |
| and | : | |
| | : | |
| **Frontier Airlines** | : | |
| 4545 Airport Way | : | |
| Denver, CO 80239 | : | |
| *Defendant.* | : | |
| | : | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the Plaintiff's Complaint was filed and served to:

City of Philadelphia
1515 Arch Street, 14th Floor
Philadelphia, PA 19102


PHILADELPHIA AIRPORT
a/k/a Philadelphia International Airport
800 Essington Avenue
Philadelphia, PA 19153


Worldwide Flight Services, Inc.
Room361 – B151, E. Hangar Road

13

Cargo Area A, JFK International Airport
Jamaica, NY 11430

Frontier Airlines
4545 Airport Way
Denver, CO 80239

Respectfully,
**MFI Law Group, PLLC**

BY: _____
Mu'min F. Islam, Esq.
*Attorney for Plaintiff*, Estate of Aaron Jenkins

Date: November 26, 2020

14

# EXHIBIT "B"

**AIRPORT-AIRLINE USE AND LEASE AGREEMENT**

**by and between**

**City of Philadelphia, Pennsylvania**

**AND**

**Frontier Airlines, Inc.**

FINAL

# CONTENTS

| Article | | Page |
|---|---|---|
| Article 1 | DEFINITIONS | 3 |
| Article 2 | TERM.. | 17 |
| Article 3 | RIGHTS AND OBLIGATIONS | 18 |
| Article 4 | PREMISES. | 27 |
| Article 5 | BOND DOCUMENTS AND FLOW OF FUNDS | 42 |
| Article 6 | RATES, FEES AND CHARGES | 46 |
| Article 7 | ADJUSTMENT OF RATES, FEES AND CHARGES | 51 |
| Article 8 | CAPITAL EXPENDITURES | 60 |
| Article 9 | ALTERATIONS, IMPROVEMENTS AND EQUIPMENT | 65 |
| Article 10 | ASSIGNMENT, SUBLEASE AND TRANSFER OF SPACE | 67 |
| Article 11 | DEFAULT AND RIGHTS AND REMEDIES UPON DEFAULT | 70 |
| Article 12 | DAMAGE OR DESTRUCTION | 75 |
| Article 13 | ENVIRONMENTAL MATTERS | 77 |
| Article 14 | INSURANCE AND INDEMNIFICATION | 89 |
| Article 15 | NON-DISCRIMINATION | 96 |
| Article 16 | MISCELLANEOUS PROVISIONS | 98 |

**EXHIBITS**

**Exhibit**

Exhibit A          —          Reserved

Exhibit B          —          Airline's Leased Premises

Exhibit C          —          Airline Space

Exhibit D          —          Airport Cost Centers; Airport Layout Plan; Northeast Philadelphia Airport

Exhibit E-1        —          Approved Capital Improvement Program – Projects Approved Prior to the Effective Date

Exhibit E-2        —          Approved Capital Improvement Program – Projects Approved on or after the Effective Date

Exhibit F          —          City and Airline Maintenance Responsibilities for Terminal Area and Ramp Area

Exhibit F-1        —          Minimum Maintenance Standards

Exhibit G          —          Illustrative Calculation of Annual Rates and Charges

Exhibit G-1        —          Illustrative Calculation of Annual Tenant Surcharges for Proprietary Equipment

Exhibit H          —          Sample Form of Monthly Activity Reports

**AIRPORT- AIRLINE USE AND LEASE AGREEMENT**
**Philadelphia International Airport**
**City of Philadelphia, Pennsylvania**

**THIS AIRPORT-AIRLINE USE AND LEASE AGREEMENT**, (hereinafter referred to as "Agreement") made and entered into on the dates designated on the signature pages hereof, effective however on the 1st day of July, 2015, by and between City of Philadelphia (hereinafter referred to as "City") a municipal corporation of the Commonwealth of Pennsylvania and City of the First Class, acting by and through its Department of Commerce, Division of Aviation, which operates the Philadelphia International Airport (hereinafter referred to as "Airport)" and Frontier Airlines, Inc. (hereinafter referred to as "Airline"), a corporation organized and existing under and by virtue of the laws of the State of Colorado, and registered to do business in the Commonwealth of Pennsylvania, appearing herein through its duly authorized representative;

**RECITALS:**

**WHEREAS,** City is the owner and operator of the Airport, located in City of Philadelphia and Delaware County, Commonwealth of Pennsylvania; and

**WHEREAS,** City manages and operates the Airport for the promotion, accommodation and development of air commerce and air transportation between the Philadelphia area and other cities of the United States and cities of other nations of the world; and

**WHEREAS,** Airline is engaged in the business of commercial air transportation of persons, property, cargo, and/or mail and is authorized by the United States of America government to engage in such commercial air transportation business; and

**WHEREAS,** Airline desires to obtain certain rights, services and privileges in connection with the use of the Airport and its facilities, and City is willing to grant and lease the same to Airline upon the terms and conditions hereinafter set forth; and

**WHEREAS,** Airline has met City's minimum qualifications for entering into this Agreement, which include (a) having Scheduled Service at the Airport, (b) not having any undisputed past due debts (including pre-petition and post-petition debts if Airline is in bankruptcy) under any lease or contract with City when this Agreement is executed by City, (c) not being currently in default under any lease or contract with City when this Agreement is executed by City, and (d) obtaining bankruptcy court approval to execute this Agreement by filing a motion in a form approved by City if Airline is in bankruptcy before this Agreement is executed by City, if necessary.

**NOW THEREFORE,** for and in consideration of the mutual covenants and agreements contained herein, City does hereby demise and let unto Airline, and Airline does hereby use or lease from City certain areas of the Airport and agrees to pay certain rates and charges, in accordance with the terms and conditions agreed to herein and City through and on behalf of City does hereby grant unto Airline, its employees, passengers, guests, patrons and invitees (in common with other duly authorized users) the right to use the Airport together with the appurtenances, facilities, improvements, equipment and services

which have been or may hereafter be provided for common use at or in connection with City through and on behalf of City in accordance with the terms and conditions mutually agreed to herein.

**Article 1**

**DEFINITIONS**

**1.01.    Definitions.**

The following words and phrases, wherever used in this Agreement, shall, for the purpose of this Agreement, have the following meanings:

1.        **"Active Loading"** shall mean that period of time that commences (i) 30 minutes prior to the scheduled departure time, for an aircraft with less than 100 seats, (ii) 60 minutes prior to the scheduled departure time, for an aircraft with a number of seats between 100 and 200 or (iii) 90 minutes prior to the scheduled departure time, for an aircraft with more than 200 seats and that expires 15 minutes after the scheduled departure time of the aircraft.

2.        **"Active Unloading"** shall mean that period of time that commences 15 minutes prior to the scheduled arrival time of an aircraft and expires (i) 30 minutes after the scheduled arrival time, for an aircraft with less than 100 seats, (ii) 60 minutes after the scheduled arrival time, for an aircraft with a number of seats between 100 and 200, or (iii) 90 minutes after the scheduled arrival time, for an aircraft with more than 200 seats.

3.        **"Activity Report"** or **"Supplemental Activity Report"** shall mean those reports required to be submitted by Airline to City within ten (10) days following the end of each calendar month in a form acceptable to City setting forth aircraft and passenger activity and other statistical information reasonably required by City related to Airline's operations at the Airport in the form of Exhibit H attached hereto, as may be modified from time to time by the City, without amendment to this Agreement.

4.        **"Additional Rents"** shall mean Landing Fees, Ground Handling Fees, International Common Use Fees, FIS Area Fees, Domestic Common Use Terminal Area Rates and Fees and any other rental, concession or fee required to be paid together with an Activity Report for each calendar month during the term of this Agreement.

5.        **"Affiliate"** shall mean any Air Transportation Company that is either a Subsidiary Airline or operates under essentially the same trade name as Airline at the Airport and uses essentially the same livery as Airline and which has executed an Operating License.  Airline and any Affiliate shall be counted as one entity for the purposes of computing any Joint Use Formula, MII formulas and Minimum Use Requirement.

6.        **"Agreement"** shall mean this Airline-Airport Use and Lease Agreement between Airline and City as it may be amended, supplemented or modified from time to time, pursuant to the terms of this Agreement and in accordance with City law.

7.        **"Air Transportation Business"** shall mean the carriage by aircraft of persons, cargo or property as a common airline for compensation or hire, or the carriage of mail, by aircraft, in commerce as defined in the Federal Aviation Act of 1958, as amended.

4

8.      **"Air Transportation Company"** shall mean an entity conducting an Air Transportation Business at the Airport.

9.      **"Aircraft Parking and Storage Areas"** shall mean those portions of the Airfield Area, that are designated by the Chief Executive Officer for the parking and storage of aircraft and aircraft support vehicles, and, if necessary, the loading and unloading of aircraft, which areas are subject to change from time to time.

10.     **"Airfield Area Requirement"** shall mean that amount calculated per Section 7.04.B hereof.

11.     **"Airline"** shall mean the individual Air Transportation Company that is a party to this Agreement.

12.     **"Airline Cost Centers"** shall mean (i) the Airfield Area Cost Center, (ii) the Terminal Area Cost Center; (iii) the Ramp Area Cost Center, (iv) the Other Buildings and Areas Cost Center, (v) the Northeast Philadelphia Airport Cost Center, and (vi) any other Airline Cost Center created pursuant to this Agreement.

13.     **"Airline Equipment"** shall mean those moveable trade fixtures, furniture and equipment located on or affixed to Airline's Leased Premises, or elsewhere at the Airport, purchased and/or constructed at the sole cost and expense of Airline which are considered the personal property of Airline.

14.     **"Airline Improvements"** shall mean those fixtures and construction related additions, modifications and improvements located on or affixed to Airline's Leased Premises, or elsewhere at the Airport, which have been purchased and/or constructed at the sole cost and expense of Airline.

15.     **"Airline's Leased Premises"** shall mean the areas of Airline Space, that are directly leased to Airline hereunder, together with Airline's Ramp Premises as set forth in Exhibit B attached to this Agreement, as such Exhibit B may be modified from time to time by the parties without amendment to this Agreement.

16.     **"Airline's Preferential Use Premises"** shall mean that portion of Airline's Leased Premises which Airline has Preferential Use of under this Agreement: such as ticket counters, holdrooms, associated Airline's Ramp Premises for aircraft parking, and associated boarding bridge(s), including all fixtures and equipment located thereon (that are not Airline Equipment)

17.     **"Airline's Ramp Premises"** shall mean that portion of the Ramp Area from the face of the terminal building in the Terminal Area to the aircraft parking restriction line ("Aircraft Parking Restriction Line" or "APRL") as set forth in Exhibit B, and that is leased specifically to Airline for its Preferential Use.  Unless specifically stated otherwise, "Airline's Preferential Use Premises" shall be deemed to include "Airline's Ramp Premises".

18.     **"Airline Revenues"** shall mean all Rents, Additional Rents, fees and other operating revenues paid by Signatory Airlines and their Affiliates in the Airline Cost Centers under this Agreement.

19.     **"Airline Revenue Allocation"** shall mean an amount determined by City in accordance with Section 5.06.C.

20.     **"Airline's Terminal Area Leased Premises"** shall mean the total square footage in the Terminal Area attributable to an individual Signatory Airline in any given Fiscal Year during the term of the Agreement, which is the sum of the Airline's Exclusive Use, Preferential Use, and Joint Use Space.

21.     **"Airline Space"** shall mean Exclusive Use Space, Preferential Use Space, Joint Use Space, and International Common Use Areas in the Terminal Area leased to any Airline, as shown on Exhibit C, as same may be modified from time to time by the parties without formal amendment hereto.

22.     **"Airport"** shall mean the Philadelphia International Airport, together with any modifications thereto.

23.     **"Airport Cost Centers"** or **"Cost Centers"** shall mean collectively the following cost centers, as illustrated on Exhibit D and as the same may hereafter be amended from time to time.  Such Airport Cost Centers shall be used for purposes of accounting for Airport Revenues and Airport Expenses and for calculating and adjusting certain rentals, fees and charges as specified in this Agreement:

A.     **"Airfield Area"** or **"Airfield Area Cost Center"** shall include all existing and future City owned and operated airfield areas at the Airport, specifically:

1.     The areas of the Airport comprising hard surface and grass areas within the airfield perimeter fence, reserved for aircraft operations and aircraft-related activities, including but not limited to areas provided for aircraft landing, taking-off, taxiing, safety overruns and parking, as designated from time to time;  and

2.     Other appurtenances on the Airport related to the aeronautical use of the Airport, including but not limited to City-owned or controlled easement areas designated as approach and transition zones, obstacle-free areas, clear zones, avigation areas or other easements, including any property purchased for direct aviation operations purposes including noise mitigation purposes, as they now exist or may be developed, extended or improved from time to time.  The Airfield Area shall exclude any property owned or purchased for purposes other than direct aviation operations.

B.     **"Terminal Area"** or **"Terminal Area Cost Center"** shall include the Airport passenger terminal buildings, including the areas available for use as baggage make-up, the sidewalk and curb adjacent to the landside of the terminal buildings, the boarding bridges and all pedestrian bridges connecting the terminal buildings with the landside vehicular parking garages, as such areas now exist or may be developed, extended or improved from time to time.

C.     **"Ramp Area"** or **"Ramp Area Cost Center"** shall mean those outside airport operations areas of the Airport designated for the Terminal Area consisting of the aircraft parking positions, ramp space and canopy space (and including any other equipment located on the Ramp Area that are owned by City and provided for the use by Air Transportation Companies) that extend from the face of the Terminal Area to the outer limits of the vehicle service road to the South, bordering the fence line on the West, and to the taxilane object free area to the Northeast  (as shown on Exhibit D), as may be subject to change from time to time.

D.    **"Other Buildings and Areas"** or **"Other Buildings and Areas Cost Center"** shall include those Airport facilities including but not limited to:  airline, general aviation and corporate hangars; commissary; fueling facilities; industrial facilities, airline freight, express and mail handling facilities; the former hangars, renovated and improved by City in 1972 and the north and south international terminal aprons associated with the area formerly known as the Overseas Terminal; and certain non-airline facilities (including office, retail, warehouses, etc.) including any property purchased for indirect aviation purposes, such as concurrent commercial development as they now exist or may be developed, demolished, extended, expanded or improved from time to time.

E.    **"Northeast Philadelphia Airport"** or **"Northeast Philadelphia Airport Cost Center"** shall include the airport facilities operated by the Division of Aviation located in the northeast portion of City as it now exists or may be developed, extended or improved from time to time.

F.    **"Outside Terminal Area"** or **"Outside Terminal Area Cost Center"** shall include the roadway, hotel, service station, vehicular parking and car rental facilities appurtenant, adjacent to or used in connection with the Airport as they now exist or may be developed, extended, or improved from time to time.

G.    **"Airport Services"** or **"Airport Services Cost Center"** shall include the Airport Expenses and Airport Revenues associated with the operation of the Airport System or any part thereof, which are not directly accounted for in the Airfield Area, Terminal Areas, Outside Terminal Area, Other Buildings and Areas, Northeast Philadelphia Airport, and Ramp Area Cost Centers.

H.    Cost Center(s) may be added or redefined during the term of this Agreement to accommodate changes in operation or new facilities or services only by approval by a majority of Signatory Airlines with a majority of landed weight.

24.    **"Airport Expenses"** shall mean the Operating Expenses, Debt Service, and Fund Requirements associated with the operation of the Airport System or any part thereof for any Fiscal Year.

25.    **"Airport Revenues"** shall mean Project Revenues as set forth in the Bond Ordinance.

26.    **"Airport System"** shall mean the Philadelphia International Airport and the Northeast Philadelphia Airport.

27.    **"ALP"** or **"Airport Layout Plan"** shall mean the currently FAA approved layout plan for the Airport depicting the physical characteristics of the Airport and identifying the location and configuration of current runways, taxiways, buildings, roadways, utilities, navaids and other improvements, as shown on Exhibit D attached hereto and as may be subject to change from time to time.  When appropriate, ALP shall also include the physical layout of the Northeast Philadelphia Airport, as may be subject to change from time to time.

28. **"Annual Budget"** shall mean the capital and operating budget and annual rates and charges report of the Airport System, prepared and adopted by City for each Fiscal Year during the term of this Agreement.

29. **"Approved Capital Improvement Program"** or **"Approved CIP"** shall mean those Capital Improvement Projects shown on Exhibit E-1 and Exhibit E-2.

30. **"Bonds"** shall have the meaning as set forth in the Bond Ordinance.

31. **"Bond Documents"** shall mean those contracts, agreements, certificates, resolutions or other materials, ancillary to and including the Bond Ordinance, evidencing the issuance of Bonds.

32. **"Bond Ordinance"** shall mean the Amended and Restated General Airport Revenue Bond Ordinance, executed June 16, 1995, as amended and supplemented, and any ordinance or resolution of City regulating or authorizing the issuance of Bonds, payable from Airport Revenues.

33. **"Bond Redemption and Improvement Account"** shall mean an account established by City pursuant to this Agreement to provide for the purposes specified in Article 5 herein.  The Bond Redemption and Improvement Account will be maintained from the sources and according to the schedule set forth in Article 5.

34. **"Bond Redemption and Improvement Requirement"** shall mean the amount required to be deposited in the Bond Redemption and Improvement Account in each Fiscal Year for the Term of this Agreement determined by City as set forth in Section 5.06.A.

35. **"Calendar Year"** shall mean the twelve (12) month period commencing on January 1st of each year.

36. **"Capital Expenditure"** shall mean:  (i) a single item of equipment, vehicles, non-recurring capital outlays, and other items of personal property purchased, leased or constructed at a cost to City, net of PFC, AIP, Federal, State, or City's Discretionary Account funds, in excess of five hundred thousand dollars ($500,000), which City determines to have a useful life in excess of five (5) years, which, along with all other  equipment, vehicles, non-recurring capital outlays, and other items of personal property exceed an aggregate net cost of five million dollars ($5,000,000) in any Fiscal Year or (ii) any other Capital Improvement Project(s) purchased, leased, or constructed at an aggregate cost to City, net of PFC, AIP, Federal, State, or City's Discretionary Account funds, in excess of one million two hundred fifty thousand dollars ($1,250,000) in any Fiscal Year, which City determines to have a useful life of more than five (5) years.

37. **"Capital Improvement Project"** shall mean a project under which an asset is purchased, leased or constructed by City for the Airport System which City determines to have a useful life of more than five (5) years and a capital cost of more than $10,000.

38. **"Cargo Air Transportation Company"** shall mean an entity engaged in the Air Transportation Business of transporting property or cargo by air, but not passengers at the Airport.

39.     **"Category Terminal Rental Rates"** shall mean those rental rates established for Airline Space classified according to Types of Space by location and function as calculated in accordance with Article 7 hereof.

40.      **"Chief Executive Officer"** shall mean the Chief Executive Officer of Aviation of City's Division of Aviation or his successor in functions

41.     **"City"** shall mean City of Philadelphia in the Commonwealth of Pennsylvania, a municipal corporation of the Commonwealth of Pennsylvania and City of the First Class, acting by and through its Department of Commerce, Division of Aviation.

42.     **"City Revenue Allocation"** shall mean the formula as set forth in Article 5.

43.     **"Code"** shall mean the Internal Revenue Code of 1986, as amended, supplemented, or replaced, and the regulations and rulings issued thereunder.

44.     **"Debt Service"** shall mean Debt Service Requirements;  the debt service requirements, net of interest earnings, if any, of any outstanding General Obligation Bonds (including General Obligation Bonds that have not been adjudged to be self-sustaining on the basis of expected Project Revenues) issued for improvements to the Airport System; the debt service requirements of any outstanding Subordinate Obligations and any other subordinate indebtedness secured by Amounts Available for Debt Service; and amounts required to repay any loans among the Aviation Capital Fund, the Renewal Fund, and the Aviation Operating Fund made pursuant to Section 4.05(c) of the Bond Ordinance.

45.     **"Debt Service Requirements"** shall have the meaning as set forth in the Bond Ordinance.

46.     **"Default Rate"** shall mean five percent (5%) plus the Prime Rate.

47.     **"Deplaned Passenger"** shall mean any passenger, including any non-revenue passenger but excluding the flight crew, disembarking from an aircraft at the Airport, even if such passenger subsequently departs from the Airport on another aircraft of the same or a different Passenger Air Transportation Company.  Where Deplaned Passenger data are used to calculate Rents, the number of Deplaned Passengers for the most recent complete Calendar Year shall be used.

48.     **"Discretionary Account"** shall mean an account established by this Agreement and funded with City Revenue Allocation or other sources, reflecting funds available for City's use in its sole discretion for any lawful Airport System purpose.

49.     **"Division of Aviation"** shall mean that operating agency of City directly responsible for the operation, management, maintenance, improvement, repair and administration of the Airport System, or such other duties and responsibilities as directed by City or any successor division or department charged by law with such responsibility.

50.     **"Domestic Common Use Gates"** shall mean any City controlled gates not directly leased to an individual airline on a preferential basis, for which City reserves for the flexible and temporary use of any Air Transportation Company.  Domestic Common Use Gates shall include the associated Ramp Area and all equipment necessary to operate from the gates, including loading bridges,

ground power units and potable water supply (that are not the property of Airline or any other Air Transportation Company).

51.     **"Domestic Common Use Gate Fee"** shall mean those rates, fees and charges established by City for any given Fiscal Year, as set forth in the Rules and Regulations for Signatory Airlines and Affiliates utilizing a Domestic Common Use Gate.

52.     **"Domestic Common Use Terminal Area"** shall mean that portion of the General Terminal Areas within the Terminal Area that could be directly leased to an individual airline on a preferential basis, but are available for use for individual flights or other limited use upon agreement by City, and include but are not limited to, Domestic Common Use Gates and Domestic Common Use Ticket Counters.

53.     **"Domestic Common Use Ticket Counters"** shall mean any ticket counter not directly leased to an individual airline on a preferential basis, for which City reserves for the flexible and/or temporary use of any Air Transportation Company.  Domestic Common Use Ticket Counters shall include the associated back office, baggage make up areas and baggage conveyors.

54.     **"Domestic Common Use Ticket Counter Fee"** shall mean those rates, fees and charges paid per Turnaround Use for any given Fiscal Year as set forth in the Rules and Regulations, established by City for Signatory Airlines and Affiliates utilizing Domestic Common Use Ticket Counters.

55.     **"Effective Date"** shall mean July 1, 2015.

56.     **"Eligible"** shall mean an entity for which there is no uncured Event of Default under the terms of this Agreement.

57.     **"Enplaned Passenger"** shall mean any passenger, including any non-revenue passenger but excluding the flight crew, boarding an aircraft at the Airport, even if such passenger previously disembarked from a different aircraft of the same or a different Passenger Air Transportation Company.  Unless established otherwise where Enplaned Passenger data are used to calculate Rents, the number of Enplaned Passengers is for the most recent complete Calendar Year for which data is available.

58.     **"Event of Default"** shall include those occurrences, actions or inactions as set forth in Article 11 of this Agreement.

59.     **"Exclusive Use Space"** shall mean that portion of Airline Space which Airline has exclusive use of under this Agreement; including generally but not limited to, ticket counter offices, airline operations space, airline office support, baggage claim offices, and airline lounges.

60.     **"FAA"** shall mean the Federal Aviation Administration, or its authorized successor(s).

61.     **"Fiscal Year"** shall mean the twelve-month period commencing on July 1st of each year, or such other twelve-month period as may be established by City from time to time.

62.     **"Fueling Services"** shall mean the transportation, sale, delivery, dispensing, storage, or draining of fuel or fuel waste products to or from aircraft, vehicles or equipment in the Airport System.

63. **"Fund Requirements"** shall mean the amount, if any, required to be paid into the Sinking Fund Reserve Account or Renewal Fund; any amounts required to be paid under Exchange Agreements; the Bond Redemption and Improvement Requirement; and the O&M Requirement.

64. **"Gate Position"** shall mean passenger gate(s) in the Terminal Area and Ramp Area, including a holdroom and loading bridge (if any), and all fixtures, furnishings and equipment located thereon, or appurtenant thereto that are reasonably necessary for flight operations.

65. **"General Terminal Areas"** shall mean those areas of the Terminal Area Cost Center including (i) those occupied or designated as space for any Division of Aviation or City function; (ii) Public Areas; (iii) those used by City to support the operations of the Airport System,  including, but not limited to, utility rooms, ductways, janitorial rooms and closets, telephone rooms, and other such areas as designated by City; (iv) Domestic Common Use Terminal Areas and (v) those designated by City and leased directly to concessionaires or other non-Air Transportation Company tenants within the Terminal Area Cost Center.

66. **"Gross Receipts"** shall mean the total amount received or realized by or accruing to Airline from all Ground Handling Services authorized by this Agreement rendered by Airline to an Air Transportation Company other than Airline, Airline's Affiliates and other Signatory Airlines at or from the Airport.  The amount due Airline at the time of each transaction, whether for cash or credit, shall be used to determine Gross Receipts and not the amount due at the time of billing or payment, unless otherwise specifically stated in this Agreement; provided, however, that any taxes imposed by law and the Ground Handling Fee which are separately stated and paid by the customer to Airline, which are directly payable to the taxing authority or to City by Airline, shall be excluded from Gross Receipts.

67. **"Ground Handling Fees"** shall mean payments received by City from Air Transportation Company(ies) or service providers authorized at the Airport  to provide Ground Handling Services.

68. **"Ground Handling Services"** shall mean services provided to Air Transportation Companies to include, but not necessarily be limited to, Fueling Services; loading and unloading of passengers, baggage and freight into aircraft; providing passenger service agents; assisting in processing of passengers and crews; furnishing and operating ground support equipment in support of aircraft operations; aircraft cleaning and lavatory service activities; deicing; and aircraft maintenance activities.

69. **"International Common Use Areas"** shall mean the International Common Use Ticket Counter Areas, the International Common Use Enplaning Areas, the International Common Use Deplaning Areas and the FIS Areas as identified on Exhibit C attached to this Agreement, as Exhibit C may be modified from time to time without amendment to this Agreement.

70. **"International Common Use Area Revenue"** shall mean the aggregate of all International Common Use Ticket Counter Area, International Common Use Enplaning Area, International Common Use Deplaning Area and FIS Area Fees received by City from each and every Air Transportation Company for use of the International Common Use Area for any given Fiscal Year.

71. **"Joint Use Space"** shall mean those portions of Airline Space which are used jointly by one or more Airlines and is apportioned to Airline based on the Joint Use Formula; including generally but

FINAL

not limited to, baggage claim areas, baggage makeup areas, inbound baggage areas, cart tunnel area, and baggage recheck areas.

72. **"Joint Use Formula"** shall mean the formula used to prorate a specified square footage for an area within Joint Use Space on the basis of twenty percent (20%) of the square footage divided equally among all such Signatory Airlines using such area. The remaining eighty percent (80%) of the square footage shall be apportioned among all such Signatory Airlines using such area based upon the ratio of the number of Enplaned Passengers of each Signatory Airline, its Affiliate(s) and those Non-Signatory Airline(s) that operate from each Signatory Airline's Leased Premises under City-approved subleases or ground handling agreements, to the total number of Enplaned Passengers of all such Signatory Airlines, their Affiliate(s), and Non-Signatory Airline(s) that operate from such Signatory Airlines' Leased Premises under City-approved subleases or ground handling agreements using such area, during the most recently reported twelve (12) month period for which such information is available.

73. **"Landing Fees"** shall mean those fees, calculated by multiplying the Landing Fee Rate by the Maximum Landed Weight (1,000 lb. units) established to pay the Airfield Area Cost Center Requirement.

74. **"Landing Fee Rate"** shall mean a rate calculated by dividing the Airfield Area Requirement by the aggregate Maximum Landed Weight (1,000 lb. units) of the Signatory Airlines and Affiliates for any given Fiscal Year.

75. **"Leased Premises Terminal Area"** shall mean the aggregate of all Airline's Leased Premises (except the Airline's Ramp Premises) as set forth in Exhibit B attached to this Agreement, as same may be modified from time to time.

76. **"Majority in Interest"** or **"MII"** shall mean the mechanism by which the Signatory Airlines may disapprove a Capital Expenditure, as set forth in Article 8.

77. **"Majority in Interest Formula"** or **"MII Formula"** shall mean the formulas as set forth in Article 8.

78. **"Maximum Landed Weight"** shall mean the maximum certificated gross landed weight in one thousand pound units, as stated in the flight operations manual of each aircraft operated at the Airport by an Air Transportation Company.

79. **"Minimum Use Requirement"** shall mean the continuous scheduling of that number of flight operations at the Airport in the Official Airline Guide publication or its successor publication by a Signatory Passenger Airline combined with its Affiliate(s) and/or Air Transportation Companies operating from the Airline's Leased Premises under City-approved subleases or ground handling agreements equal to an average of at least four and one-quarter (4.25) jet aircraft daily departures for the aggregate Gate Positions, as applicable, determined using the weighted formula set forth in Section 4.12.

80. **"Monthly Rents"** shall mean payments of one-twelfth (1/12) of the total annual Rent associated with Airline's Leased Premises and one-twelfth (1/12) of any other Rents that City may determine during the Term of this Agreement to be paid on a monthly basis.

81.    **"Non-Airline Revenues"** shall mean all rentals, charges, fees, ground handling fees, user charges, concession and other operating revenues received by or on behalf of City from the operation of the Airline Cost Centers or any part thereof; but excluding however, all Airline Revenues, and also excluding all gifts, grants, reimbursements, restricted funds or payments received from governmental units or public agencies or any other source, passenger facility charges, customer facility charges, and federal, state or City subsidies or incentives deposited in the Aviation Capital Fund.

82.    **"Non-Signatory Airline"** shall mean any Air Transportation Company that has not entered into an agreement substantially similar to this Agreement with City.  Such Non-Signatory Airlines, (excluding Affiliates of Signatory Airlines that have executed an Operating License), are charged a fifteen percent (15%) premium on all rates and charges as set forth by City from time to time, and do not have all of the same rights and privileges afforded to a Signatory Airline or Affiliates.  No MII voting rights are available to Non-Signatory Airlines.

83.    **"Non-Signatory Landing Fee Rate"** shall mean a rate that includes a fifteen percent (15%) premium over the Landing Fee Rate for any given Fiscal Year.

84.    **"Operating Expenses"** shall have the meaning as set forth in the Bond Ordinance. Operating Expenses allocable to the Airport Services Cost Center shall be allocated to the other Cost Centers (Airfield Area, Terminal Area, Ramp Area, Other Buildings and Areas, Northeast Philadelphia Airport and Outside Terminal Area) fifty percent (50%) based on each such Cost Center's proportionate share of the Operating Expenses of the Airport directly allocated to such Cost Center, and fifty percent (50%) based on each such Cost Center's proportionate share of Non-Airline Revenues.

85.    **"Operating License"** shall mean the contract for the conduct of commercial flight operations at the Airport that has been executed by City and an Air Transportation Company.

86.    **"Operation and Maintenance Account"** or **"O&M Account"** shall mean a fund established by City for the necessary expenses for the maintenance, operation, repairs and ordinary replacement and reconstruction of the Airport to the extent that other funding allocated for Operating Expenses in the Annual Budget is not sufficient for such purposes.

87.    **"O&M Requirement"** shall mean an amount not to exceed one million dollars ($1,000,000) per Fiscal Year, as same may be allocated to a particular Cost Center, to be deposited in the O&M Account to maintain a balance equal to ten percent (10%) of Operating Expenses as set forth in Section 5.06.B.

88.    **"Other Fees"** shall mean those fees and charges imposed by City and paid by Air Transportation Companies for certain uses and operations at the Airport, including, but not limited to Tenant Surcharges for Proprietary Equipment as set forth in the Rules and Regulations, or as imposed pursuant to this Agreement, and any applicable federal, state or local law, regulation, ordinance, statute or directive.

89.    **"Passenger Air Transportation Company"** shall mean an entity engaged in or desiring to engage in the Air Transportation Business at the Airport primarily for the carriage of persons.

90.     **"PFC"** shall mean federally approved Passenger Facility Charges or passenger facility fees, as authorized by 49 USC App. Section 1513 and regulated by 14 CFR Part 158, as such statute and regulation currently exist or as they may be amended during the term of Agreement.

91.     **"Preferential Use"** shall mean a right or use having priority, but not exclusivity, over a use by other Passenger Air Transportation Companies.

92.     **"Preferential Use Space"** shall mean that portion of Airline Space which Airline has Preferential Use of under this Agreement, including ticket counters, holdrooms, and associated boarding bridge(s), including all fixtures and equipment located thereon (that are not Airline Equipment).

93.     **"Prime Rate"** shall mean the prime rate as published in the Wall Street Journal as being the base rate on corporate loans posted by at least seventy five percent (75%) of the Nation's thirty largest banks.

94.     **"Project Revenues"** or **"Airport Revenues"** shall mean Project Revenues as specifically defined in the Bond Ordinance.

95.     **"Proprietary Equipment"** shall mean those moveable or permanent fixtures, furniture and equipment located on or affixed to Airline's Leased Premises, or elsewhere at the Airport, purchased and/or constructed at the cost and expense of City which are made available for use by Airline and subject to the Tenant Surcharge for Proprietary Equipment, if any, as set forth in a separate written agreement between City and Airline.

96.     **"Public Areas"** shall mean those areas of the Terminal Area designated by City for the public ingress and egress of the Airport's customers, passengers, employees and tenants within the Terminal Area including public circulation areas, restrooms, stairwells, and elevators.

97.     **"Ramp Area Premises"** shall mean that square footage of the Ramp Area (in the aggregate) attributable to either the Signatory Airlines' Ramp Premises leased specifically to the Signatory Airlines for their Preferential Use or the International Common Use Areas measured from the face of the building to the aircraft parking limit line, as further described in Exhibit B, as may be subject to change from time to time.

98.     **"Ramp Area Premises Rate"** shall mean that rate for any given Fiscal Year per linear foot of the Aircraft Parking Restriction Line, to be paid by Signatory Airlines for  the length of the Aircraft Parking Restriction Line in each respective Signatory Airline's Ramp Premises for any given Fiscal Year, calculated in accordance with Section 7.03.C.

99.     **"Ramp Area Rentals"** shall mean those rentals, fees and charges calculated in accordance with Section 7.03, established to pay the Ramp Area Requirement for any given Fiscal Year.

100.    **"Ramp Area Requirement"** shall mean that amount determined by City for any given Fiscal Year calculated in accordance with Section 7.03.B.

101.    **"Regional Aircraft"** shall mean aircraft with fewer than fifty-one (51) seats.

102.    **"Rents"** shall mean all Terminal Rentals, Ramp Area Rentals, Other Fees, other rents, charges, fines, costs, reimbursements, penalties, taxes, late charges, liquidated damages, and interest of all types and of all nature that Airline is required to pay pursuant to this Agreement.

103.    **"Rental Car Concession Fees"** shall mean those fees imposed under City's ground transportation regulation that corresponds to either a percentage of a car rental company's gross revenues or any minimum annual guarantee, as applicable.

104.    **"Requesting Air Transportation Company"** shall mean an Air Transportation Company requesting accommodation on the Airline's Preferential Use Premises and the same with respect to other Signatory Passenger Airlines as set forth in Section 4.11.

105.    **"Revenue Aircraft Arrival"** shall mean any passenger aircraft arrival at the Airport for which Airline has received or made a monetary fee or charge, including but not limited to, scheduled trips and charters, sightseeing and other trips for which revenue is received, but excluding, without limitation, ferry, test, courtesy, and inspection or other trips for which there is no fee or charge.  Training flights shall be excluded from Revenue Aircraft Arrivals, except to the extent that the number of training flights operated by Airline during any Fiscal Year exceeds five (5) per Fiscal Year.  Flights which are diverted to the Airport because of mechanical, meteorological or other causes shall be considered the same as a Revenue Aircraft Arrival, except that if a revenue flight is required to return to the Airport because of such mechanical, meteorological or other precautionary reasons, such arrival shall not be considered a Revenue Aircraft Arrival.

106.    **"Rules and Regulations"** shall mean those rules and regulations promulgated by City for the use of the Airport, including but not limited to Airport Rates and Charges Regulation for the Use of Facilities at Philadelphia International Airport and Northeast Philadelphia Airport, as the same may be amended, modified or supplemented from time to time by City.

107.    **"Scheduled Service"** shall mean the scheduled flights of a Signatory Airline and/or in combination with its Affiliates as applicable, at the Airport as published in the Official Airline Guide or successor publication referenced and used by City of at least two (2) flights, or one (1) round trip, a week at the Airport on the same day or days of the week for eight (8) or more weeks within the immediately preceding ninety (90) consecutive day period.

108.    **"Signatory Airline"** shall mean an Air Transportation Company which has no uncured default under any agreement with City; and the following:

Domestic Airline must also (i) execute the Airline-Airport Use and Lease Agreement, (ii) if operating four or fewer daily departures, must lease of minimum of 150 square feet of Airline Space, (iii) if operating more than four daily departures, may be required to lease at least one gate preferentially, and (iv) must lease space directly from the Airport.

International Airline must also (i) execute the Airline-Airport Use and Lease Agreement, (ii) must lease a minimum of 150 square feet of Airline Space, and (iii) must operate regularly Scheduled Service.

Cargo Airline must also (i) execute the Airline-Airport Use and Lease Agreement and (ii) must operate regularly Scheduled Service.

When used in plural, this term means the collective group of Signatory Airlines. Signatory Airlines include Signatory Passenger Airlines and Signatory Cargo Airlines.

109.     **"Signatory Cargo Airline"** shall mean a Cargo Air Transportation Company that is a Signatory Airline.

110.     **"Signatory Passenger Airline"** shall mean a Passenger Air Transportation Company that is a Signatory Airline.

111.     **"State"** shall mean Commonwealth of Pennsylvania.

112.     **"Substantial Completion Date"** shall mean the earlier of (i) the date that a Capital Improvement is ready to be used for its intended purpose or (ii) the date of the completion of the capitalized interest period for any Bonds related to the Capital Expenditure, as determined by City.

113.     **"Subsidiary Airline"** shall mean any Air Transportation Company that is a directly or indirectly wholly-owned subsidiary of Airline or of Airline's parent company.

114.     **"Terminal Area Requirement"** shall mean that amount each Fiscal Year determined as set forth in Section 7.02.B.

115.     **"Terminal Rentals"** shall mean those rentals, fees and charges, calculated in accordance with Section 7.02, established to pay the Terminal Area Requirement for any given Fiscal Year.

116.     **"Tenant Surcharge for Proprietary Equipment"** shall mean that amount to be paid by Air Transportation Company(ies) as determined by the City annually in the manner illustrated in Exhibit G-1, for the use and maintenance of Proprietary Equipment, for which the Air Transportation Company(ies) would otherwise be responsible for providing at its (their) own expense for its (their) use.

117.     **"Ticket Counter Positions"** shall mean a ticket counter area, including the associated back office, baggage make-up areas and baggage conveyors.

118.     **"Total Maximum Landed Weight"** shall mean the sum of the maximum gross certificated landed weight in 1,000 lb. units of all Signatory Airlines and Affiliates over a stated period of time.

119.     **"Total Passengers"** shall mean all Enplaned Passengers and Deplaned Passengers at the Airport.

120.     **"TSA"** shall mean the Transportation Security Administration or its authorized successor(s).

121.    **"Types of Space"** shall mean the classification of the square footage attributable to the Airline Space in any given Fiscal Year for the purpose of establishing Category Terminal Rental Rates, as set forth in Section 7.02.C.

122.    **"Turnaround Use"** shall mean that each aircraft arrival and departure or other utilization of a Gate Position by an Air Transportation Company for a turnaround aircraft operation not to exceed one hundred eighty (180) minutes, consistent with the definitions of Active Loading and Active Unloading.

**1.02**.    **Other Terms.**

Any terms not specifically defined in this Agreement as follows shall have the meaning as set forth in the Bond Ordinance if related thereto.

**Article 2**

**TERM**

**2.01     Pre-Condition for Effective Agreement**

This Agreement shall be effective only if executed by Airlines having at least 50% of Total Maximum Landed Weight in Calendar Year 2014.  The Effective Date of this Agreement shall commence on July 1, 2015.

**2.02     Term**

This Agreement shall become effective on July 1, 2015 and shall continue in effect through June 30, 2020.

**2.03     Extension of Agreement**

The City may, by giving notice no later than December 1, 2019, offer a one-year extension of the Term. Acceptance of the extension requires assent by a majority of the airlines using the same method for determining a majority as set forth in Section 8.06.A.2.  If Airline assent is not given by December 31, 2019, the offer will be deemed rejected.  If the offer is accepted, the City may propose a second one-year extension of the Term using the same procedure as for the initial one-year extension except that the offer deadline will be December 1, 2020, and the acceptance deadline December 31, 2020.

**2.04.    Surrender of Airline's Leased Premises**

At the expiration of the Term of this Agreement, or at the earlier termination of the letting thereof, Airline will quit and surrender its Airline's Leased Premises in good state and condition, reasonable wear and tear excepted, and Airline shall remove therefrom all Airline Equipment, trade fixtures and personal property belonging to Airline.   Such Airline's Leased Premises and all structures, foundations, and improvements placed thereon by Airline, and which, by and under the terms of this Agreement are to remain on such Airline's Leased Premises as the property of City, shall be in good usable order and condition, with allowance for reasonable wear and tear and damage by the elements, and City shall have the right on such termination, to enter upon and take possession of such Airline's Leased Premises.  All other Airline Equipment, trade fixtures and personal property belonging to Airline shall be removed from said Airline's Leased Premises on or before the time of the expiration or earlier termination of the letting and the Airline's Leased Premises restored to the condition existing at the time of the letting, reasonable wear and tear excepted, unless City and Airline agree in writing at the time of such installation or not less than thirty (30) days in advance of such expiration or such earlier termination, with respect to City's acceptance of title to such other Airline Equipment, trade fixtures and personal property of Airline in lieu of restoration of the Airline's Leased Premises.  All Airline Equipment shall be removed within forty-five (45) days of the time of the expiration or earlier termination of the letting and the Airline's Leased Premises or other such time as shall be mutually agreed to by City and Airline.

**Article 3**

**RIGHTS AND OBLIGATIONS**

**3.01.    Rights of Airline**

  **A.    Airline's Air Transportation Business.**  The rights granted hereunder are in addition to all rights elsewhere granted in this Agreement and relate to the conduct of Airline's Air Transportation Business at the Airport.  Airline shall have the right, at its own cost and expense, and in common with others as may be so authorized by City, to:

    **1.    Air Transportation.**  Operate an Air Transportation Business at the Airport, including all activities reasonably necessary for such operation.

    **2.    Airport Use.**  Use facilities, equipment and improvements at the Airport for the operation of Airline's Air Transportation Business.

    **3.    Aircraft Operations.**  Land, take-off, load, unload, repair, condition, service, park and store aircraft or other equipment, in areas designated by City; provided, however, that Airline shall not use Terminal Areas including the Ramp Area to load or unload all-cargo aircraft unless otherwise authorized in writing by City.

    **4.    Aircraft Maintenance.**  Service aircraft or equipment operated by Airline with line maintenance or materials or supplies at City-designated locations.

    **5.    Conveyance Rights.** Sell tickets, document shipments, handle reservations, and load and unload persons, property, cargo and/or mail at the Airport by using motor vehicles or such other means of conveyance as Airline may desire or require in the operation of its Air Transportation Business, which means of conveyance is subject to the approval of City through and on behalf of City.

    **6.    Procurement.**  Purchase, either on or off the Airport, Airline's requirements of gasoline, fuel, lubricating oil, grease, food and other passenger supplies, and any other materials and supplies, from any person or company of Airline's choice, and the right to make arrangements with any person or company of Airline's choice for work to be done for Airline, subject, however, to City's right to require such person or company to enter into a contract or secure a permit and/or license to conduct such business at the Airport and subject to such person's or company's compliance with applicable federal, local and State security requirements.

    **7.    Aircraft Testing.**  Test aircraft and other equipment being utilized at the Airport in the operation of Airline's Air Transportation Business; provided, however, that said testing shall be incidental to the use of the Airport in the operation by Airline of its Air Transportation Business and shall not unreasonably hamper or interfere with the use of the Airport and its facilities by others entitled to the use of same.  City reserves the right to restrict or prohibit such testing operations which it deems to interfere with the use of the Airport, including excessive noise as reasonably determined by City.

8.      **Signage.**  Install and maintain identifying signs at the Airport, the general type, design and location of which shall be subject to the Airport permit processes and the prior approval of City, which approval shall be at the sole discretion of City.  The general type, design and location of such signs shall be compatible with and not detract from the pattern and décor of the Terminal Area.

9.      **Communication Devices.**  Install, maintain and operate such electronic or electrical devices, radio, communication, meteorological and aerial navigation equipment and facilities in, on and about the Airport as may be necessary or convenient in the opinion of Airline for its operations; provided that the location and nature of such devices, equipment and facilities shall be subject to the prior approval of City and shall not unreasonably hamper or interfere with the use of the Airport and its facilities by others entitled to the use of same.  City reserves the right to restrict or prohibit such electronic or electrical devices, radio, communication, meteorological and aerial navigation equipment and facilities which it deems will interfere with the use of the Airport.

10.     **Hire and Train.**  Hire and train, on the Airport, personnel in the employ of, or to be employed by Airline or any other Air Transportation Company, provided that such right shall not be construed as authorizing the conduct of a separate business by Airline, but shall permit Airline to perform such functions as are incidental to the conduct of its Air Transportation Business.

11.     **Ingress and Egress.**  Ingress to and egress from the Airport and Airline's Leased Premises, Public Areas and common use areas for Airline's officers, employees, agents, subcontractors and invitees, including, but not limited to, passengers, suppliers of materials, and furnishers of services, aircraft equipment, vehicles, machinery and other property.  Such right shall be subject to Federal Aviation Regulations (FAR) Part 107, 49 CFR Part 1542 and any successor regulations, applicable laws, and City's right in accordance with applicable law to establish reasonable and not unjustly discriminatory Rules and Regulations; provided, however, that any such Rules and Regulations of Airport shall not unreasonably interfere with the operation of Airline's Air Transportation Business.  As set forth in Article 9, City may at any time temporarily or permanently close or re-route any roadway, door, passageway or other access to the Airline's Leased Premises or to the Airport, so long as a means of ingress and egress reasonably equivalent is concurrently made available to Airline.  Airline hereby releases and discharges City through and on behalf of City from any and all claims, demands, or causes of action which Airline may now or at any time hereafter have arising or alleged to arise out of such a closing or re-routing.

12.     **Vending Machines.**  Airline may install a limited number of soft drink vending machines and snack vending machines, subject to the prior approval of City, in non-public Airline's Leased Premises for the exclusive use of Airline's employees and agents.

13.     **Food Service.**  Subject to any restrictions in City's existing agreement(s) with its food and beverage service provider(s); (i) provide under a separate contract with City through and on behalf of City for its own flight kitchen, (ii) serve food or beverages to its passengers and crews for consumption aboard its aircraft, except that no such food or beverages may be sold by Airline in the Terminal Area or elsewhere at the Airport without the prior approval of City.  If in-

flight food or beverages are supplied to Airline by an off-Airport caterer or supplier, or other Air Transportation Company, or concessionaires other than City's on-Airport food and beverage service provider(s), City shall require such off-Airport caterer or supplier, or other Air Transportation Company, to pay a fee at a rate not to exceed the rate that would be payable to City for comparable deliveries made on the Airport by City's on-Airport food and beverage service provider, as such rate may be amended from time to time.

     **14.**    **Porter/Skycap.**   Provide either alone or in conjunction with other Air Transportation Companies or through a sub-contractor, porter/skycap service for the convenience of the public.

     **15.**    **Wireless Applications and Similar Technology.**  To the extent not pre-empted by Federal Communications Commission rulings and regulations, Airline will not install, deploy or otherwise engage in the use of any new transmitting wireless device, application and/or technologies on its Airline's Leased Premises, any portion of the Airport or within the Airport System without having first obtained the prior approval of the Division of Aviation. Such wireless applications shall only be for Airline's operational use. All wireless applications used by Airline as of the date of this Agreement are deemed approved. At the request of the Division of Aviation, Airline will cease operation of a particular device due to interference with another transmitting device of City, Division of Aviation, emergency services, and/or other already approved wireless device. City reserves the right to impose a fee for the use of such wireless equipment and/or to charge for any space required for the installation of such equipment, as additional rentals payable under this Agreement, for the use of such area. Airline shall not have any right to install any type of wireless device, application and/or technology at the Airport for commercial and/or revenue generating purposes, if the wireless application is the same as that falling within a City concession agreement.

     **16.**    **Airline Equipment.**  Install such personal property, including instant ticketing machines, furniture, furnishings, supplies, machinery, and equipment, in Airline's Leased Premises as Airline may deem necessary, useful or prudent for the operation of its Air Transportation Business, subject to City's prior approval. Title to such personal property shall remain with Airline, subject to the provisions of this Agreement, or as may be otherwise provided by law. Airline will not install, deploy or otherwise engage in the use of any self-service check-in kiosks and/or device, applications and/or technologies on its Airline's Leased Premises or any portion of the Airport without having first obtained the prior approval of the Division of Aviation. Airline shall also have the right, subject to a Tenant Surcharge for Proprietary Equipment as set forth in a separate written agreement to use City owned fixtures, furniture and equipment at the Airport.

     **17.**    **Airline Improvements.**  Construct such modifications, finishes and improvements in its Airline's Leased Premises as Airline may deem necessary or prudent for the operation of its Air Transportation Business, subject to City's prior approval.

     **18.**    **Telephone and ATM.**  Airline shall not provide nor enter into any agreements providing for pay telephones or wireless cell phone connectivity for the public anywhere at the Airport. Airline may not install cash machines (ATMs), sell merchandise or operate any other sort of retail business at the Airport without the prior approval of City.

19.      **Airline Lounges.**  Airline shall have the right, subject to the prior approval of City, to construct and maintain an airline lounge included in Airline's Leased Premises.  Upon entering into a separate agreement with City, Airline may engage in the sale of food and/or beverages to passengers and guests in such airline lounge.  Such agreement shall include a fee to be paid to City which shall not be less than the current concession fee paid by the food and/or beverage concessionaire(s), and shall be paid in addition to the Rent for the Terminal Area space occupied by such airline lounge.  No fee to City will be applicable to the free distribution of beverages and/or food consumed within the Airline lounge.  Notwithstanding the foregoing, Airline shall not be required to pay a concession fee to City on account of food or beverages, including alcoholic beverages, purchased directly from any of the food and/or beverage concessionaires at the Airport who are already paying a concession fee on such products.

20.      **Public Facilities.**  Airline shall have the right to use public Airport facilities in common with others authorized to do so, in accordance with the laws of the United States of America, the Commonwealth of Pennsylvania, the City and the Airport, and the Rules and Regulations.

21.      **Concessionaire Fees.**  Nothing in this Agreement shall prohibit City from charging Airline the standard rates charged to concessionaires in connection with the sale by Airline to others of food, beverages or other items normally sold by concessionaires or the rendering by Airline for compensation of services normally rendered by concessionaires.  To the extent that Airline competes with the concessionaire of City, City shall not be deprived of concession revenue by such competition.

B.      **Airline to Service Others.**  The rights and privileges granted to Airline pursuant to this Article 3 may be exercised on behalf of Airline by other Signatory Airlines or contractors authorized by City to provide such services at the Airport, subject to the prior approval of City and further subject to all laws of the United States of America, the Commonwealth of Pennsylvania, the City and the Airport's Rules and Regulations, and other fees and charges as may be applicable to the activities undertaken.

C.      **Rights Extended to Others.**  Airline may exercise on behalf of any other Air Transportation Company any of the rights granted Airline herein, so long as Airline is currently exercising those same rights in the operation of Airline's own Air Transportation Business at the Airport, subject to all laws, ground handling agreements, Rules and Regulations, and other fees and charges as may be applicable to the activities undertaken.

D.      **Limitation to Air Transportation Business.**  Nothing in this Agreement shall be construed as authorizing Airline to conduct any business separate and apart from the conduct of its Air Transportation Business.

E.      **Rights Reserved for City.**  Any and all rights and privileges not specifically granted to Airline for its use of and operations at the Airport pursuant to this Agreement are hereby reserved for and to City.

**3.02.** **Ground Handling Services**

    **A.** **Notice.** In the event Airline agrees to provide Ground Handling Services to any portion of the on-Airport operations of another Air Transportation Company, except any Airline, Affiliate(s) or City-approved sublessee of Airline, Airline shall provide City thirty (30) days' advance notice of such proposed activities, including, but not limited to, the following:

        **1.** A description of the type and extent of services to be provided;

        **2.** The Air Transportation Company to whom the services are to be provided; and

        **3.** The aircraft gates, holdrooms and other facilities that will be involved in the Ground Handling Services and the charges therefor. All such services shall occur within the Airline's Leased Premises, the leased premises of the Air Transportation Company to be ground handled, or at such other locations as may be designated by City.

Such Ground Handling Services arrangement shall be reduced to writing and is subject to the prior approval of City. City approval shall be dependent upon Airline charging reasonable fees for ground handling services.

    **B.** **Ground Handling Fee.** Airline shall pay City a nondiscriminatory Ground Handling Fee of ten percent (10%) of Ground Handling Gross Receipts, based on the Gross Receipts derived by Airline for providing such services to Air Transportation Companies, other than for services provided to any Signatory Airline, Affiliate or City-approved sublessee of Airline, whether collected or uncollected.

    **C.** **Third Party Airline Service Providers.** City reserves the right to establish the total number of third party airline service companies operating at the Airport. Nothing herein shall restrict City to any specific limitation whatsoever based on either a total number of providers or based on a specific type of service. In addition, nothing in this Section 3.02.C shall limit or restrict the right of Airline to provide Ground Handling Services to any Affiliate of Airline or Air Transportation Company under a City-approved sublease or ground-handling agreement with Airline.

**3.03.** **Obligations of Airline**

In addition to the obligations as set forth elsewhere in this Agreement, the following obligations shall apply to Airline at the Airport.

    **A.** **Compliance with Insurance.** Airline shall comply with the requirements of all insurance companies having policies of public liability, fire and other insurance in force covering the Airline's Leased Premises and any other areas and facilities used by Airline of which Airline has received notice.

    **B.** **ALP Compliance.** Airline will comply with any City limitations or restricted uses of the Airfield Area by any aircraft operated and controlled by Airline which exceeds the design strength or capability of the Airfield Area as described in the current FAA approved ALP, as amended, or other engineering evaluations performed subsequent to the approval of the current ALP, including the current airport certification manual as required by the FAA.

**C.      Mechanics' Liens.**   Although prohibited by law, if any mechanics' liens or other liens or orders for the payment of money shall be filed in a court of competent jurisdiction against the Airport property or any improvements thereon or against Airline by reason of, or arising out of, any labor or materials furnished or alleged to have been furnished or to be furnished to Airline in connection with any work of construction, alteration, repair or demolition to all or any part of the Airport property by Airline, Airline shall cause the same to be canceled and discharged of record by bond approved by the court or as otherwise permitted by such court in which the claim is filed, at the expense of Airline.

**D.      Utilities.**   Airline shall not knowingly interfere or permit interference with the use, operation or maintenance of the Airport, including but not limited to, the effectiveness or accessibility of the drainage, sewage, water, communications and fire protection, utility, electrical, security or other systems installed or located from time to time at the Airport.

**E.      Leased Premises Condition.**   Airline shall have the responsibility for maintenance, cleaning and operations established pursuant to Exhibit F, as may be amended, supplemented or modified from time to time by the parties.   In addition, Airline shall preserve, maintain and keep its Airline's Leased Premises in an orderly, clean, neat, and sanitary condition free from fuel, oil, trash, debris and other foreign objects in each case resulting from Airline's operations.   In the event the City and the Airline agree that Airline will maintain Proprietary Equipment, Airline agrees to conduct maintenance in accordance with the Minimum Maintenance Standards pursuant to Exhibit F-1, as agreed upon by the parties.

**F.      Operation of Equipment.**   In addition to its other responsibilities for maintenance, cleaning and operation pursuant to Exhibit F, as may be amended, supplemented or modified from time to time by the parties, Airline shall safely operate equipment, including Proprietary Equipment and specifically including City or Airline-owned loading/boarding bridges, if any, located on the Airline's Ramp Premises.

**G.      Professional Operations.**   Airline shall conduct its Air Transportation Business using best management practices consistent with industry standards, including (i) manage passenger check-in lines in compliance with applicable fire codes and regulations, (ii) accurately and timely input flight information into multi-use flight information display (MUFIDS) and baggage information display (BIDS), (iii) notify City at least thirty (30) days in advance of planned schedule changes, including but not limited to equipment changes, flight times, and number of flights and (iv) notify City of disruptions and operational or equipment changes that will impact City.

**H.      Non-Disturbance and Conduct of Employees.**   Airline shall require all of its agents, employees, contractors, subcontractors, suppliers, service providers, vendors or officers hired by Airline working in view of the public and about the Terminal Area to wear clean and neat attire and to display appropriate identification.   Airline will, in and about the Airport and its Airline's Leased Premises, exercise reasonable control over the conduct, demeanor and appearance of its employees, agents and representatives, contractors, suppliers, vendors, service providers and officers in an orderly and proper manner so as not to harass, irritate, disturb or be offensive to the public and at all times act in accordance with the Rules and Regulations and Airport Security Program.   Upon objection from City to Airline concerning the conduct, demeanor or appearance of such persons, Airline will, within a reasonable time, remedy the cause of the objection.

**I.**     **Obstructions.**   Airline shall not construct anything unless authorized by City.   No Improvement that has been authorized by City shall be deemed an obstruction.   Any obstructions erected by Airline shall be removed by Airline at its expense, if requested by City or required by the FAA.   Airline agrees not to increase the height of any structure or objects or to permit the growth of plantings of any kind or nature whatsoever that would interfere with the line of sight between the Airport's control tower and the ramp towers and the operations controlled therefrom.   Airline further agrees not to install any structures, objects, machinery or equipment that would interfere with operation of navigation aids or would interfere with the safe and efficient operation of the Airport.

**J.**     **Antennae.**   Airline shall not install antennae at the Airport without City's prior approval. Airline shall comply with the regulations, directives and requirements of City as to the placement, erection, repair and maintenance of each outside antenna that Airline erects at the Airport and shall pay all fees and privilege charges associated therewith.

**K.**     **Subsidiary Airline Obligations.**   Any and all of the obligations of Airline set forth in this Agreement shall apply to any Subsidiary Airline conducting operations at the Airline's Leased Premises and Airline shall ensure compliance by any such Subsidiary Airline.

**L.**     **Airport Terminal Equipment.**   It is understood and agreed that, during the Term of this Agreement, City and Airline will consult on various technological changes that may be implemented by City to alter the handling of passengers, baggage, and cargo in and about the Airport and the Signatory Airlines' use of and operations at the Airport.   In such event, City and Airline agree to consult as to the applicability and implementation of such technological changes to the Airport and the Signatory Airlines, subject to the provisions outlined in Article 8 of this Agreement.

**3.04     Airport Security Program**

**A.**     **TSA Program.**   In accordance with regulations issued by the FAA, the U.S. Department of Transportation and the U.S. Department of Homeland Security, Transportation Security Administration ("TSA") and found at 49 Code of Federal Regulations ("CFR") Part 1542, airports are required to have TSA-approved security programs.   These programs are designed to control access to certain areas of airports and to control the movement of people and vehicles within those areas.

**B.**     **Airline Compliance.**   City has a TSA-approved security program for the Airport.   Airline must have a security program for the operation of its Air Transportation Business at the Airport at all times during the Term of this Agreement.   At all times during the Term of this Agreement, Airline's security program must be in compliance with 49 CFR Part 1544 or 1546 and all other applicable laws and regulations from time to time enacted or promulgated, must be consistent and compatible in all respect with City's overall security program for the Airport, and must be acceptable to City and the TSA.

**C.**     **Indemnification.**   Airline shall be responsible for any breach of security on the Airline's Leased Premises which occurs as a result of the negligence and/or willful misconduct of Airline, its agents, employees, contractors, subtenants, Affiliates, or invitees, not including passengers, and Airline further agrees to indemnify and hold harmless City from and against any and all damages, penalties, fines, claims and costs resulting directly or indirectly from the breach of Airline's responsibilities, covenants and agreements as set forth in this Section 3.04.C.   City shall provide Airline notice of and consult with Airline regarding any claims that City has knowledge of and are related to Airline.   City shall

defend all alleged security violations.  The indemnification contained in this Section 3.04.C applies to this Section 3.04.C only.

**D.    Confidentiality and Indemnity.**  In connection with its operations, Airline may receive, gain access to or otherwise obtain certain knowledge and information related to City's overall Airport security program.  Airline acknowledges that all such knowledge and information is of a highly confidential nature.   Airline covenants and agrees that no person, whether an employee of Airline or a third party, shall be permitted or gain access to such knowledge and information, unless such person has been approved by City in advance in writing, which approval may be granted or withheld by City in its sole discretion.   Notwithstanding the foregoing, Airline is permitted to direct such security knowledge and information to its employees who require same to conduct Airline's Air Transportation Business or to comply with any law or regulation.  Airline further agrees to indemnify and hold harmless City and other users of the Airport from and against any and all fines, claims, costs, expenses, damages and liabilities, including but not limited to all attorneys' fees and costs, resulting directly or indirectly from the breach of Airline's covenants and agreements as set forth in this Section 3.04.D.  City shall provide Airline notice of any claims that City has knowledge that relate to Airline.  The indemnification contained in this Section 3.04.D applies to this Section 3.04.D only.

**E.    Material Breach.**  Violation of any of the provisions of this Section 3.04 shall be a material breach.  In order to cure a breach under this Section 3.04, Airline shall cooperate with City in all respects reasonably necessary to assist in its defense related thereto in City's sole discretion.

## 3.05    Removal of Aircraft

**A.    Airline Removal.**  As soon as allowed by the appropriate authorities, Airline shall remove any of its disabled aircraft from any parts of the Airport, including, without limitation, runways, taxiways, aprons and Aircraft Parking and Storage Area and shall place any such disabled aircraft only in such storage areas as may be designated by City.  Airline shall store such disabled aircraft only upon such terms and conditions as may be established by City.

**B.    City Removal.**  In the event Airline fails, is unable (due to bankruptcy, strike or any other reason) or elects not to move any aircraft as required, City, to the extent not prohibited by law, may, but shall not be obligated to, cause the removal of such aircraft (after first informing Airline of City's intent to remove such aircraft).  Airline agrees to reimburse City for all of City's actual costs of such removal, plus a fifteen (15%) administrative fee.

## 3.06    Electric Cart Usage

Anything contained in this Agreement to the contrary notwithstanding, City reserves the right to preclude Airline from operating or contracting to operate on its own behalf or in conjunction with other Air Transportation Companies, an electric cart or other motorized vehicle passenger transportation service within the Terminal Area.  City's decision to preclude such operations shall be at the sole discretion of City and City shall have no liability to Airline in conjunction therewith.

**3.07     Obligations of City**

In addition to the obligations as set forth elsewhere in this Agreement, including Exhibit F, as may be amended, supplemented or modified from time to time by the parties, City shall have the obligations set forth below.

**A.     Airport Operation.**   City shall use reasonable efforts to, except as otherwise provided in this Agreement, efficiently maintain and operate the Airport in an orderly, clean, neat, safe and sanitary condition and in a state of reasonably good repair consistent with airports of similar size.  In addition, City will maintain and operate the Airport facilities to conform to the requirements of the FAA, TSA, and other governmental agencies and regulatory authorities having jurisdiction over the Airport.

**B.     Non-Airline Revenues.**   City shall use reasonable efforts to optimize concession and other Non-Airline Revenues at the Airport consistent with its obligations as a City-owned airport operator.

**C.     Airport Approaches.**   City shall use reasonable efforts, to the extent it is legally able so to do, to keep the Airport and its approaches free from obstruction, congestion and interference for the safe, convenient and proper use thereof by Airline.

**D.     Ice and Snow Removal.**   City shall use reasonable efforts to keep the Airport free from ice, snow and other foreign matter which could adversely affect operations in accordance with Exhibit F, City's Snow and Ice Plan and other applicable operational plans, as may be amended from time to time.

**E.     Maintenance of Common Area of Airport and Terminal Area.**   City shall use reasonable efforts to appropriately furnish and maintain in safe condition and good repair all common areas in and about the Airport, which are used by, or made accessible to the public or any Air Transportation Company.   In addition, City shall use reasonable efforts to appropriately furnish and maintain in safe condition and good repair all City owned loading bridges, furniture, carpeting and other equipment or belongings owned by City in the Airline's Leased Premises, and to fulfill its other responsibilities for maintenance and cleaning of the Terminal Area including the Ramp Area, as set forth in Exhibit F, as may be amended, supplemented or modified from time to time by the parties.

**Article 4**

**PREMISES**

**4.01.   Classification of Airline Space**

Airline Space in the Terminal Area will be classified and defined as shown in the following table:

| Airline Space | Space Location/Function | Description/Definition of space |
|---|---|---|
| *Exclusive Use Space* | Ticket Counter Offices | Airline office areas located within the ticketing building that support the passenger check-in function and Airline staff. |
| | Airline Lounge | An area operated by a particular airline offering private meeting rooms, business services, and food and beverage. |
| | Airline Office Support | Airline office support area typically located on the second level of the terminal. |
| | Airline Operations Space | Leased area which includes operations offices, and mechanical/electrical facilities. |
| | Baggage Claim Offices | Airline offices which are located within or adjacent to the baggage claim area. |
| *Preferential Use Space* | Holdroom | A waiting area usually adjacent to a gate, used for assembling departing. |
| | Ticket Counters | Areas in which departing passengers check-in, including E-ticket kiosks. |
| | Ticket Counter Queuing | A 20-foot area in front of the Ticket Counters . |
| *Joint Use Space* | Baggage Claim Area | Area provided in the Terminal Area for the claiming of checked baggage from the airlines by arriving passengers. |
| | Baggage Make-Up Area | A nonpublic area where checked baggage for departing flights is sorted and loaded into containers or onto baggage carts. |

| Airline Space | Space Location/Function | Description/Definition of space |
|---|---|---|
| *Joint Use Space* | Baggage Recheck Area | Area and devices used for the recheck of baggage. |
| | Cart Tunnel Area | Roadway or tunnel area used for tug circulation. |
| | Inbound Baggage | The area where checked baggage from arriving flights is unloaded from baggage containers or baggage carts and placed on conveyor belts for distribution to the baggage claim device. |
| *International Common Use Areas* | International Common Use Deplaning Area | The area equal to one-half of the space designated on Exhibit B for International Common Use Baggage Make-Up Area, Holdroom, and Ramp Premises, including boarding bridges and associated fixtures and equipment located thereon (that are not the property of Airline). |
| | International Common Use Enplaning Area | The area equal to one-half of the space designated on Exhibit B for International Common Use Baggage Make-Up Area, Holdroom, and Ramp Premises, including boarding bridges and associated fixtures and equipment located thereon (that are not the property of Airline). |
| | International Common Use Ticket Counter Area | The area designated on Exhibit B for International Common Use ticket counter areas and associated fixtures and equipment located thereon (that are not the property of Airline). |
| | International FIS Area (FIS Areas) | The area designated on Exhibit B where international deplaned passengers are processed and collect their checked baggage and the baggage delivery cart movement (Inbound Baggage) associated therewith. More specifically, the area where U.S. Customs and Border Protection Services are conducted, including passport and baggage inspection, collection of duties of certain imported items, and ancillary offices and rooms required to support these services. |

**4.02.    Exclusive Use Space**

Airline will have exclusive use of that portion of Airline's Leased Premises designated as Exclusive Use Space as described in Section 4.01.   Airline's Exclusive Use Space, excluding Airline Lounges, are subject to the change of facility status, relocation and other provisions of this Agreement.

**4.03.    Preferential Use Space**

      **A.    General.**  Airline will have Preferential Use of that portion of Airline's Terminal Area Leased Premises designated as Preferential Use Space as described in Section 4.01.   Airline's Preferential Use Space are subject to the change of facility status, relocation, Active Loading and Active Unloading period requirements and other provisions of this Agreement.

      **B.    Terminal A East.**  In addition, in the event all or some of the Gate Positions of Airline's Preferential Use Space are now or in the future located in that portion of Terminal A East having access to the existing sterile corridor as of the Effective Date, such Gate Positions within Airline's Preferential Use Space and associated Airline's Ramp Premises are subject to the Gate Position reservation to City, as follows:

          **1.**    City hereby reserves and Airline hereby releases from its use and lease the eight (8) hour time frame of 1400 Hours to 2200 Hours on a daily basis on Airline's Gate Positions now located in that portion of Terminal A East having access to the existing sterile corridor as such sterile corridor exists as of the Effective Date and as shown on Exhibit B, hereinafter referred to as a "Gate Reservation".  City shall provide notice to Airline no less than ninety (90) days before any of Airline's Preferential Use Space are to be used in connection with the Gate Reservation.

          **2.**    For the duration of the Gate Reservation, the subject Gate Positions will be designated as International Common Use Areas, and available for use by Air Transportation Companies designated by City consistent with the established international gate use provisions in its operating plan.  Such use of the subject Gate Position shall include rights of ingress and egress and use of appurtenant aircraft support equipment which are reasonably necessary for the effective use of such Gate Position.  Unless otherwise agreed to by Airline, the foregoing shall exclude use of any Airline Equipment, Airline-owned proprietary computers and peripherals and ground support equipment.  City acknowledges and agrees that Airline shall have no liability, including but not limited to custodial responsibilities, related to or arising out of the use by another Air Transportation Company during the Gate Reservation of any Gate Position of Airline subject to the Gate Reservation.  City may require Airline to tow aircraft from the Gate Position during the Gate Reservation time frame.  City shall designate a location at either (i) the Aircraft Parking and Storage Area to which the aircraft is to be towed or (ii) such other area at the Airport to which the aircraft is to be towed and shall not impose a parking or storage fee in connection with such towed aircraft.   City shall also require any Air Transportation Company using the Gate Position during the Gate Reservation time frame to expeditiously remove any aircraft at the end of the Gate Reservation time frame.

          **3.**    In consideration for the Gate Reservation, City hereby agrees to provide Airline a credit of Rents equal to one twenty-fourth (1/24th) of the Rents attributable to the Gate

Positions in Airline's Leased Premises that are subject to the Gate Reservation for each hour included in the Gate Reservation time frame.  Such credit of Rents shall be credited to Airline's Rents each month at or before the date such Rents are due by Airline to City as provided for in this Agreement, so that Airline shall be required to pay only the net amount due each month.   If Airline or its Affiliate(s) use a Gate Position subject to the Gate Reservation for an off-schedule operation during the Gate Reservation, no additional Terminal Rentals shall be incurred by Airline or its Affiliate(s) for such operations.

     **4.**     City hereby reserves the right in City's sole discretion, to enter into a separate written agreement with Airline waiving the Gate Reservation or modifying the hours included in the Gate Reservation on all or some of the Gate Positions in Airline's Leased Premises that are subject to the Gate Reservation.  In the event the Gate Reservation is so waived or modified, the credit of Rents provided for herein will be likewise modified to reflect the actual hours included in the Gate Reservation.

     **5.**     City hereby reserves the right in City's sole discretion to make modifications to any Gate Position subject to a Gate Reservation suitable for the volume and character of air traffic, flight activity, and passenger traffic and that the City deems is necessary or proper to facilitate the use of such Gate Position as an International Common Use Area.  Such modifications may include, but are not necessarily limited to modifications of Gate Position ticket lift counters and equipment, jetbridge adjustments or enhancements, ramp markings and holdroom seating reconfigurations/additions and all cost and expense of such modification shall be borne by City.  City will make a reasonable effort to provide alternative accommodations or mitigate any adverse effects of such Gate Position modification.  Except, in each case, where caused by the gross negligence or willful misconduct of City and their officers, employees and contractors, the Airline agrees that no liability shall attach to such parties by reason of such inconvenience and, for and in further consideration of the use of the Airline's Leased Premises, Airline waives any right to claim damages or other consideration therefore except as set forth in Section 9.01.

## 4.04.   Joint Use Space

     **A.**     **Domestic Baggage Claim Area**.  Airline has the right to use Domestic Baggage Claim Area(s) in conjunction with other Signatory Airlines and Air Transportation Companies as designated by City.

     **B.**     **Domestic Baggage Make-up Area.**  Airline has the right to use Domestic Baggage Make-up Area(s) in conjunction with other Signatory Airlines and Air Transportation Companies as designated by City.

     **C.**     **Cart Tunnel**.  Airline has the right to use the Cart Tunnel Area in conjunction with other Signatory Airlines and Air Transportation Companies as designated by City.

     **D.**     **Baggage Recheck Area.**  Airline has the right to use the Baggage Recheck Area in conjunction with other Signatory Airlines and Air Transportation Companies as designated by City.

**E.      Inbound Baggage Area.**  Airline has the right to use the Inbound Baggage Are in conjunction with other Signatory Airlines and Air Transportation Companies as designated by City.

**4.05.   International Common Use Areas**

Airline may request and City may grant to Airline the right to use International Common Use Areas in conjunction with other Signatory Airlines and Air Transportation Companies designated by City. International Common Use Areas are to be assigned at the discretion of City, consistent with the established international gate use provisions in its operating plan, in its prudent operation of the Airport. Use of the International Common Use Areas must be scheduled with City on a biannual basis or as periodically established.     Signatory Airlines shall have priority use of the International Common Use Areas over Non-Signatory Airlines for the operation of international flights.

**4.06.   General Terminal Areas**

**A.      Terminal Areas Designations.**  All Terminal Areas will be designated as General Terminal Areas until such premises are included in Airline Space.

**B.      Domestic Common Use Terminal Areas.**  Airline may request and City may grant to Airline the right to use Domestic Common Use Terminal Areas in conjunction with other Signatory Airlines and Air Transportation Companies designated by City.  Domestic Common Use Terminal Areas are to be assigned at the sole discretion of City in its prudent operation of the Airport as necessary to achieve a balanced utilization of the Terminal Area.

**1.      Domestic Common Use Gates** may be utilized by an Air Transportation Company on a Turnaround Use basis and must be scheduled with City during the month prior to the month that such Air Transportation Company desires to use the Domestic Common Use Gates.

**2.      Domestic Common Use Ticket Counters** may be utilized by an Air Transportation Company on a Turnaround Use basis and must be scheduled with City during the month prior to the month that such Air Transportation Company desires to use the Domestic Common Use Ticket Counters.

**C.      Public Areas.**  Airline has the right of ingress and egress to the Public Areas and the right to its use in conjunction with its Air Transportation Business at the Airport.

**D.      Other General Terminal Areas.**  City shall at all times manage, direct, control, and where appropriate, enter into contracts and leases in and for the General Terminal Areas.  Airline's rights with respect to the General Terminal Areas are at all times subject to the terms of this Agreement, the Rules and Regulations and the rights and privileges afforded to other Terminal Area tenants under separate leases and contracts.  City shall have the right to restrict Airline's ingress, egress or use of the General Terminal Areas as provided for in this Agreement, subject to Airline's right to use the Public Areas and the Domestic Common Use Terminal Areas as provided for herein and otherwise in the prudent operation of the Airport and sole discretion of City.

**4.07.   Use of Airline's Ramp Area Premises**

   **A.   General.**  Airline shall have Preferential Use of the Airline's Ramp Premises included in Airline's Leased Premises for the loading and unloading of Airline's passenger aircraft, or the passenger aircraft of Airline's Affiliates and Air Transportation Company subtenant(s), and City-approved Air Transportation Company users under an existing ground handling agreement.  Airline's use of said Airline's Ramp Premises shall be limited to (i) the loading and unloading of persons, property, cargo, parcels, mail and in-flight food and related supplies on passenger aircraft, as well as (ii) subject to the provisions of this Agreement the parking, refueling, interior cleaning, and minor mechanical maintenance of Airline's passenger aircraft, and the aircraft of Airline's Affiliate(s), City-approved Air Transportation Company subtenant(s), and City-approved Air Transportation Company users under an existing ground handling agreement.  Unless otherwise approved by City, Airline's right of Preferential Use of the Airline's Ramp Premises shall not include the parking of any aircraft beyond the published size of aircraft approved by City for such area, which aircraft size limitations are subject to change from time to time.

   **B.   Ground Support Equipment Storage.**  Airline shall have the right to stage/store its ground support equipment on the Airline's Ramp Premises in areas designated for such staging/storage by City, subject to the requirement that Airline's ground support equipment may need to be removed from such staging/storage areas at City's request if necessary to accommodate use of such Airline's Preferential Use Premises for another Air Transportation Company's flights pursuant to Section 4.11.

   **C.   Alternate Ramp Premises.**  City may from time to time, following consultation with Airline's local management personnel and taking into consideration Airline's operational needs, temporarily designate suitable alternate areas outside the Airline's Ramp Premises for the loading and unloading of Airline's passenger aircraft and/or the staging/storage of ground support equipment, consistent with City's obligations under Section 4.07 and Article 9.

   **D.   Disabled Equipment.**  Airline shall not store on the Airline's Ramp Premises any damaged equipment, disabled equipment or mechanically non-operable motorized equipment.

   **E.   Maintenance of Airline's Ramp Premises**.  In addition to the other obligations of Airline set forth in this Agreement, with respect to the Airline's Ramp Premises, Airline agrees to the extent reasonably practicable, to abide by Section 13.03 and Section 13.05 and to promptly remove any spilled or deposited petroleum products and the accumulation of oil and grease caused by the aircraft and ground support equipment of Airline, Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements, except those Air Transportation Companies operating on the Airline's Ramp Premises under a City Designated Accommodation per Section 4.11.F, while operating on the Airline's Ramp Premises or elsewhere at the Airport.  Airline shall also maintain the Airline's Ramp Premises of the Airport in a safe, neat, clean and orderly manner and place all trash and debris in proper containers approved by City, until properly disposed of in a manner acceptable to City.

**4.08.   Airport Modifications**

   **A.   General.**  Airport modifications may take place during the Term of this Agreement and City, in its sole discretion, may determine that it is necessary or proper in order to facilitate the planning, design or construction of any such modifications to direct Airline, upon a minimum of one hundred twenty

(120) days advance written notice, to vacate all or a portion of Airline's Leased Premises and to remove and/or relocate any and all improvements authorized hereunder.  City shall use reasonable efforts to provide suitable alternate facilities, if available, for Airline for a period that would complete Airline's then current term under this Agreement.  In the event that City directs Airline to vacate all or a portion of Airline's Leased Premises, Airline shall proceed to perform such work as is necessary.  In the event of relocation, City shall reimburse Airline for reasonable moving expenses.

**B.     Reimbursement for Unamortized Investment.**   In the event that suitable alternate facilities are not available, City shall reimburse Airline for the undepreciated or unamortized (calculated on a straight-line basis) capital cost of any improvements made by Airline in such vacated space (i) for improvements made by Airline during the Term of this Agreement only as documented in City permitting processes or (ii) for improvements made by Airline prior to the Term of this Agreement, only as approved during a Signatory Airline consultation process, as outlined in Article 8 of this Agreement.

**4.09.   City's Right to Enter and Make Repairs**

**A.     City's Right to Enter.**   City and its authorized officers, employees, agents, contractors, subcontractors, and other representatives (including but not limited to the Airport's City Fire Marshall's Office) shall have the right and with as little interruption to Airline's operations as is reasonably practicable, to enter upon Airline's Leased Premises for the following purposes:

**1.     Inspection.**   To inspect such Airline's Leased Premises at reasonable intervals during regular business hours (or at any time in an emergency) to determine whether Airline has complied or is complying, with the terms and conditions of this Agreement.

**2.     Maintenance.**   To perform maintenance and make repairs and replacements where Airline is obligated to do so and has failed after sixty (60) days prior notice to do so (or less in the case of an emergency which Airline fails to immediately address), in which event Airline shall reimburse City for its actual costs, plus a fifteen percent (15%) administrative fee, promptly upon demand.

**3.     Structural Safety.**   To perform maintenance and make repairs and replacements where City is obligated to do so; and in any other case where City, in its reasonable judgment, determines that it is necessary or desirable so to do in order to preserve the structural safety of such Airline's Leased Premises or of the Terminal Area or to correct any condition likely to cause injuries or damages to persons or property.

**4.     Police Power.**   To take necessary action in the exercise of City's police power with respect to Airline's Leased Premises or of the Terminal Area.

**5.     Fire/Life Safety.**   To perform fire/life safety inspections with respect to Airline's Leased Premises or of the Terminal Area where City is obligated to do so.

**6.     Security.**   To take necessary action for security related purposes.

**B.     Non-Interference.**   No such entry by or on behalf of City upon the Airline's Leased Premises of Airline shall cause or constitute a termination of the letting thereof or be deemed to constitute

FINAL

an interference with the possession thereof by Airline.  During any inspection and repairs, City may close doors, entrances, corridors and other facilities, all without any liability to City for inconvenience, interference or annoyance.  Such repairs and replacements shall be made in coordination with Airline to the best extent possible.

**4.10.    Relinquishment of Abandoned Space**

In the event that Airline has abandoned or constructively abandoned a portion of its Airline's Leased Premises, same shall be an Event of Default hereunder.  City may, in addition to the other remedies provided for in this Agreement and after appropriate notice and cure periods provided for in this Agreement, partially terminate this Agreement with respect to, and delete from Airline's Leased Premises hereunder, such abandoned space.  Whether or not all or a portion of the Airline's Leased Premises is abandoned or constructively abandoned shall be determined by City in its discretion but after taking into account planned use by the Airline for such premises and provided that reduced use of the Airline Lease Premises by Airline, Affiliate(s), and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements shall not be considered an abandonment or constructive abandonment.

**4.11.    Accommodation of Requesting Air Transportation Companies**

   **A.    Policy of Open Access.**  City has a policy of providing open access to the Airport and achieving a balanced utilization of the facilities of the Airport.  To achieve that goal, City, as may be modified from time to time and consistent with the provisions of this Agreement: (i) has established Domestic Common Use Terminal Areas; (ii) has established procedures for the consensual reallocation of space and accommodations among Passenger Air Transportation Companies, including Airline; (iii) has reserved to City the right to require temporary use of Airline's Preferential Use Premises; (iv) has established procedures to accommodate requests for facilities by Passenger Air Transportation Companies seeking to expand their present service at the Airport or Passenger Air Transportation Companies seeking entry into the Airport and (v) has established Minimum Use Requirements.

   **B.    Utilization of Facilities during Periods of Operational Inconvenience.**  During periods of operational inconvenience, including but not limited to, weather delays, the temporary non-availability of facilities for maintenance purposes, or aircraft mechanical delays, and when accommodation at Domestic Common Use Gates is not readily available, Airline shall make all reasonable efforts to accommodate other Air Transportation Company's operations on Airline's Preferential Use Premises in such instances.

   **C.    Accommodation Obligation of Airline.**  City is obligated under federal law to provide Airport access to all qualified Air Transportation Companies on reasonable terms and without unjust discrimination.  Airline's Preferential Use Premises may be subject to City's right to accommodate the air services of other Air Transportation Companies at the Airport, including but not limited to air services that enhance competition on routes served by Airline and/or other Air Transportation Companies already operating at the Airport.

   **D.    City's Scheduling Rights.**  In the event that City is unable to reasonably, efficiently, and adequately accommodate the existing or proposed operations of an Air Transportation Company at the Domestic Common Use Terminal Areas and provided that the use by another Air Transportation

FINAL

Company of Airline's Preferential Use Premises will not interfere with the Active Loading and Active Unloading operations by Airline, Affiliate(s), and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements, City has the right to schedule aircraft operations of such other Air Transportation Company at Airline's Preferential Use Premises subject to the provisions of this Section 4.11.  The overnight parking of Airline's aircraft at its Airline's Ramp Premises shall not be deemed Active Loading and Active Unloading or occupation of the Gate Position by Airline.

   **E.**  **Voluntary Accommodation by Signatory Passenger Airlines.** City will notify the Signatory Passenger Airlines of any Requesting Air Transportation Company. The Signatory Passenger Airlines shall make every reasonable effort to accommodate such Requesting Air Transportation Company at times when the use of such Preferential Use facilities shall not interfere with the Active Loading and Active Unloading of Airline, its Affiliate(s), and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements.  City will notify the Signatory Passenger Airlines in writing regarding the request for accommodation, including the specific schedule to be accommodated.   If no Signatory Passenger Airline has responded in writing to City and the Requesting Air Transportation Company within fifteen (15) days of such notification, City and Requesting Air Transportation Company shall proceed to the provisions of Section 4.11.F.

If Airline is able and willing to accommodate the schedule of a Requesting Air Transportation Company on all or a portion of Airline's Preferential Use Premises, a written agreement shall be entered into between Airline and the Requesting Air Transportation Company, prior to the effective date of Requesting Air Transportation Company's operations, subject to the prior review and approval by City.   Such agreement shall be subject to the provisions of Article 10.  Rentals, fees and charges established in the agreement and charged by Airline to the Requesting Air Transportation Company shall not exceed one hundred and fifteen percent (115%) of Airline's pro rata total costs of accommodating Requesting Air Transportation Company.

   **F.**  **City Designated Accommodation.** If the Requesting Air Transportation Company's attempt to obtain voluntary Signatory Passenger Airline accommodation proves unsuccessful as determined by City, City shall serve notice to all Signatory Passenger Airlines of City's intention to make a determination within fifteen (15) days, as to how the Requesting Air Transportation Company can be accommodated on one or more of the Signatory Passenger Airlines' Preferential Leased Premises, either individually or in combination.  At the end of such fifteen (15) day period, City may, subject to Airline's right to Preferential Use thereof, designate all or a specific portion of Airline's Preferential Use Premises as may be required to accommodate or partially accommodate the proposed operations of the Requesting Air Transportation Company, including rights of ingress and egress, the right to use the Airline's Ramp Premises, the loading bridges and other appurtenant aircraft support equipment, which are reasonably necessary for the effective use of such Airline's Preferential Use Premises.  Unless otherwise agreed to by Airline, the foregoing shall exclude any Airline-owned proprietary computers and peripherals and ground support equipment.  Airline shall accommodate such Requesting Air Transportation Company on all or such portion of the Airline's Preferential Use Premises in a commercially reasonable manner taking into account the nature of both Airline and Requesting Air Transportation Company's respective operations, which manner of accommodation shall be subject to the review and approval of City.  City's designation shall set forth the time and date of any aircraft towing requirements of Airline, subject to the provisions of Section 4.11.G.

1.     **City Designated Accommodation - Rights and Provisions.**  If the right to use all or a designated portion of Airline's Preferential Use Premises is granted to a Requesting Air Transportation Company by City, such Requesting Air Transportation Company shall:

     **a.**     **Operating License**. Execute an Operating License or other agreement required by City and agree in writing to indemnify City and Airline, to the extent required of Airline pursuant to the provisions of this Agreement.

     **b.**     **Insurance**.   Furnish a certificate of insurance evidencing types of insurance and with the limits and deductibles required to be carried by Airline hereunder and endorsed to include Airline and City as additional insureds.

     **c.**     **Agreement with and Indemnification of Airline and City**.  During the period of time that such Requesting Air Transportation Company is using Airline's Preferential Use Premises as required by City, Airline's indemnification of City as required herein shall not extend to the use, occupancy and operations of Requesting Air Transportation Company at Airline's Preferential Use Premises pursuant to this Section 4.11, unless damage or injury is caused by Airline, its officers, directors, employees, or agents who have come upon Airline's Preferential Use Premises in connection with Airline's use and occupancy thereof.

2.     **City Designated Accommodation - Rentals and Fees**

     **a.**     In the event that City designates all or a portion of Airline's Preferential Use Premises for the accommodation of a Requesting Air Transportation Company, Airline and the Requesting Air Transportation Company shall have a period of fifteen (15) days to enter into an agreement-in-principle of substantial business terms, including, but not limited to, the effective date of Requesting Air Transportation Company's operations, subject to the prior review and approval by City.  Such agreement shall be subject to the provisions of Article 10.  Rentals, fees and charges established in the agreement and charged by Airline to the Requesting Air Transportation Company shall not exceed one hundred and fifteen percent (115%) of Airline's pro rata total costs of accommodating Requesting Air Transportation Company.

     **b.**     If Airline's and the Requesting Air Transportation Company's attempt to reach agreement pursuant to Section 4.11.F.2.a proves unsuccessful as a consequence of Airline's failure to make a reasonable offer of accommodation, as determined by City, City shall invoice the Requesting Air Transportation Company as if such premises were included in the Domestic Common Use Terminal Areas, subject to the Signatory or Non-Signatory Domestic Common Use Gate Fee, the Domestic Common Use Ticket Counter Fee and/or Other Fees as appropriate.  All rates, fees and charges received by City from such Requesting Air Transportation Company shall be considered and applied as Non-Airline Revenues.

G.      **Aircraft Towing Requirements of Airline**

      1.      **General.**  City may require Airline to tow aircraft from the Ramp Area Premises, if City requires Airline's Preferential Use Gate Positions or Airline's Ramp Premises in order to accommodate operations by a Requesting Air Transportation Company.  City shall designate a location at either (i) the Aircraft Parking and Storage Area to which the aircraft is to be towed or (ii) such other area at the Airport to which the aircraft is to be towed and shall not impose a parking or storage fee in connection with such towed aircraft.  This obligation of Airline to tow any parked aircraft not engaged in an Active Loading or Active Unloading operation shall include, but is not limited to, any parked aircraft remaining over-night.  This towing requirement shall not be invoked by City if the period of time between the completion of the Active Unloading and the commencement of the Active Loading periods is equal to less than ninety (90) minutes.

      2.      **Failure to Tow Aircraft.**  In the event Airline fails to expeditiously remove any aircraft which City has notified Airline to tow under the previous paragraph, as determined by City, then such failure will be an Event of Default hereunder, which shall be curable by Airline towing such said aircraft and thereafter paying the City one thousand ($1,000) dollars for each thirty (30) minute period or portion thereof that Airline fails to tow.  The parties hereby agree that this amount is liquidated damages and not a penalty, is payable within ten (10) business days following receipt of an invoice hereunder and shall be included as a Non-Airline Revenue in the Airfield Area Cost Center.

      H.      **Priority under Accommodation.**  Subject to the provisions of Section 4.03 of this Agreement, in the event City designates the accommodation of a Requesting Air Transportation Company on Airline's Preferential Use Premises, Airline, its Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements shall have priority in all aspects of usage of such Airline's Preferential Use Premises over all Requesting Air Transportation Companies scheduled by City to use such Airline's Preferential Use Premises. Requesting Air Transportation Company will be entitled to maintain its schedule on Airline's Preferential Use Premises until such time as Airline provides Requesting Air Transportation Company and City at least ninety (90) days advance notice of such changes to its schedule, as subsequently verified in the Official Airline Guide, as will require Requesting Air Transportation Company to either (i) adjust its schedule or (ii) to initiate the accommodation process under Section 4.11.E.

## 4.12.  Change of Facility Status

      A.      **Change of Facility Status Rights.**  In the event that City, in exercising prudent management of the Airport facilities, determines there is a need for additional facilities to lease to a Requesting Air Transportation Company or additional facilities are needed for Domestic Common Use Terminal Areas, a portion of any individual Signatory Airline's Leased Premises may be subject to a change of facility status pursuant to the provisions of this Article.

      B.      **Airline's Leased Premises Subject to Change of Facility Status.**  Airline's Leased Premises may, from time to time, be subject to a change of facility status if City determines that Airline combined with its Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements, after the applicable cure period, do not meet the Minimum Use Requirement.  City, in addition to all other rights and remedies provided for in this

Agreement, may remove from Airline's Leased Premises such portions of Airline's Leased Premises such that Airline will meet the Minimum Use Requirements, subject to the provisions of this Article.

**C.     Change of Facility Status Qualifying Process.**

**1.     Notification to Signatory Passenger Airlines.**  In the event that City determines that additional facilities are needed for lease to a Requesting Air Transportation Company or additional facilities are needed for Domestic Common Use Terminal Areas, City shall provide all Signatory Passenger Airlines with a fifteen (15) day notice that City will undertake a change of facility status review.

**2.     Facilities Utilization Ranking.**  Using the actual daily activity for the three full calendar months immediately prior to notice, or, in the alternative, the scheduled activity for the three full calendar months subsequent to the notice, City shall calculate the average airline aircraft departures per Gate Position per day utilizing the weighted formula set forth herein (Departures/Gate Position) for each Signatory Passenger Airline. Departures credited to the Signatory Airline shall include departures from its Gate Positions reported by the Signatory Passenger Airline and shall include use by its Affiliate(s)  and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements.

**3.     Weighted Formula.**  Notwithstanding the foregoing, in the event that more than fifty percent (50%) of the departures from the Airline's Gate Positions, whether by Airline, Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements, are represented by Regional Aircraft, then departures by all Regional Aircraft from Airline's gates at Terminals A, B, C, D and E shall be discounted by fifty percent (50%). Departures from Terminal F shall not be discounted under any circumstances.

**4.     Minimum Use Requirements.** The calculation of minimum average departure requirements will vary based on the number of gates occupied by a Signatory Passenger Airline as set forth in the following chart:

| | |
|---|---|
| First Gate | 4.25 Departures |
| Second Gate | 4.75 Departures |
| Third Gate | 5.25 Departures |
| Gates In Excess Three Gates | 5.75 Departures |

Based on the foregoing, for the immediately preceding three (3) month period, an Airline with one gate must maintain a Minimum Use Requirement of an average of 4.25 departures per day; an Airline with two gates must maintain a Minimum Use Requirement of an average of 4.5 departures per day; an Airline with three gates must maintain a Minimum Use Requirement of an average of 4.75 departures per day and an Airline with 4 or more gates must maintain a Minimum

Use Requirement of an average of 5 departures per day. In no event will the Minimum Use Requirement exceed an average of 5 Departures/Gate Position per day for the aggregate number of Airline's Gate Positions.

5.     **Qualifying Signatory Passenger Airlines.**  As a result of the facilities utilization ranking, Signatory Passenger Airlines that have not met the Minimum Use Requirement will be subject to the change of facility status process to the extent of the number of Gate Positions in such Airline's Leased Premises that do not meet the Minimum Use Requirement.  City will notify in writing each Signatory Passenger Airline that qualifies for the change of facility status as to the number of Gate Positions in such Airline's Leased Premises that do not meet the Minimum Use Requirement.

6.     **Signatory Airline Response Process.**  In the event that Airline does not meet the Minimum Use Requirement, Airline shall have the opportunity, within thirty (30) days after the notification from City pursuant to Section 4.12.C.5 that Airline qualifies for the change of facility status, to demonstrate to City's satisfaction that Airline intends to add sufficient scheduled flights (whether by Airline, its Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements) to raise its scheduled activity to meet its Minimum Use Requirement.  If Airline does not respond within thirty (30) days or if the response is deemed unsatisfactory by City, in its sole discretion, City may initiate the Change of Facility Status Implementation Process outlined in Section 4.12.D.  In the event Airline fails to raise its scheduled activity to meet the Minimum Use Requirement within ninety (90) days, City may initiate the Change of Facility Status Implementation Process outlined in Section 4.12.E.

**D.     Change of Facility Status Implementation Process – No Cure Offered**

1.     **City Notification of Needed Space.**  In the event Airline is subject to the change of facility status process, City will notify Airline with respect to the type and amount of premises that City may remove from Airline's Leased Premises.

2.     **Airline Premises Proposal.**  Within thirty (30) days of receiving the notice from City regarding the type and amount of premises that may be removed from Airline's Leased Premises, each Signatory Airline qualifying for the change of facility status process will be required to prepare and submit to City a proposal, which shall identify in detail, the specific candidate premises within its Airline's Leased Premises (including Ticket Counter Positions, Gate Positions and supporting premises) it proposes for reversion to City based on the type and amount of premises needed as indicated by City in the notification.  To the extent practicable, Airline's proposal shall identify balanced shares of Ticket Counter Positions, Gate Positions and supporting premises for reversion to City to allow for operations by multiple airlines.  Airline will not be required to include more Gate Positions in Airline's proposal than are minimally required to allow Airline to meet the Minimum Use Requirement.

3.     **City's Review of Premises Proposal.**  City will review all of the proposals submitted by Signatory Airlines subject to the change of facility status process and determine if the proposals are operationally practical.  If Airline fails to submit the required proposal to City

within the thirty (30) day notice period or if Airline submits a proposal that City determines does not meet this criteria, City shall prepare an alternative plan for such Signatory Airline and that plan will be final.

      **4.**     **City's Selection of Premises Packages.**   After accepting the proposals from each Signatory Airline subject to the change of facility status process (or substituting a proposal for those from non-responsive Signatory Airlines), City will notify each Signatory Airline subject to this process as to which proposal was selected by City, and on what date such premises will be deleted from the subject Signatory Airline's Leased Premises, said transfer date to be no earlier than sixty (60) days following the date of the premises packages selection notification. In determining which of the proposals will be selected, City will employ its best judgment as to the current and future operational needs of the Airport. City's determination as to which Signatory Airline's premises shall be subject to change of facility status shall be at the sole discretion of City, and such decision will be final.

**E.**     **Change of Facility Status Implementation Process—Failure to Cure**

      **1.**     **City Notification of Needed Space.**   In the event of a failure to cure pursuant to Section 4.12.C.6, City will notify Airline, if subject to the change of facility status process, with respect to the type and amount of premises that City may remove from Airline's Leased Premises.

      **2.**     **Airline Premises Proposal.**   Within fifteen (15) days of receiving the notice from City regarding the type and amount of premises that may be removed from Airline's Leased Premises, each Signatory Airline qualifying for the change of facility status process will be required to prepare and submit to City a proposal, which shall identify in detail, the specific premises within its Airline's Leased Premises (including Ticket Counter Positions, Gate Positions and supporting premises) which it proposes for reversion to City based on the type and amount of premises identified by City in the notification. To the extent practicable, Airline's proposal shall identify balanced shares of Ticket Counter Positions, Gate Positions and supporting premises for reversion to City to allow for operations by multiple airlines. Airline will not be required to include more Gate Positions in Airline's proposal than are minimally required to allow Airline to meet the Minimum Use Requirement.

      **3.**     **City's Review of Premises Proposal.**   City will review all of the proposals submitted by Signatory Airlines subject to the change of facility status process and determine if the proposals are operationally practical. If Airline fails to submit the required proposal to City within the fifteen (15) day notice period or if Airline submits a proposal that City determines does not meet this criteria, City shall prepare an alternative plan for such Signatory Airline and that plan will be final.

      **4.**     **City's Selection of Premises Packages.**   After accepting the proposals from each Signatory Airline subject to the change of facility status process (or substituting a proposal for those from non-responsive Signatory Airlines), City will notify each Signatory Airline subject to this process as to which proposal was selected by City, and on what date such premises will be deleted from the subject Signatory Airline's Leased Premises, said transfer date to be no earlier than fifteen (15) days following the date of the premises packages selection notification. In

determining which of the proposals will be selected, City will employ its best judgment as to the current and future operational needs of the Airport.  City's determination as to which Signatory Airline's premises shall be subject to change of facility status shall be at the sole discretion of City, and such decision will be final.

**F.      Airline Obligations Regarding Change of Facility Status**

     **1.      Removal of Airline Equipment and Vacating Leased Premises.**  In the event that any portion of Airline's Leased Premises are to be removed from Airline's Leased Premises as a result of a change of facility status process, Airline will vacate such portion of Airline's Leased Premises and remove its Airline Equipment on or before the transfer date set forth in the premises proposal notification.

     **2.      Amendment to Leased Premises.**  In the event that any portion of Airline's Leased Premises are to be removed from Airline's Leased Premises included in this Agreement as a result of a change of facility status process, City shall prepare and provide to Airline a revised Exhibit B which will set forth Airline's Leased Premises subsequent to such removal, and all Rents and Other Fees associated with such Leased Premises, as amended, shall be effective on the transfer date set forth in the premises proposal notification.

     **3.      Consolidation of Airline Operations.**  In the event that any portion of Airline's Leased Premises are to be removed from Airline's Leased Premises included in this Agreement as a result of a change of facility status process, Airline shall use its best efforts to consolidate its aircraft arrivals and departures on its remaining Airline's Leased Premises.  In the event Airline cannot reasonably consolidate all of its aircraft arrivals and departures and the arrivals and departures of its Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements on its remaining Airline's Leased Premises, City shall make all reasonable efforts to accommodate Airline's and its Affiliate(s) and Air Transportation Companies operating from Airline's Leased Premises under City-approved subleases or ground handling agreements for the then-current scheduled aircraft arrivals and departures for a period of twelve (12) months from the transfer date set forth in the change of facility status.  Airline shall be responsible to pay the Rents associated with its use of City's Domestic Common Use Terminal Areas.

**Article 5**

**BOND DOCUMENTS AND FLOW OF FUNDS**

**5.01.    Subordination to Bond Ordinances**

This Agreement and all rights granted to Airline hereunder are expressly subordinated and subject to the lien and provisions of the pledges, transfer, hypothecation or assignment made by City in the Bond Ordinance adopted by City to issue Bonds.  City expressly reserves the right to make such pledges and grant such liens and enter into covenants as it may deem necessary or desirable to secure and provide for the payment of Bonds, including the creation of reserves therefore, provided that City shall not take any actions that would be inconsistent with the terms and conditions of this Agreement.  Notwithstanding the foregoing, nothing contained in this Article shall be deemed a pre-approval by Airline of a future Bond Ordinance that changes the terms and conditions of this Agreement.

**5.02.    Internal Revenue Code of 1986**

Airline understands that City is and will be the issuer of bonds and Bonds.  With respect to bonds or Bonds that may be issued, the interest on which is intended to be excludable from gross income of the holders for Federal income tax purposes under the Code, Airline agrees that it will not act, or fail to act (and will immediately cease and desist from any action, or failure to act) with respect to the use of the Airline Leased Premises, if the act or failure to act may cause City to be in noncompliance with the provisions of the Code, and Airline will not take or persist in any action or omission which may cause the interest on such bonds or Bonds to be includable in the gross income of the holders thereof for Federal income tax purposes.

**5.03.    SEC Rule 15c2-12**

Upon request of City, Airline shall provide City with such information with respect to Airline as City may request in writing in order for City to comply with its continuing disclosure obligations under Securities and Exchange Commission ("SEC") Rule 15c2-12 (the" Rule"), as it may be amended from time to time.  To the extent that Airline is an "Obligated Party" with respect to the bonds or Bonds as per the Rule, Airline agrees to execute the Continuing Disclosure Agreement incident to such financing.

**5.04.    Bond Documents Flow of Funds**

All Project Revenues shall be deposited, maintained and paid as set forth in the Bond Documents.

**5.05.    Establishment of Bond Redemption and Improvement Account, O&M Account and Discretionary Account**

The Signatory Airlines and City agree under this Agreement to establish the Bond Redemption and Improvement Account, O&M Account and Discretionary Account pursuant to Section 4.06 of the Bond Ordinance and herein, which accounts shall have the following uses:

**A.     Bond Redemption and Improvement Account.**  Any balance in the Bond Redemption and Improvement Account is available for use by City for the payment of deficiencies with respect to the Debt Service Requirements or deficiencies with respect to the Sinking Fund Reserve Requirement as provided under the Bond Ordinance.  If no such deficiencies exist, City is not in default under the Bond Ordinance and a Majority-in Interest of the Eligible Signatory Airlines, determined pursuant to the Airfield Area MII Formula, mutually agree (whose agreement will not be unreasonably withheld), the Division of Aviation can use such amounts for repair, renewals, replacements or alterations to the Airport System; redemption of Bonds; costs of Capital Projects or equipment; purchase of Bonds; arbitrage rebate pursuant to Section 148(f) of the Code or for any lawful Airport System purposes.  At the termination of this Agreement, it is City's intention to retain the balance in the Bond Redemption and Improvement Account in an Airport related account with substantially the same purpose.

**B.     O&M Account.**  Any balance in the O&M Account is available for use by City for the payment of Operating Expenses in City's sole discretion in the event the then current Airport Revenues allocated to Operating Expenses in the Annual Budget are deemed to be insufficient.  If a Majority-in Interest of the Eligible Signatory Airlines, determined pursuant to the Airfield Area MII Formula, and City mutually agree (whose agreement will not be unreasonably withheld), any balance then can be used for repairs, renewals, replacements, alterations, the redemption of Bonds or bonds or for any Airport System purposes.  Notwithstanding the foregoing, City has no reasonable expectation that funds in the O&M Account will be used to pay Debt Service since the account is being created to pay Operating Expenses. At the termination of this Agreement, it is City's intention to retain the balance in the O&M Account in an account with substantially the same purpose.

**C.     Discretionary Account.**  Any balance in the Discretionary Account may be used by City for any lawful Airport System purpose.

**5.06.    Deposit and Application of Airport Revenues**

It is understood and agreed that so long as any Bonds or bonds are outstanding, the deposit and application of Project Revenues for each Fiscal Year during the Term of this Agreement shall be governed by the Bond Documents.  Notwithstanding anything to the contrary in this Article, City is expressly permitted in the Bond Ordinance to use amounts remaining in the Aviation Operating Fund following any transfers pursuant to 4.06 (a) – (i) of the Bond Ordinance for the Bond Redemption and Improvement Requirement, the O&M Requirement, the Airline Revenue Allocation, and City Revenue Allocation.  Pursuant to Section 4.06 of the Bond Ordinance, any amounts remaining in the Aviation Operating Fund following any transfer then required to be made pursuant to Section 4.06 of the Bond Ordinance, will be applied or credited in the following manner:

**A.     Bond Redemption and Improvement Requirement.**

**1.**     The Bond Redemption and Improvement Requirement shall mean an amount not to exceed the lesser of (i) the amount of Debt Service Reserve Surety Bonds fulfilling City's Sinking Fund Reserve Requirements or (ii) twenty five percent (25%) of the Debt Service Requirement thereafter.  City hereby provides its written direction pursuant to Section 4.06 of the Bond Ordinance that the Bond Redemption and Improvement Account may be funded with amounts remaining, if any, following any and all transfers required by Section 4.06 of the Bond Ordinance.

2.      Notwithstanding the foregoing, for each and every Fiscal Year during the Term of this Agreement, the interest earned on the balance of the Bond Redemption and Improvement Account shall first be used to reduce the Bond Redemption and Improvement Requirement for the following Fiscal Year and the remaining interest and any excess balance in the Bond Redemption and Improvement Account due to a reduction in the Debt Service Requirement, if any, shall be transferred to the Aviation Operating Fund and then allocated to the Airport Cost Centers in proportion to the Debt Service Requirement for each such Airport Cost Center as a Non-Airline Revenue.

3.      The net Bond Redemption and Improvement Requirement shall be allocated on the basis of Debt Service Requirements to the Airport Cost Centers.

**B.      O&M Requirement.**

1.      The O&M Requirement shall mean an amount not to exceed one million dollars ($1,000,000) per Fiscal Year to be deposited in the O&M Account to maintain a balance equal to ten percent (10%) of Operating Expenses.

2.      Notwithstanding the foregoing, for each and every Fiscal Year during the Term of this Agreement, the interest earned on the balance of the O&M Account shall first be used to reduce the O&M Requirement for the following Fiscal Year and the remaining interest and any excess balance in the O&M Account due to a reduction in Operating Expenses, if any, shall be transferred to the Aviation Operating Fund, then allocated to the Airport Cost Centers in proportion to the Operating Expenses for each such Airport Cost Center as a Non-Airline Revenue.

3.      The net O&M Requirement shall be allocated on the basis of Operating Expenses to the Airport Cost Centers.

**C.      City and Airline Revenue Allocation.**  For each Fiscal Year during the Term of this Agreement, the prior Fiscal Year's total net revenue from the Outside Terminal Areas Cost Center, if any, shall be reduced by the sum of Seven Million Dollars ($7,000,000).  Of the then remaining net revenue balance, if any, an amount equal to fifty percent (50%) thereof, which together with the aforementioned Seven Million Dollar ($7,000,000) allocation, shall be City Revenue Allocation.  City Revenue Allocation for each Fiscal Year shall be applied to the Discretionary Account or to such other fund or account of the Airport System as determined by City. The Airline Revenue Allocation shall be calculated as follows from any amounts remaining in the Aviation Operating Fund if any, following any and all transfers required by Section 4.06 of the Bond Ordinance and by Sections 5.06.A and 5.06.B above:

1.      During the Term of this Agreement, the Airline Revenue Allocation shall be equal to fifty percent (50%) of the prior Fiscal Year's total net revenue from the Outside Terminal Areas Cost Center reduced by an amount of up to seven million dollars ($7,000,000), to the extent net revenue from the Outside Terminal Areas Cost Center equals or exceeds seven million dollars ($7,000,000).

2.      If Project Revenues of the Outside Terminal Area Cost Center have been pledged pursuant to a Supplemental Ordinance in accordance with the Bond Ordinance, the

Airline Revenue Allocation for each Fiscal Year, if any, shall first be credited to the Other Buildings and Areas Cost Center to determine the Airfield Area Requirement for such Fiscal Year and then, if the Airline Revenue Allocation exceeds the deficit of the Other Buildings and Areas Cost Center, the excess shall be allocated pro rata to the Airfield Area Cost Center and Terminal Area Cost Center based on airline revenue allocable to such cost center.

3.      If Project Revenues of the Outside Terminal Area Cost Center have not been pledged pursuant to a Supplemental Ordinance in accordance with the Bond Ordinance, then the Airline Revenue Allocation shall be allocated on a pro rata basis to the Signatory Airlines in proportion to each individual Signatory Airline's payment of Rents and Additional Rents for the most recent complete Fiscal Year for which data are available.

4.      Such pro rata portion of the Airline Revenue Allocation shall be credited against Rents for each Signatory Airline in the subsequent Fiscal Year during the Term of this Agreement.

D.      **Discretionary Account.**  Following any and all transfers required by Section 4.06 of the Bond Ordinance and by Sections 5.06.A, 5.06.B, and 5.06.C above, any amounts remaining in the Aviation Operating Fund, less the Airline Revenue Allocation, shall be deposited in the Discretionary Account to be used by City for any lawful Airport System purpose.

**Article 6**

**RATES, FEES AND CHARGES**

**6.01.   General**

In consideration for the use of the Airline's Leased Premises; the facilities, rights, and privileges granted hereunder; and for the undertakings of City; Airline agrees to pay City, without notice, demand, set-off or counterclaim, the rentals and fees as set forth in this Article 6 and as adjusted according to the procedures of Article 7.

**6.02.   Terminal Rentals**

**A.      General**

**1.      Airline's Terminal Rentals.**  The Rents associated with Airline's Terminal Area Leased Premises for any given Fiscal Year, shall be calculated by multiplying the Category Terminal Rental Rates for each Type of Space by the corresponding square footage of each Type of Space included in Airline's Terminal Area Leased Premises.

**2.      Terminal Area Leased Premises Rentals.**  The Category Terminal Rental Rates for the Types of Space for any given Fiscal Year shall be established as set forth in Section 7.02.C hereof.

**B.      Joint Use Space**

**1       Allocation of Space in Domestic Baggage Claim Areas.**  The square footage associated with each Domestic Baggage Claim Area shall be allocated among Signatory Passenger Airlines on the basis of the Joint Use Formula.

**2.      Allocation of Space in Domestic Baggage Make-up Areas.**  The square footage associated with each Domestic Baggage Make-up Area shall be allocated among Signatory Passenger Airlines on the basis of the Joint Use Formula.

**3.      Allocation of Space in Cart Tunnel Area.**  The square footage associated with each Cart Tunnel Area shall be allocated among domestic Signatory Passenger Airlines on the basis of the Joint Use Formula.

**4.      Allocation of Space in Baggage Recheck Area.**  The square footage associated with the Baggage Recheck Area shall be allocated among Signatory Passenger Airlines on the basis of the Joint Use Formula.

**5.      Allocation of Space in Inbound Baggage Area**.  The square footage associated with the Inbound Baggage Area shall be allocated among Signatory Passenger Airlines on the basis of the Joint Use Formula.

FINAL

**C.     International Common Use Areas.**

**1.     Airline's International Common Use Ticket Counter Area Fees.**  The Rents associated with Airline's use of the International Common Use Ticket Counter Area for any given Fiscal Year shall be equal to the product of the International Common Use Ticket Counter Area Fee (calculated in Section 7.02.D.1) multiplied by the number of Airline's Enplaning Passengers using such International Common Use Ticket Counter Area.

**2.     Airline's International Common Use Enplaning Area Fees.**  The Rents associated with Airline's use of the International Common Use Enplaning Area for any given Fiscal Year shall be equal to the product of the International Common Use Enplaning Area Fee (calculated in Section 7.02.D.2) multiplied by the number of Airline's Enplaning Passengers using such International Common Use Enplaning Area.

**3.     Airline's International Common Use Deplaning Area Fees.**  The Rents associated with Airline's use of the International Common Use Deplaning Area for any given Fiscal Year shall be equal to the product of the International Common Use Deplaning Area Fee (calculated in Section 7.02.D.3) multiplied by the number of Airline's Deplaning Passengers using such International Common Use Deplaning Area.

**4.     Airline's FIS Area Fees.**  The Rents associated with Airline's use of the FIS Area for any given Fiscal Year shall be equal to the product of the FIS Area Fee (calculated in Section 7.02.D.4) multiplied by the number of Airline's Deplaned Passengers utilizing the FIS Area.

**D.     Other Terminal Area Rates and Fees**

**1.     Domestic Common Use Terminal Area.**  The Domestic Common Use Gate Fee and Domestic Common Use Ticket Counter Fee per Turnaround Use for any given Fiscal Year shall be established in the Rules and Regulations and determined assuming four (4) Turnaround Uses per day.

**2.     Other Terminal Area Fees.**  Other Fees pertaining to the Terminal Area for any given Fiscal Year shall be determined as set forth in the Rules and Regulations.

## 6.03.   Ramp Area Rentals

**A.     Airline's Rents for Ramp Area Premises.**  The Rents associated with Airline's Ramp Premises shall be equal to the Ramp Area Premises Rate multiplied by the corresponding linear footage of the Aircraft Parking Restriction Line in Airline's Ramp Premises for any given Fiscal Year.

**B.     Other Ramp Area Fees.**  Other Fees pertaining to the Ramp Area for any given Fiscal Year shall be determined as set forth in the Rules and Regulations.

## 6.04.   Landing Fees

**A.     Airline's Landing Fees.**  Airline's Landing Fees shall be equal to Landing Fee Rate multiplied by the Maximum Landed Weight of Airline's Revenue Aircraft Arrivals for any given Fiscal Year.

    **B.**    **Other Airfield Area Fees.**  Other Fees pertaining to the Airfield Area for any given Fiscal Year shall be determined as set forth in the Rules and Regulations.

### 6.05.  Passenger Facility Charges

Airline acknowledges that City has the right to assess Airline passengers a PFC for the use of the Airport in accordance with 49 U.S.C. Section 40117 and the rules and regulations provided thereunder (14 C.F.R. Part 158, herein the PFC Regulations) and as otherwise hereinafter authorized or permitted. Airline shall collect on behalf of and remit to City on a timely basis any such charges in accordance with the requirements of the PFC Regulations, including but not limited to holding any charges collected by Airline, pending remittance to City, in trust for the benefit of City.  Airline shall remit PFC to City, and must include an itemized statement with its payment supporting the calculation of the PFC remittance.  City shall have the right to use all such PFC collected in any lawful manner.  Airline and City shall comply with and shall observe all of the provisions of the PFC Regulations as they apply to each party.

### 6.06.  Payments

    **A.**    **Payment of Rents, Fees and Charges.**  Unless and until City notifies Airline in writing designating an alternative payment method, all Rents (save and except PFC) due hereunder shall be made by separate wire or automated clearing house (ACH) transfer as follows*:*

> Wells Fargo  Bank, N.A.
> Phone: 1-800-869-3557
> City of Philadelphia Aviation Division
> Aviation Operating Account
> Account #200-003-388-8734
> ABA #121000248 (Routing Number)
> ACH# 031000503

Unless and until City notifies Airline in writing designating an alternative payment method, all PFC due hereunder shall be made by separate wire or automated clearing house (ACH) transfer as follows:

> Wells Fargo Bank, N.A.
> Phone: 1-800-869-3557
> City of Philadelphia Aviation Division
> Aviation Capital Account
> Account #200-003-388-8653
> ABA # 121000248 (Routing Number)
> ACH# 031000503

Payments should include identifying information, including but not limited to the invoice number. Payments made by Airline shall be received by City subject to collection.  Airline agrees to pay on demand by City any costs, including attorney fees and costs incurred by City for collection.  If Airline fails to timely remit to City all or any part of the payments which it is obligated to make to City hereunder, which failure remains uncured for a period of ten (10) days after the date of delivery of City's notice to Airline of such failure, then City shall be entitled to pursue all of City's remedies available under this Agreement, at law or in equity, plus applicable interest or other costs and expenses.

**B.**      **Default Rate.**  If City shall, at any time or times, accept any payments of Rents after they shall become due and payable, such acceptance shall not excuse subsequent delays, or constitute, or be construed to be a waiver of any or all of City's rights hereunder.  Airline shall pay interest at the Default Rate on all payments which are unpaid as of the first day after the day on which such payment is due to City, or such other maximum allowable interest rate should the Default Rate violate any applicable laws or regulations.  City's failure to impose such an interest charge in any particular case shall not be deemed a waiver of City's right to do so in any future case.

**C.**      **Proration of Rent.**  Any Rents due for periods of less than one (1) month shall be prorated on a daily basis based on a Calendar Year of three hundred and sixty five (365) days.  The foregoing shall not apply to Additional Rents or Other Fees that are not subject to proration.

**D.**      **Monthly Rents.**  All Monthly Rents with respect to fixed rental amounts shall be due to City, in advance, on the first day of each calendar month, without notice, demand, set-off or counterclaim.

**E.**      **Additional Rents.**  All Additional Rents required under the Monthly Activity Reports for each calendar month shall be due to City without invoice on or before the tenth (10th) day of each subsequent calendar month during the term of the Agreement.

**F.**      **Other Fees.**  Payments for Other Fees shall be made by Airline when due and payable, as imposed pursuant to the Airport's Rules and Regulations, any federal, state or local law, regulation, ordinance, statute or directive, or this Agreement.  If such amounts or charges are not paid when due, they shall nevertheless, be collectible as Other Fees with any of the Monthly Rents or Additional Rents thereafter falling due.

**G.**      **Alternate Payee.**  All or any portion of the payments due from Airline under this Agreement shall be paid by Airline to any party designated by City in writing with reasonable notice and instructions as to payment.

**6.07.**   **Treatment of Affiliate Airlines with Respect to Rates, Fees and Charges**

**A.**      **Landing Fee Rate.**  For purposes of this Agreement, any Airline Affiliate will pay the Landing Fee Rate assessed to Airline.  Any Airline affiliate that has not executed an Operating License or similar agreement with City governing their operations at the Airport will pay the Non-Signatory Landing Fee Rate.

**B.**      **Activity Reports and Payments.**  Each Affiliate shall be responsible for the reporting of its own operations in a monthly Activity Report, and shall be responsible for the payment of all Landing Fees and Other Fees for such operations.  As evidenced by written notice to the City, Airline may elect to report Affiliate's operations on Airline's monthly Activity Report and to pay Affiliate's Landing Fees and Other Fees for such operations.

However, during the term of the approved affiliation with Airline, Airline shall be liable as a guarantor for all unpaid Terminal Rentals, Ramp Area Rentals, Other Fees and Additional Rents expressly contemplated herein, incurred by its Affiliate(s) while Affiliate is operating as Airline's Affiliate.  The guarantee contained in this Section 6.07.B applies to this Section 6.07.B only. Airline shall ensure compliance with the filing of monthly Activity Reports by its Affiliates, as outlined in Section 7.08.

FINAL

**C.      Ground Handling Fees.**  Airline is exempt from any Ground Handling Fees related to Ground Handling Services provided to its Affiliate(s).  Airline shall pay Ground Handling Fees for services rendered to a former Affiliate subsequent to termination of Affiliate status.

**D.      Joint Use Formula.**  City shall not include Affiliates in the calculation of the twenty percent (20%) portion of the Joint Use Formula applied to the allocation of the square footage related to Joint Use Space.  The Enplaned Passengers of an Airline's Affiliate(s) will be included in the calculation of the eighty percent (80%) portion of the Joint Use Area Formula applied to the allocation of the square footage related to Joint Use Space.

**E.      Fuel Flowage Fees.**  Any Airline Affiliate shall be exempted from any Fuel Flowage Fees established in the Rules and Regulations.  However, any Airline affiliates that have not executed an Operating License or similar agreement with City governing their operations at the Airport will pay any Fuel Flowage Fees established in the Rules and Regulations.

**6.08.    No Other Charges**

No rents, fees or charges other than those herein referred to or provided for in this Agreement, shall be imposed by the Division of Aviation upon any of the Signatory Airlines, that alters the fair and equitable balance of Airport rates and charges as set forth herein as of the Effective Date of this Agreement.

**Article 7**

**ADJUSTMENT OF RATES, FEES AND CHARGES**

**7.01.    General**

A.    **Annual Adjustment to Terminal Rentals, Ramp Premises Rate and Landing Fee Rate**

1.    **Annual Rate Adjustments.**  Subject to Section 7.05 herein, the Terminal Rentals, Ramp Premises Rate and Landing Fee Rate are subject to adjustment as of July 1, 2016, and each July 1 thereafter during the Term of this Agreement.  Signatory Airline rates, fees and charges will be recalculated annually for each Fiscal Year of the Term hereof, and made effective as of July 1 of each such Fiscal Year, unless otherwise adjusted during the Fiscal Year under Section 7.05 hereof, as described below.  The rates and charges calculation attached hereto as Exhibit G is provided for illustrative purposes only and reflects the rate calculation methodologies described in this Article 7.

2.    **Delayed Rate Adjustments.** If the calculation of the Terminal Rentals, Ramp Premises Rate or Landing Fee Rate is not completed by July 1 for any reason in any given Fiscal Year, the Terminal Rentals, Ramp Premises Rate or Landing Fee Rate then in effect shall continue to be paid by Airline until such calculation of the adjusted rate is completed.  The adjusted rate will be retroactive to the first day of the Fiscal Year and any payments by Airline to City shall be adjusted accordingly.

3.    **Airline Consultation.**  City will consult with the Signatory Airlines prior to adjusting the Terminal Rentals, Ramp Premises Rate and Landing Fee Rate by providing preliminary budget information, including the Terminal Rentals, Ramp Premises Rate and Landing Fee Rate calculation, for the ensuing Fiscal Year in writing to the Signatory Airlines no less than forty five (45) days prior to implementation of the adjustment.  A consultation meeting will be held at least thirty (30) days prior to the implementation date of any Terminal Rentals, Ramp Premises Rate or Landing Fee Rate increase.

**7.02.    Terminal Area Rates, Fees and Charges**

A.    **Terminal Area - Cost Center Residual Methodology.**  City shall employ a cost center residual methodology for charging Terminal Rentals, using Airline Space in calculating Category Terminal Rental Rates by Types of Space in the Terminal Area Cost Center.

B.    **Terminal Area Requirement.**  The Terminal Area Requirement for each Fiscal Year shall be the amount in the Annual Budget equal to:

1.    The sum of Operating Expenses, Debt Service and Fund Requirements allocated to the Terminal Area Cost Center;

2.    Less all Non-Airline Revenues allocated to the Terminal Area Cost Center;

FINAL

     **3.**     Together with any deficit or credit estimated in the Annual Budget for operation of the Terminal Area during the then-current Fiscal Year or any adjustment carried over from the preceding Fiscal Year to reflect any difference between the actual versus estimated surplus or deficit; and

     **4.**     Less the Airline Revenue Allocation allocated to the Terminal Area Cost Center, if any.

**C.**     **Category Terminal Rental Rates**

     **1.**     **Types of Space.**  For any given Fiscal Year, Airline Space shall be classified by Type of Space as set forth in the table below:

| Category (Types of Space) | Location/Function | Weighted Value |
|---|---|---|
| 1 | Ticket counter and ticket counter offices | 100% |
| 2 | Holdrooms, baggage claim area, baggage claim offices, airline lounge, upper level Airline office support space | 75% |
| 3 | Airline Operations Space, baggage makeup, inbound baggage | 50% |
| 4 | FIS Area, Cart Tunnel, Baggage Recheck, Ticket Counter Queuing | 25% |

     **2.**     **Calculation of Category Terminal Rental Rates.**  For any given Fiscal Year, the Category Terminal Rental Rates for the Airline Space square footage shall be calculated as follows:

     **a.**     Classify all Airline Space by Types of Space described above;

     **b.**     Multiply the total square footage of each Type of Space by the weighted value of each Type of Space identified in Section 7.02.C.1 above to determine the weighted equivalent square footage;

     **c.**     Sum the weighted equivalent square footage for all of the Types of Space to determine total weighted equivalent square footage;

     **d.**     Divide the Terminal Revenue Requirement by the total weighted equivalent square footage to establish the Type 1 Rental Rate;

e.      Multiply the Type 1 Rental Rate by the weighted value of each Type of Space identified in Section 7.02.C.1 for Types 2, 3 and 4 to determine the Category Terminal Rental Rate for each of the remaining Types of Space.

**D.      Other Terminal Area Fees – International Common Use Areas and FIS**

**1.      International Common Use Ticket Counter Areas**

a.      The "**International Common Use Ticket Counter Area Cost"** shall be equal to the Category Terminal Rental Rates for the Types of Space contained in the International Common Use Ticket Counter Area multiplied by the corresponding square footage of the International Common Use Ticket Counter Area for any given Fiscal Year.

b.      The "**International Common Use Ticket Counter Area Fee"** for any given Fiscal Year shall be determined by dividing the "International Common Use Ticket Counter Area Cost" by the sum of (i) the estimated number of Signatory Airline Enplaned Passengers utilizing the International Common Use Ticket Counter Area for any given Fiscal Year and (ii) 1.15 multiplied by the estimated number of Non-Signatory Airline Enplaned Passengers utilizing the International Common Use Ticket Counter Area for any given Fiscal Year as established in the Annual Budget.

**2.      International Common Use Enplaning Areas**

a.      The "**International Common Use Enplaning Area Cost"** shall be equal to the Category Terminal Rental Rates for the Types of Space contained in the International Common Use Enplaning Area multiplied by the corresponding square footage of the International Common Use Enplaning Area for any given Fiscal Year.

b.      The "**International Common Use Enplaning Area Fee"** for any given Fiscal Year shall be determined by dividing the "International Common Use Enplaning Area Cost" by the sum of (i) the estimated number of Signatory Airline Enplaned Passengers utilizing the International Common Use Enplaning Area for any given Fiscal Year and (ii) 1.15 multiplied by the estimated number of Non-Signatory Airline Enplaned Passengers utilizing the International Common Use Enplaning Areas for any given Fiscal Year as established in the Annual Budget.

**3.      International Common Use Deplaning Areas**

a.      The "**International Common Use Deplaning Area Cost"** shall be equal to the Category Terminal Rental Rates for the Types of Space contained in the International Common Use Deplaning Area multiplied by the corresponding square footage of the International Common Use Deplaning Area for any given Fiscal Year.

b.      The "**International Common Use Deplaning Area Fee"** for any given Fiscal Year shall be determined by dividing the "International Common Use Deplaning Area Cost" by the sum of (i) the estimated number of Signatory Airline Deplaning Passengers utilizing the International Common Use Deplaning Area for any given Fiscal

Year and (ii) 1.15 multiplied by the estimated number of Non-Signatory Airline Deplaning Passengers utilizing the International Common Use Deplaning Areas for any given Fiscal Year as established in the Annual Budget.

    **4.**    **FIS Areas**

        **a.**    The "**FIS Area Cost**" shall be equal to the Category Terminal Rental Rates for the Types of Space contained in the FIS Area multiplied by the corresponding square footage of the FIS Area for any given Fiscal Year.

        **b.**    The "**FIS Area Fee**" for any given Fiscal Year shall be determined by dividing the "FIS Area Cost" by the sum of (i) the estimated number of Signatory Airline Deplaning Passengers utilizing the FIS Area for any given Fiscal Year and (ii) 1.15 multiplied by the estimated number of Non-Signatory Airline Deplaning Passengers utilizing the FIS Areas for any given Fiscal Year as established in the Annual Budget.

    **E.**    **Allocation of Rental Car Concession Fees.** For the purposes of allocating Non-Airline Revenues to Airport Cost Centers—and,  in particular, to the Terminal Area in Section 7.02.B.2 above— City and Airline agree to the following allocation of Rental Car Concession Fees generated by the car rental companies, which is consistent with the current practice of the parties:

    **1.**    The Rental Car Concession Fees generated by the Alamo and Enterprise car rental brands and any new entrant car rental companies entering the Airport subsequent to the Effective Date, their respective successors and assigns, will be allocated to the Outside Terminal Area Cost Center;

    **2.**    The Rental Car Concession Fees generated by all of the other currently existing rental car company brands, their successors and assigns, except those concession fees originating from the Alamo/Enterprise car rental company brands, will be allocated to the Terminal Area Cost Center; and

    **3.**    In the event that an existing car rental company brand, the Rental Car Concession Fees of which are currently allocated to one cost center merges with, or is acquired by, a car rental company the Rental Car Concession Fees of which are allocated to a different cost center, the Rental Car Concession Fees generated by the individual car rental brands making up the resulting merged entity will be segregated by pre-merger/acquisition brand and allocated on a pre-merger/acquisition basis by brand to the Terminal Area or Outside Terminal Area Cost Center according to (1) and (2) above.

**7.03.**    **Ramp Area Rentals**

    **A.**    **Ramp Area – Cost Center Residual Methodology.**  City shall employ a cost center residual methodology for charging Ramp Area Rentals, using Ramp Area Premises in calculating the Ramp Area Premises Rate.

**B.     Ramp Area Requirement.**  The Ramp Area Requirement for each Fiscal Year shall be the amount in the Annual Budget equal to:

**1.**     The sum of Debt Service and Fund Requirements allocated to the Ramp Area Cost Center;

**2.**     Less all Non-Airline Revenues, allocated to the Ramp Area Cost Center; and

**3.**     Together with any deficit or credit estimated in the Annual Budget for operation of the Ramp Area during the then-current Fiscal Year or any adjustment carried over from the preceding Fiscal Year to reflect any difference between the actual versus estimated surplus or deficit.

**C.     Ramp Area Premises Rate.**  The Ramp Area Premises Rate for any given Fiscal Year shall be determined as that rate per linear foot of the Aircraft Parking Restriction Line calculated by dividing the Ramp Area Requirement by the linear footage of the Aircraft Parking Restriction Line attributable to the Ramp Area Premises.

**7.04.   Landing Fee**

**A.     Airfield Area - Modified Cost Center Residual Methodology.**  City shall employ a modified cost center residual methodology—taking into consideration the Airfield, Other Buildings and Areas, and Northeast Philadelphia Airport Cost Centers—in calculating Airfield Area rentals and fees, using the aggregate of (i) Signatory Airlines' and (ii) Signatory Airline Affiliates' aggregate Maximum Landed Weight in calculating the Landing Fee Rate for any given Fiscal Year.

**B.     Airfield Area Requirement Calculation.**  The Airfield Area Requirement for each Fiscal Year shall be the amount in the Annual Budget equal to:

**1.**     The sum of Operating Expenses, Debt Service and Fund Requirements for the Fiscal Year allocable to the Airfield Area, Other Buildings and Areas, and Northeast Philadelphia Airport;

**2.**     Less all Non-Airline Revenues allocated to the Airfield Area, Other Buildings and Areas and Northeast Philadelphia Airport Cost Centers, as contained in the Annual Budget; and

**3.**     Less all Non-Signatory Landing Fees, assumed in the Annual Budget to be equal to the Non-Signatory Landing Fee Rate multiplied by the aggregate Maximum Landed Weight of Non-Signatory Airlines; and

**4.**     Together with any deficit or credit estimated in the Annual Budget for operation of the Airfield Area during the then-current Fiscal Year or any adjustment carried over from the preceding Fiscal Year to reflect any difference between the actual versus estimated surplus or deficit; and

**5.**     Together with any deficit or credit estimated in the Annual Budget for operation of the Other Buildings and Areas during the then-current Fiscal Year or any adjustment carried over

from the preceding Fiscal Year to reflect any difference between the actual versus estimated surplus or deficit; and

      **6.**      Less the Airline Revenue Allocation allocable to the Airfield Area, if any; and

      **7.**      Together with any deficit or credit estimated in the Annual Budget for operation of the Northeast Philadelphia Airport during the then-current Fiscal Year or any adjustment carried over from the preceding Fiscal Year to reflect any difference between the actual versus estimated surplus or deficit.

      **C.**      **Landing Fee Rate.**  The Landing Fee Rate shall be calculated by dividing the Airfield Area Requirement by the sum of (i) the aggregate Maximum Landed Weight of the Signatory Airlines and (ii) the aggregate Maximum Landed Weight of the Signatory Airline Affiliates for any given Fiscal Year.

**7.05.**    **Mid-Year Adjustment to Terminal Rentals, Ramp Premises Rate or Landing Fee Rate**

City may implement a midyear adjustment of the Terminal Rentals, Ramp Premises Rate or Landing Fee Rate in any given Fiscal Year when City determines that the current estimate of Terminal Area, Ramp Area or Airfield Area Requirements (based on year-to-date actual information) is estimated to be ten percent (10%) or higher than the then Annual Budget.  City will notify and hold a consultation meeting with the Signatory Airlines at least thirty (30) days prior to the implementation of a mid-year adjustment of the Terminal Rentals, Ramp Premises Rate or Landing Fee Rate.

**7.06.**    **End of Year Reconciliation**

Within sixty (60) days after the completion of City's annual audited financial statements, but not later than May 1 following the end of the Fiscal Year, City shall calculate any deficit or credit in Terminal Rentals, Ramp Area Rentals and Landing Fees using actual Operating Expenses, Debt Service, Non-Airline Revenues, Fund Requirements and Airline Revenue Allocation from the preceding Fiscal Year to determine any surplus or deficit in the amount of Airline Revenue.  Any such surplus or deficit shall be included in the determination of the Airfield Area Requirement, Terminal Area Requirement, and Ramp Area Requirement for the succeeding Fiscal Year, as described in Sections 7.02, 7.03 and 7.04.

**7.07.**    **No Formal Amendment**

Adjustments to Terminal Rentals, Ramp Premises Rate, and Landing Fee Rates shall apply without the necessity of formal amendment of this Agreement.

**7.08.**    **Monthly Activity Reports**

      **A.**      **Landing Weight Report.**  Airline shall prepare and file with City, in the manner indicated on Exhibit H, an "Aircraft Used in Philadelphia Service" form (Form 72-109), as may be modified by City from time to time, showing the certified maximum gross landing weight of each aircraft.  Such completed form shall be submitted prior to commencement of service and annually thereafter and whenever changes in the aircraft serving the Airport occur;

**B.      Additional Rents Report**

      **1.      Payment of Additional Rents.**  As provided for in Section 6.06.E, not later than ten (10) days after the end of each calendar month, Airline shall pay the Additional Rents (including landing fees, other use charges and ground handling fees) due for the previous month. By the tenth (10th) day of the month, Airline shall remit an itemized calculation of amounts of Additional Rents on individual self-invoicing reports, the formats for which will be provided and revised from time to time by City.

      **2.      Landing Fee Management Program**.  In the event that the City implements a landing fee management program or similar system, the City may invoice Airline for Landing Fees based on flight activity provided by such system.  In the event flight activity information from the landing fee management program or similar system conflicts with Airline's Activity Report, the landing fee management program or similar system may prevail.

**C.      Other Activity Reports.**  Airline shall remit, in the form and manner indicated on Exhibit H,  the following monthly Activity Reports by the tenth day of the month for the previous month's activity:

      **1.**      A **"Monthly Schedule Data Report"** form (Form 72-35) attached hereto as Exhibit H, as Exhibit H may be modified by City from time to time, including the number of flight arrivals operated by Airline during the previous month including the type, model and make of aircraft.

      **2.**      A **"Traffic Activity Summary"** form (Form 72-36) attached hereto as Exhibit H, as Exhibit H may be modified by City from time to time, including all passenger, mail and cargo activity for the previous month.  Said Activity Summary shall include the number of Deplaned Passengers and Enplaned Passengers by terminal.

**D.**      As provided for in Section 6.06.F, payments for Other Fees shall be made by Airline when due and payable, as imposed pursuant to the Airport's Rules and Regulations, any federal, state or local law, regulation, ordinance, statute or directive, or this Agreement.

**E.      Electronic Reporting, Billing and Payment Systems.**  City may elect to implement one or more electronic reporting, billing and/or payment systems to collect Airport activity information, disseminate billing information and process payments as an alternative to the methods described above. If City elects to utilize any such systems during the Term of this Agreement, Airline shall make every reasonable effort to comply with the requirements applicable thereto.  Airline shall continue to provide Activity Reports and payments as described above until such time as Airline commences use of any such electronic systems as implemented by City.

**F.**      With respect to each and every filing required herein:

      **1.**      The acceptance by City of any such payment shall not preclude City from questioning the accuracy of Airline's reports upon which the Additional Rents and/or Other Fees are based.  City, as provided for in this Agreement shall have the right, upon reasonable notice,

to examine that portion of the books and records of Airline relevant for the purpose of ascertaining that the amounts paid or to be paid to City are correct.

2.      In the event that Airline fails to remit to City the payments and the supporting data for Additional Rents as described above, City may compute such Additional Rents as though the activity statistics upon which said Additional Rents are based were the same as during the highest month in City's immediately preceding Fiscal Year or in the current Fiscal Year, whichever is higher, or upon the basis of such other estimate thereof as City, in its discretion, deems reasonable.  City will issue an invoice to Airline for such estimated Additional Rents.  After Airline remits the required, but delinquent payment and report to City, City shall recalculate the Additional Rents for the month in question based upon the report.  If the actual Additional Rents are higher than those invoiced by City, Airline shall be liable for any deficiencies in payments; payments for said deficiencies shall be deemed due as of the date such rental, fee or charge was due and payable.

3.      If the actual Additional Rents are less than those Additional Rents invoiced by City to Airline, City shall either apply such overpayment as a credit against a subsequent amount due for such rentals, fees, and charges from Airline or at the election of City, issue a refund, provided, however, Airline shall not be entitled to any credit for late fees on payments of such estimated amounts.

**7.09    Records and Audits of Records**

**A.      Airline Books and Records**

1.      Airline shall keep books of account and other records relating to the provision and requirements of this Agreement (including the records supporting the basis for and recalculation of Monthly Rents, Additional Rents and Other Fees described in Section 6.06 of this Agreement) consistent with its reporting obligations herein.

2.      City, through its duly authorized representative, and the City Controller, shall have the right, at any time during the Term of this Agreement and for three (3) years after the termination of this Agreement, and upon advance notice to Airline and during reasonable business hours, to make an audit or cause an audit, examination or inspection of Airline's original books and records relating to Airline's operations.  Airline shall, if requested, provide assistance to such auditors in making such inspection, and, if such records are maintained in electronic or other machine-readable format, shall provide the Airport and/or its representative such assistance as may be required to allow complete access to such records including providing such records in electronic read-only format compatible with computers utilized by City.

3.      Airline shall make such books and records available to City for audit at the Airport or some other mutually agreed upon location.  Should adequate records not be made available at the Airport or at the agreed upon location, then the additional cost of said audit, including all actual travel, food and lodging expenses incurred by City shall, at City's direction, be borne by Airline.

**4.**     The cost of such audit shall be borne by City; provided however, the actual cost of such audit shall be borne by Airline if the audit reveals an underpayment of five percent (5%) or more of the specific Monthly Rents, Additional Rents or Other Fees being audited and payable under this Agreement for any Fiscal Year, as determined by such audit, or Airline has failed to maintain accurate and complete records required herein.

**B.     City Books and Records**

**1.**     City shall follow such procedures and keep and maintain such books, records and accounts as may be necessary or appropriate under the provisions of this Agreement consistent with City practices.

**2.**     Airline shall be entitled to access such Division of Aviation books, records and accounts that contain any information affecting the computation of Rents and Additional Rents. Airline shall have right at any reasonable time, subject to prior written notice to City, to examine, make copies and take extracts from such books, records and accounts.

**3.**     In addition, in accordance with applicable FAA regulations, all records concerning the Airport are subject to inspection by any duly authorized agent of the United States Secretary of Transportation upon reasonable request.

**Article 8**

**CAPITAL EXPENDITURES**

Capital Expenditures to preserve, rehabilitate protect, enhance, expand, or otherwise improve the Airport System, or any part thereof, will be required during the term of this Agreement.

**8.01.    Approved Capital Improvement Program**

City has identified on Exhibit E-1 and Exhibit E-2 of this Agreement the Capital Expenditures in the Approved Capital Improvement Program planned for inclusion in Airline Cost Centers, as of the date of this Agreement.  Exhibit E-1 reflects the Approved Capital Improvement Program as approved by the Signatory Airlines under prior Airport-Airline Use and Lease Agreements which have not been completed as of the Effective Date of this Agreement.   Exhibit E-2 reflects the Approved Capital Improvement Program for (i) Capital Expenditures approved by the Signatory Airlines under the most recent prior Airport-Airline Use and Lease Agreement but such approval was designated to be effective only upon the Effective Date of this Agreement, pursuant to Section 2.01 and, (ii) as amended, to include Capital Expenditures approved during the Term of this Agreement.

Airline agrees to the inclusion of Airport Expenses associated with the Capital Improvement Projects set forth on Exhibit E-1 and Exhibit E-2, in the identified Airline Cost Centers and in the determination of Airline's rentals, charges and fees upon the Substantial Completion Date of each Capital Improvement Project.  Modification or amendment of Exhibit E-1 and Exhibit E-2 shall not require a formal amendment to this Agreement, but shall be subject to the provisions contained in this Article pertaining to Signatory Airline Consultation Process, as applicable.

**8.02.    Rights regarding Proposed Capital Improvement Projects**

**A.    City's Right to Capital Program.**   Airline acknowledges that nothing contained in this Agreement, including but not limited to the withholding of Capital Expenditure approval by the Signatory Airlines pursuant to this Agreement, in any way limits or restricts the rights of City to implement Capital Improvement Projects within the Airport System at any time.

**B.    Withholding Approval.**   Airline acknowledges that the rights granted in this Article are expressly limited to preventing the inclusion of Airport Expenses of Capital Improvement Project(s) except those exempted in Section 8.03.B below in the applicable rate base for the Airline Cost Centers during this Agreement's Term.

**8.03.    Capital Expenditures Requiring Signatory Airline Consultation**

**A.    Qualifying Projects.**   Capital Expenditures for Capital Improvement Projects require Signatory Airline Consultation, except as exempted in Article 8.03.B below.

**B.    Exempted Projects.**   Notwithstanding the foregoing, certain Capital Expenditures will not require a Signatory Airline Consultation Process and will be excluded from inclusion in a MII vote as follows:

**1.**     The Approved Capital Improvement Program, so long as the aggregate Capital Expenditure for the Approved Capital Improvement Program does not increase more than ten percent (10%) over the estimated aggregate Capital Expenditure as shown on Exhibit E-1;

**2.**     Any reallocation of all or a portion of the funding approved for one or more projects in the Approved Capital Improvement Program set forth on Exhibit E-1 for another Capital Improvement Project(s), or a portion thereof, included in the Approved Capital Improvement Program, so long as City provides the Signatory Airlines with a written notification of the reallocation, an opportunity for a consultation discussion if requested by any of the Signatory Airlines and a revised Exhibit E-1;

**3.**     Any Capital Improvement Project and associated Capital Expenditure required by any agency of the United States government or the Commonwealth of Pennsylvania having jurisdiction over activities within the Airport System or by federal law or executive order;

**4.**     Any Capital Improvement Project and associated Capital Expenditure to repair casualty damage at the Airport System or to Airport System property which must be repaired in order for City to meet its obligations under this Agreement or under any Bond Documents related to the Airport System, the cost of which exceeds the proceeds of insurance;

**5.**     Any Capital Improvement Project and associated Capital Expenditure required to settle claims, satisfy judgments or comply with judicial orders against the State or City by reason of ownership, operation, or maintenance of the Airport System.  To the extent City is able to recoup all or some of its expenditures from insurance proceeds, such amounts shall be refunded to the Airline Cost Center, prorated as applicable; or

**6.**     Any Capital Improvement Project and associated Capital Expenditure that is of an *emergency nature*, as determined by City.

**8.04    Signatory Airline Consultation Process – New Capital Improvement Projects**

**A.     Notification.**  City shall provide a notification to the Signatory Airlines identifying any new Capital Improvement Projects and whether those Capital Improvement Projects require a Signatory Airline Consultation Process in accordance with this Article. The notification shall include (i) the date, time and location for the consultation meeting which shall occur no sooner than fifteen (15) days after delivery of the notification and (ii) the basis upon which City established that a Capital Improvement Project is exempt from the Signatory Airline Consultation Process, if applicable.

**B.     Project Description.**  The notification shall also include the following for each Capital Improvement Project requiring a Signatory Airline Consultation Process outlined on City's notification:

**1.**     A description of the proposed Capital Improvement Project, together with a cost estimate, schedule, estimated Substantial Completion Date, and preliminary drawings, if any;

**2.**     The proposed allocation of Capital Expenditure among Airline Cost Center(s);

3.      An explanation of the need for and/or benefit to be derived from the Capital Improvement Project;

4.      The proposed funding for the Capital Improvement Project;

5.      The impact of the Capital Improvement Project on rates to be paid by the Signatory Airlines in each of the Airline Cost Centers due to the new Airport Expenses upon the Substantial Completion Date of the Capital Improvement Project; and

6.      A description of any required vacating or relocation of Signatory Airlines from the Airline's Leased Premises and the proposed cost of such relocation.

C.      **Additional Capital Projects.**  No later than December 1, 2016, the Airport shall present to the Airlines a project description, in accordance with Section 8.04.B, and a ballot for approval, in accordance with Section 8.06, for one or more of the following projects:

1.      Additional funds of at least $100 million and not more than $250 million for the Terminal Modernization Program for which $200 million was previously approved in 2013;

2.      The planning design and construction of a new FAA control tower consistent with FAA approved location(s); or

3.      Initial phases of planning, design and construction of an extension of Runway 8-26 and related airfield and terminal improvements up to $300 million.

Notwithstanding any other provision of the Agreement and without regard to the date the MII ballot is presented to the Airlines, the Airlines shall have until December 31, 2016, to respond to the ballot.  The Airlines must approve at least one or more of the three projects identified above, but at least one of the approved projects must be either project #2 or #3.

If no projects are approved by the deadline of December 31, 2016, the Airlines shall have twenty (20) calendar days to cure by submitting a new response that approves at least one of the three projects.  If after the expiration of the twenty-day period the Airlines have not cured, the Airport may select one project for approval and it will be deemed approved via the MII procedure.

With regard to project #2 above, the Airport will exercise all diligence and reasonable efforts to secure the maximum amount of project funding from sources other than the Airlines, including without limitation the FAA and funding sources traditionally used for projects of this sort.

Nothing contained herein shall preclude additional MII requests for the three project indicated above.

**8.05    Signatory Airline Consultation Process – Capital Improvement Project Funding Variances**

A.      **Notification.**  City shall provide a notification to the Signatory Airlines in the event:

1.      The aggregate Capital Expenditure for the Approved Capital Improvement Program set forth on Exhibit E-1 exceeds the aggregate amount of the previously

approved Capital Expenditure for the Approved Capital Improvement Program by more than ten percent (10%) or

2.      The amount of any Capital Improvement Project approved in accordance with Section 8.06 for the Approved Capital Improvement Program set forth on Exhibit E-2 exceeds the amount of the approved Capital Improvement Project by more than ten percent (10%) and such excess will increase Airline Revenues to be paid by the Signatory Airlines.

B.      **Documentation.**  In the notification to the Eligible Signatory Airlines, City shall provide:

1.      The reason the approved Capital Expenditure has increased by more than ten percent (10%) over the original estimate or the reason that City now plans to fund the Capital Improvement Project in a manner which will increase Airline Revenues to be paid by the Signatory Airlines;

2.      The particular Airline Cost Center(s) rate base in which the additional Capital Expenditure is to be included upon the Substantial Completion Date of the Capital Improvement Project;

3.      The estimated change in rates to be paid by the Signatory Airlines in each of the Airline Cost Centers due to the revised Airport Expenses upon the Substantial Completion Date of the Capital Improvement Project; and

4.      The date, time and location for the consultation meeting which shall occur no sooner than fifteen (15) days after delivery of the notification.

**8.06.    Signatory Airline Disapproval Process**

A.      **Vote.**  Within thirty (30) days following City-Signatory Airlines consultation meeting, City shall provide all Eligible Signatory Airlines with a ballot and conduct an Eligible Signatory Airline vote as follows:

1.      For those Capital Expenditures or Capital Improvement Project funding variances that will only impact the rates, fees and charges of the Terminal Area Cost Center, the MII will be based on the Terminal Area Cost Center MII Formula, defined as follows:

The MII will require no less than 50% plus one of the number of Eligible Signatory Passengers Airlines representing more than 50% of the Signatory Passenger Airline Enplaned Passengers, including passengers from Affiliates.  This measure will be calculated for the most recently reported twelve (12) month period for which data are available.

2.      For those Capital Expenditures or Capital Improvement Project funding variances that will impact the rates, fees and charges of the Airfield, the Other Buildings and Areas, or the Philadelphia Northeast Airport Cost Centers, the MII will be based on the Airfield Area Cost Center MII Formula, defined as follows:

The MII requires no less than (i) 50% plus one of the number of Eligible Signatory Airlines, and (ii) more than 50% of the Total Maximum Landed Weight.  This measure will be calculated for the most recently reported twelve (12) month period for which data is available

**B.**     **Voting.**  Each Eligible Signatory Airline which is entitled to vote pursuant to the above-described procedures shall submit its ballot to City and the Chairman of the Philadelphia Airlines Airport Committee signifying its approval or disapproval of the proposed Capital Expenditure or Capital Improvement Project funding variance within thirty (30) days of the delivery of the ballots to the Eligible Signatory Airlines.

**C.**     **Approval of Capital Expenditures or Capital Improvement Project Funding Variances.**  Capital Expenditures or Capital Improvement Project funding variances on the ballot distributed to the Eligible Signatory Airlines shall be deemed approved unless disapproval is specifically provided by Eligible Signatory Airlines pursuant to the applicable MII formula, within thirty (30) days of the issuance of the ballot.

**8.07.   Application of Airport Expenses**

**A.**     **Approved Projects.**  The Airport Expenses for Capital Improvement Projects that are exempt from a Signatory Airline Consultation Process or deemed approved by the Eligible Signatory Airlines shall be included in the applicable Airline Cost Center rate base upon the Substantial Completion Date of such Capital Improvement Project.

**B.**     **Disapproved Projects.**  The Airport Expenses for Capital Expenditures or Capital Improvement Project funding variances that are disapproved by the Eligible Signatory Airlines may not be included in an Airline Cost Center rate base unless and until a subsequent Signatory Airline Consultation Process approves the Capital Expenditure or funding variance, as applicable.

**8.08.   Disapproved Capital Improvement Project Status**

From time to time, City may call for another Signatory Airline vote to establish Eligible Signatory Airline approval or disapproval on a Capital Expenditure or Capital Improvement Project funding variance that has previously been disapproved.

**Article 9**

**ALTERATIONS, IMPROVEMENTS AND EQUIPMENT**

**9.01.   City's Construction Rights**

In order that City and its facilities may be suitable for the volume and character of air traffic, flight activity, and passenger traffic, which will require accommodation, and for purposes of maintaining or constructing improvements, modifications, or expansions to the Airport System, including construction of Capital Improvement Projects, City shall have the right to close, temporarily relocate, reconstruct, change, alter, or modify the General Terminal Areas, either temporarily or permanently, and/or the means of access to Airline's Leased Premises or elsewhere in the Terminal Area pursuant to this Agreement or otherwise provided that to the extent reasonably possible, any City-sponsored Capital Improvement Project that is undertaken shall not adversely interfere with Airline's operation of its Air Transportation Business.

**9.02.   Notification**

Unless such action is necessitated by circumstances, which, in the opinion of City, pose an immediate threat to the health and safety of persons using the Airport, City shall provide Airline reasonable notice of the construction activities; the timing of such notice shall be at the discretion of City taking into consideration the nature, the scope, and the anticipated disruption as a result of the construction activities.

**9.03.   Ingress and Egress**

City shall provide reasonably adequate means of ingress and egress for Airline's Leased Premises or for alternate premises in the event Airline is relocated to alternate premises.

**9.04.   Inconveniences during Construction**

Programs of construction, reconstruction, expansion, temporary relocation, maintenance and repair may inconvenience Airline in its operations at Airport.  City will make a reasonable effort to provide alternative accommodations to mitigate any adverse effects of such programs and Airline agrees that no liability shall attach to the Commonwealth of Pennsylvania, City, and their officers, employees, and contractors by reason of such inconvenience and, for and in further consideration of the use of the Airline's Leased Premises, Airline waives any right to claim damages or other consideration therefore except as set forth in Section 9.01 above.  The aforementioned non-liability and waiver shall not apply in the event a claim is due to the gross negligence or willful misconduct of the City or its officers, employees and contractors.

**9.05.   Airline Improvements**

      **A.**    **City Consent.**  Airline shall not construct, install, or make any structural or non structural alterations, additions or improvements to the Airline's Leased Premises, including without limitation, the installation of trade fixtures, without prior approval of City, which will not be unreasonably withheld or delayed; provided, however, that, if City approvals are required for any such alterations, additions or

improvements, the plans and specifications, location and construction schedule for such alternations, additions or improvements shall be (i) approved by City in writing prior to the commencement of any and all such construction or installation, (ii) in compliance with the tenant alterations procedures of City and (iii) in compliance with all applicable laws and regulations, including, without limitation, the requirements of the Americans with Disabilities Act.

       **B.**    **Airport Operation.**  Any work associated with construction and installation by Airline shall not unreasonably interfere with the operation of the Airport, or otherwise unreasonably interfere with the permitted activities of other tenants in or users of the Terminal Area.  Upon completion of the approved construction and within sixty (60) days of the receipt by Airline of a certificate of occupancy, a complete set of as-built drawings shall be delivered to City in a media type and format acceptable for the permanent record of City.

       **C.**    **Property of Airline.**  All alterations, additions and improvements made by Airline, except for those financed by City, shall be and remain the property of Airline until the termination of this Agreement and thereafter will be subject to the provisions of Section 2.04.

**9.06.**   **Airline Improvements Compliance**

Airline Improvements and all alterations thereof and additions thereto, shall in all respects be constructed in accordance with applicable codes and Rules and Regulations of the Airport and pursuant to any required building or installation permit to be obtained from City, Tinicum Township and/or Delaware County, as applicable, according to the customary terms and conditions thereof.

**9.07.**   **Airline Equipment and Furnishings**

Airline agrees that it will, at its own expense, furnish, decorate, insure and provide necessary specialized furnishings and Airline Equipment for its own Airline operations at all areas of the Airline's Leased Premises, to the extent that such furnishings and equipment are not otherwise provided by City for use by Airline as Proprietary Equipment, as set forth in this Agreement.  Such furnishings and equipment provided by Airline shall be (i) kept neat, clean and in presentable appearance, (ii) maintained in good working condition and (iii) subject to the prior approval of City, such approval not to be unreasonably withheld.

**Article 10**

**ASSIGNMENT, SUBLEASE AND TRANSFER OF SPACE**

**10.01.   Prohibited Transactions**

Airline shall not assign, mortgage, pledge or otherwise transfer this Agreement without obtaining the prior written consent of City; provided, however, the foregoing shall not be deemed or construed to require the consent of City in connection with an assignment of this Agreement or any of the rights or privileges granted to Airline herein pursuant to a merger, consolidation, or sale of all or substantially all of the assets of Airline.   Nothing contained herein shall be construed to prohibit City from exercising any of its legal rights existing independently from this Agreement with respect to such merger, consolidation, or asset sale.

**10.02.   Sublease**

Airline shall not sublet any of the space leased to Airline under this Agreement, by operation of law or otherwise, without obtaining the prior written consent of City.

**10.03.   Approved Transactions**

In the event an assignment, subletting, pledge or transfer is approved by City, such approval shall in no way relieve Airline of any contractual obligations assumed under this Agreement unless City specifically consents thereto in its discretion, and such approval shall not constitute a waiver of strict future compliance by Airline with the provisions of this Article.   Further, Airline shall not enter into any agreement to handle other aircraft at the Airport (other than aircraft of Affiliates) without obtaining the prior written consent of City.

**10.04.   Merger, Consolidation or Asset Sale**

    **A.**      If within one (1) year following and as a result of a merger, consolidation, or asset sale as described in Section 10.01, Airline intends to thereafter substantially decrease or discontinue service between the Airport and a particular destination that is not serviced by an Air Transportation Company (other than Airline or its Affiliates) at the Airport, then Airline shall give City advance written notice of the same.   Airline agrees to continue service to such destination for a period of six (6) months after giving said notice; provided, however, Airline shall be relieved of this obligation to the extent that Airline's Leased Premises is inadequate to accommodate the scope of service contemplated in connection with said merger, consolidation or asset sale.

    **B.**      In the event that Airline delivers notice pursuant to the preceding paragraph, City may request a consultation with Airline.   Airline agrees to meet with City within fifteen (15) business days after receipt of such request in an effort to minimize the impact of Airline's merger, consolidation, or asset sale to local passengers and to afford City a reasonable opportunity to find an Air Transportation Company that will begin service between the Airport and the applicable destination.   Nothing contained herein shall

prohibit Airline from substantially reducing or ceasing services in the event that same is required by any governmental agency in order to complete the merger, consolidation, or asset sale.

## 10.05.   Future Compliance

Regardless of City's consent, no subletting or assignment shall release Airline of Airline's obligations or alter the primary liability of Airline to pay Rents and to perform all other obligations to be performed by Airline hereunder, and in the case of an assignment, unless otherwise agreed in writing by City, Airline and such assignee shall be jointly and severally liable for the obligations of Airline under this Agreement. Consent to one assignment or subletting shall not be deemed consent to any other or subsequent assignment or subletting.  In the event of default by any assignee of Airline or any successor of Airline in the performance of any of the terms hereof, City may proceed directly against Airline without the necessity of exhausting remedies against such assignee or successor unless released of its obligation as described in Section 10.03.  City may consent to subsequent assignment or subletting or may execute amendments or modifications to this Agreement with assignees of Airline without notifying Airline or any successor of Airline, and without obtaining its or their consent thereto and such action shall not relieve Airline of liability under this Agreement, except as set forth above.

## 10.06.   Right of First Refusal

For the Term of this Agreement, Airline hereby grants to City a right of first refusal as to any offer that Airline desires to accept from a bona fide third party (whether airline or non-airline entity) to acquire by any transfer mechanism, all or a portion of the Airline's Leased Premises.  This right of first refusal requires City to match the offer, made by such bona fide third party in all material respects within thirty (30) days of the receipt by City of notice of said offer and the desire of Airline to accept it.  To the extent permitted by applicable law, this right of first refusal shall extend to offers made in the context of bankruptcy proceedings.  This right of first refusal shall not apply to (i) any Ground Handling Services; (ii) any agreement with on-airport providers of aviation-related services that includes the use of portions of the Airline's Leased Premises by the service provider in connection with the provision of services to Airline or its Affiliates; (iii) any sublease or assignment to an Affiliate; (iv) any sublease on a month to month term or for a term of one year or less; or (v) any transfer related to a merger, consolidation or asset sale as described in Section 10.01.

## 10.07.   Leasehold Mortgage

Airline may not grant a leasehold mortgage without the prior approval of City, which approval may be withheld in the sole discretion of City.

## 10.08.   Bankruptcy

Notwithstanding any provision contained in this Agreement and to the extent consistent with Federal bankruptcy law, any party to this Agreement which seeks protection under the Federal bankruptcy code, or is currently operating under the protection of the Federal bankruptcy code, herein called "Debtor", shall be prohibited from conveying its interest under this Agreement to any other entity without prior approval of City.  In the event that such a Debtor intends to assume the Agreement, or assume and assign the Agreement pursuant to 11 U.S.C. Section 365, Bankruptcy-Executory Contracts and Unexpired Leases,

the Debtor shall be required to immediately cure any and all defaults and provide adequate assurance of future performance under this Agreement which shall include, but not be limited to (i) adequate assurance of the reliability of the proposed source for the rentals, fees and charges due under this Agreement upon the assumption of the Agreement, and (ii) adequate assurance that all other consideration due under this Agreement shall be forthcoming upon the assumption of this Agreement.

**Article 11**

**DEFAULT AND RIGHTS AND REMEDIES UPON DEFAULT**

**11.01.  Events of Default**

The occurrence of any of the following shall constitute a material breach of the Agreement by Airline and an Event of Default:

**A.**      Airline's abandoning or constructive abandoning of the Airline's Terminal Area Leased Premises as determined pursuant to Section 4.10, if such abandonment or constructive abandonment continues for fifteen (15) days after receipt of notice of default by Airline.

**B.**      Airline's failure to pay any Monthly Rents, Passenger Facility Charge payments or any other payment due hereunder, if such failure continues for ten (10) days after receipt of notice to Airline.

**C.**      Airline's failure to pay, when due, any installment of Additional Rents or other sum required to be paid by Airline hereunder where such failure continues for ten (10) days after notice thereof to Airline.

**D.**      Airline's failure to observe and comply with the requirements of Section 3.04.E, Section 13.12, Sections 14.01.A and 14.01.B, Section 15.01, and Sections 16.05.A and 16.06 where such failure continues for thirty (30) days, after notice thereof to Airline provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such thirty (30) day period, Airline shall not be deemed to be in default if Airline shall within such period commence such cure and thereafter diligently prosecutes the same to completion, and advises City of same, but in no event for longer than sixty (60) days after notice to Airline without the consent of City, or for such shorter cure period as may be specifically prescribed in the applicable article of this Agreement.

**E.**      Airline's failure to observe and perform any other provision or covenant of this Agreement to be observed or performed by Airline, where such failure continues for thirty (30) days after notice thereof to Airline provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such thirty (30) day period, Airline shall not be deemed to be in default if Airline shall within such period commence such cure and thereafter diligently prosecute the same to completion, and advise City of same, but in no event for longer than sixty (60) days after notice to Airline without the consent of City.

**F.**      The filing of a petition by or against Airline for relief in bankruptcy or insolvency or for its reorganization or for the appointment pursuant to any local, state or federal bankruptcy or insolvency law of a receiver or trustee of any part of Airline's property; or, an assignment by Airline for the benefit of creditors; or the taking possession of the property of Airline by any local, state or federal governmental officer or agency or court-appointed official for the dissolution or liquidation of Airline or for the operating, either temporarily or permanently, of Airline's business, provided, however, that if any such action is commenced against Airline the same shall not constitute a default if Airline files a motion to dismiss such action within thirty (30) days after its filing and such action is dismissed or discharged within ninety (90) days after the action against Airline was commenced.

**G.**     Notwithstanding anything set forth in Sections 11.01.A, B, C, and D above to the contrary, in no event shall City be obligated to send more than two (2) notices under any single article of this Agreement in any twelve (12) month period for any of the failures described in those subsections. Any failure occurring after City has sent two (2) notices within a twelve (12) month period shall be an automatic Event of Default hereunder and City shall be entitled to exercise its rights and remedies hereunder.  In any event, more than six (6) Events of Default in any twelve (12) month period will render the next default an automatic Event of Default hereunder and City shall be entitled to exercise its rights and remedies hereunder.

**H.**     A default by Airline which is not cured within the applicable cure period in any other agreement entered into with City relating to the Philadelphia Airport System.

## 11.02.  Remedies of City

Upon the occurrence of any Event of Default set forth in Section 11.01, City, at its option, may take all or any of the following actions:

**A.**     In addition to any other rights and remedies provided to City herein including the respective indemnification provisions set forth herein, City may, without any further liability of City to Airline except in the case of City's gross negligence or willful misconduct, perform any obligations of Airline set forth herein which Airline has failed to perform in a timely manner, after reasonable notice, in which case Airline shall pay to City, upon receipt of invoice, City's costs incurred therefor, plus a fifteen percent (15%) administrative fee, unless a different payment requirement is stated in this Agreement. This provision shall not apply to Airline's responsibility to tow or move aircraft or the like except as otherwise established in Section 3.05.

**B.**     City shall be entitled to terminate this Agreement and, until such time as City has relet the space leased to Airline hereunder, recover (i) all unpaid Rents which have accrued prior to the date of said Event of Default and which are then due and payable, (ii) damages for the period following the termination of the Term, based upon any and all amounts which Airline would have been obligated to pay for the balance of the Term, and City may declare such sums to be immediately due and payable, and (iii) any and all sums due under Section 11.03.  It is agreed that in determining the amount of such damage for the period after termination of any future payments which would have been due City, City may make such determination based upon the sum thereof for the full year immediately prior to the Event of Default. Airline's liability for the payment of the foregoing sum shall survive the termination of the Agreement; and/or

**C.**     City, at any time after the occurrence of any Event of Default whether or not the Agreement has been terminated as aforesaid, may reenter and repossess, the Airline's Terminal Area Leased Premises and any part thereof with or without process of law, provided no undue force shall be used, and shall have the option, but not the obligation either in its own name, as agent for Airline if this Agreement has not been terminated or for its own behalf if this Agreement has been terminated, to give rights and privileges to or lease to other airlines or users, all or any part of the Airline's Terminal Area Leased Premises; provided that City shall not be required to grant rights or lease to any entity proposed by Airline or observe any instruction given by Airline about the granting of such rights.  The failure of City to grant preferential use rights or lease the Airline's Terminal Area Leased Premises or any part or parts

thereof shall not relieve or affect Airline's liability hereunder, nor shall City be liable for failure to grant such preferential rights or lease; or in the event such preferential rights are granted or the space or equipment is leased, for failure to collect the fees or rent thereof, and in no event shall Airline be entitled to receive any excess of net fees collected over sums payable by Airline to City hereunder.  Nor shall such reentry or taking possession of the Airline's Terminal Area Leased Premises be construed as an election on City's part to terminate this Agreement unless a notice of such election by City is given to Airline.  Notwithstanding any such leasing or granting of preferential rights without termination, City may at any time thereafter elect to terminate this Agreement for any previous breach and uncured default.  For the purpose of such leasing or granting of preferential rights, City may, in its reasonable discretion, decorate or make repairs, changes, alterations or additions in or to the Airlines' Terminal Area Leased Premises to the extent deemed by City desirable or convenient, and the cost of such decoration, repairs, changes, alterations or additions shall be charged to and payable by Airline as Rents hereunder, as well as any reasonable brokerage and legal fees expended by City; and any sums collected by City from any new airline shall be credited against the balance of the Rents due hereunder as aforesaid.  Airline shall pay to City monthly, on the days when Rents would have been payable under this Agreement, the amount due hereunder less the amount obtained by City from such new airline, if any; and/or

     **D.**     In the event that City elects to terminate this Agreement, City at its option, may serve notice upon Airline that this Agreement and the then unexpired Term hereof shall cease and expire and become absolutely void on the date specified in such notice, to be no less than ten (10) days after the date of such notice, without any right on the part of Airline thereafter to save the forfeiture by payment of any sum due or by the performance of any term, provision, covenant, agreement or condition broken; and, thereupon and at the expiration of the time limit in such notice, this Agreement and the Term hereof granted, as well as the rights and privileges of Airline hereunder, shall wholly cease and expire and become void in the same manner and with the same force and effect (except as to Airline's liability) as if the date fixed in such notice were the date herein stated for expiration of the Term.  Thereupon, Airline shall immediately quit and surrender to City the Airlines' Terminal Area Leased Premises by summary proceedings, detainer, ejectment or otherwise and remove itself and all other occupants thereof and, at City's option, any Airline property thereon without City being liable for any damages therefore.  No such expiration or termination of this Agreement shall relieve Airline of the liability and obligations under this Agreement accruing prior to the termination thereof, whether or not City leases or grants preferential rights to the Airline's Terminal Area Leased Premises to another entity, or leases the Exclusive Use Space, all of which shall survive such expiration or termination; or

     **E.**     Airline further hereby expressly authorizes and empowers (which power is coupled with an interest) City, upon the occurrence of an Event of Default, to exercise the remedy of self-help with respect to the Proprietary Equipment and to enter upon the Airline's Terminal Area Leased Premises, distrain upon and remove therefrom all inventory, equipment, machinery, trade fixtures and personal property of whatsoever kind or nature, whether owned by Airline or by others and to proceed without judicial decree, writ of execution or assistance or involvement of constables or City and Airline officers, to conduct a private sale, by auction or sealed bid without restriction.  Airline hereby waives the benefit of all laws, whether now in force or hereafter enacted, exempting any personal property on the Airline's Terminal Area Leased Premises from sale or levy, whether execution thereon is had by order of any court or assistance or involvement of constables or City and Airline officer, or through self-help, private sale hereinabove authorized.

**F.**      City shall have the right of injunction, in the event of a breach or default or threat thereof by Airline of any of the agreements, conditions, covenants or terms hereof, to restrain the same and the right to invoke any remedy allowed by law or in equity, whether or not other remedies, indemnity or reimbursements are herein provided.   The rights and remedies given to City in this Agreement are distinct, separate and cumulative remedies; and no one of them, whether or not exercised by City, shall be deemed to be in exclusion of any other.

**G.**      Airline expressly waives the benefits of all laws, now or hereafter in force, exempting any of Airline's property on the Airline's Terminal Area Leased Premises or elsewhere from distraint, levy or sale in any legal proceedings taken by City to enforce any rights under this Agreement.  If proceedings shall be commenced by City to recover possession under the Acts of Assembly, either at the end of the Term of any extension thereof or on sooner termination thereof, or for nonpayment of Rents or any other reason, Airline specifically waives pursuant to 68 P.S. § 250.501(e) the right to the fifteen (15) or thirty (30) day notice and agrees that five (5) days' notice shall be sufficient in either or any such case.  The right to enter judgment against Airline and to enforce all of the other provisions of this Agreement hereinabove provided may be exercised by any assignee of City's right, title and interest in this Agreement, in such assignee's own name, notwithstanding the fact that any or all assignments of said right, title and interest may not be executed and/or witnessed in accordance with the Act of Assembly and any and all laws regulating the manner and/or form in which such assignments shall be executed and witnessed.

**H.**      Neither this Agreement nor any rights or privileges hereunder shall be an asset of Airline in any bankruptcy, insolvency or reorganization proceeding.  If City shall not be permitted to terminate this Agreement because of the provisions of the United States Bankruptcy Code, Airline or any trustee for it shall, within fifteen (15) days upon request by City to the Bankruptcy Court, assume or reject this Agreement, provided however, that Airline may not assume this Agreement unless all defaults hereunder shall have been cured, City shall have been compensated for any monetary loss resulting from such default and City shall be provided with adequate assurance of full and timely performance of all provisions, terms and conditions of this Agreement on the part of Airline to be performed.

**I.**      The failure or delay on the part of either party to enforce or exercise at any time any of the provisions, rights or remedies in the Agreement shall in no way be construed to be a waiver thereof, nor in any way to affect the validity of this Agreement or any act hereof, or the right of the party to thereafter enforce each and every such provision, right or remedy.  No waiver of any breach or default of this Agreement shall be held to be a waiver of any other or subsequent breach or default.  The receipt by City of Rents from and after the time when the non-payment of Rents becomes an Event of Default hereunder shall not be construed as a waiver of such default.  The receipt by City of a lesser amount than the Rents due shall not be construed to be other than a payment on account of the Rents then due, nor shall any statement on Airline's check or any letter accompanying Airline's check be deemed an accord and satisfaction, and City may accept such payment without prejudice to City's right to recover the balance of the Rents due or to pursue any other remedies provided in this Agreement.  No act or thing done by City or City's agents or employees during the Term and any extension thereof shall be deemed an acceptance of a surrender of the Airline's Terminal Area Leased Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by City, unless such surrender is rejected by City.

FINAL

**J.**      City shall have the right, upon any uncured Event of Default hereunder, to cancel the security badge access to the Airport of all employees of Airline.

## 11.03.   City's Right to Cure

City may perform, in whole or in part, any obligation of which Airline is in default, either prior to (provided Airline is not in the process of curing its default) or following the maturation of such default into an Event of Default, and Airline shall pay on demand as Rents any expenditures made pursuant hereto and the amount of any obligations incurred in connection herewith, plus per annum interest at the Default Rate from the date of any such expenditure, and City's performance shall not constitute a cure of such default by Airline.

## 11.04.   City's Expenses

Airline shall be responsible for all of City's costs and expenses, including usual attorneys' fees, in enforcing any and all provisions of this Agreement.  All such costs and expenses shall constitute Rents, shall accrue interest at the Prime Rate from the date of such expenditure, and shall be payable by Airline to City immediately upon demand.

## 11.05.   Disputed Obligations

Notwithstanding anything to the contrary in this Agreement, if a dispute arises between City and Airline with respect to any obligation or alleged obligation of Airline to pay money, the payment under protest by Airline of the amount claimed by City to be due shall not waive any of Airline's rights, and if any court or other body having jurisdiction determines that all or any part of the protested payment was not due, then City shall as promptly as reasonably practicable reimburse Airline any amount determined as not due.

**Article 12**

**DAMAGE OR DESTRUCTION**

**12.01.  Partial Damage**

If all or any portion of the Airline's Leased Premises, (but specifically excluding any Airline Improvements, Airline Equipment, or personal property, fixtures, equipment or other installations provided by Airline in and to the Airline's Leased Premises,) is partially damaged by fire, explosion, the elements, act(s) of war or terrorism, or other casualty, but not rendered untenantable, the same will be repaired with due diligence by City at its own cost and expense, to the extent and only to the extent of insurance proceeds received by City, and there shall be no abatement of Airline payments, provided, however, that if any damage is caused by the act or omission of Airline, its Affiliates, sublessees, agents, or employees, Airline shall be responsible at its expense for making the necessary repairs for which it is responsible as approved by City.  If Airline fails to make the necessary repairs in a timely manner as determined by City, then Airline shall reimburse City for the costs and expenses incurred in such repair, plus a fifteen percent (15%) administrative fee.

**12.02.  Damage Suitable for Repair**

If damages referred to in Section 12.01 shall be so extensive as to render part or all of the Airline's Leased Premises untenantable, but capable of being repaired in one hundred and twenty (120) days, the same shall be repaired with due diligence by City at its own cost and expense, to the extent and only to the extent of insurance proceeds received by City, and Airline payments payable herein shall abate, in proportion to the portion of the Airline's Leased Premises rendered untenantable, from the time of such damage until such time as the Airline's Leased Premises are fully restored and certified by City's engineers as ready for occupancy provided, however, that if any damage is caused by the act or omission of Airline, its Affiliates, sublessees, agents, or employees, Airline shall be responsible, at its expense, for making the necessary repairs as approved by City.  If Airline fails to make the necessary repairs for which it is responsible in a timely manner as determined by City, then Airline shall reimburse City for the costs and expenses incurred in such repair, plus a fifteen percent (15%) administrative fee.

**12.03.  Complete Damage**

In the event the Airline's Leased Premises are completely destroyed by fire, explosion, the elements, act(s) of war or terrorism, or other casualty or so damaged that they are untenantable and cannot be replaced except after more than one hundred and twenty (120) days, City shall be under no obligation to repair, replace, and reconstruct said Airline's Leased Premises and Airline payments shall abate as of the time of such damage or destruction and shall cease until such time as said Airline's Leased Premises are fully restored, or until City provides substitute facilities, acceptable to Airline, for use by Airline.  If within twelve (12) months or such other time as may be mutually agreed to by City and Airline after the time of such damage or destruction said Airline's Leased Premises shall not have been repaired or reconstructed, and City has not supplied substitute facilities, acceptable to Airline, Airline may give City notice of its intention to cancel this Agreement in its entirety as of the date of such damage or destruction.

**12.04.   Airline Acts or Omissions**

Notwithstanding the foregoing, if said Airline's Leased Premises are completely destroyed as a result of the negligence of Airline or its Affiliates, sublessees, agents, or employees, applicable fees and charges shall not abate and City may, in its discretion, require Airline to repair and reconstruct said Airline's Leased Premises within twelve (12) months or such other time as may be mutually agreed to by City and Airline of such destruction and pay the costs therefor; or City may repair and reconstruct said Airline's Leased Premises within twelve (12) months of such destruction and Airline shall be responsible for reimbursing City for the costs and expenses incurred in such repair, plus a fifteen percent (15%) administrative fee.

**Article 13**

**ENVIRONMENTAL MATTERS**

**13.01**.   **Environmental Definitions**

A.      **"Hazardous Substances"** shall mean (i) asbestos, volatile hydrocarbons, industrial solvents, explosives, hazardous chemicals, radioactive material, oil, petroleum, petroleum products or by products, crude oil, natural gas, natural gas liquids, hazardous chemical gases and liquids, volatile or highly volatile liquids, and/or synthetic gas, and shall include, without limitation, substances defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "regulated substance," "pollutant," or "contaminant," as those terms are used in any Environmental Law or at common law, and (ii) any and all other materials or substances that any governmental agency or unit having appropriate jurisdiction shall determine in generally applicable regulations from time to time are hazardous, harmful, toxic, dangerous or otherwise required to be regulated, removed, cleaned-up, or remediated.

B.      **"Environmental Law"** shall mean (i) all applicable current and future federal, state, and local environmental safety or health laws, statutes, rules, regulations, ordinances, orders, or common law including, but not limited to, reported applicable decisions of any applicable state or federal courts and shall include, but not be limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 et seq.); the Toxic Substances Control Act, as amended, (15 U.S.C. § 2601 et seq.); the Hazardous Materials Transportation Act, as amended (49 U.S.C. § 5101 et seq.); the Clean Air Act, as amended, (42 U.S.C. § 7401  et seq.) ; the Clean Water Act, as amended (33 U.S.C. § 1251 et seq.); the Oil Pollution Act of 1990, as amended (33 U.S.C. § 2701 et seq.); the Safe Drinking Water Act, as amended (42 U.S.C. § 300 et seq.); the Air Pollution Control Act, 35 P.S. §4005; the Federal Insecticide, Fungicide and Rodenticide Act, as amended (7 U.S.C.§ 136 et seq.);  the National Oil and Hazardous Substances Pollution Contingency Plan (40 C.F.R. § 300.1 et seq.); the Pennsylvania Solid Waste Management Act, as amended (35 P.S. § 6018.101 et seq.); the Pennsylvania Hazardous Sites Cleanup Act, as amended (35 P.S. § 6020.101 et seq.); the Pennsylvania Clean Streams Law, as amended (35 P.S. § 691.1 et seq.); the Pennsylvania Storage Tank and Spill Prevention Act (35 P.S. § 6021.101 et seq.); Pennsylvania Land Recycling and Environmental Remediation Standards Act (35 P.S. § 6026.101 et seq.); the Pennsylvania Hazardous Material Emergency Planning and Response Act, as amended (35 P.S. § 6022.101 et seq.);  and the Philadelphia Code, as any of the foregoing may hereinafter be amended; any rule or regulation promulgated pursuant thereto; (ii) all applicable Airport Rules and Regulations; and (iii) any other applicable present or future law, ordinance, regulation, permit or permit condition, order, directive or guideline addressing environmental, health, or safety issues of or by the federal government or the Commonwealth of Pennsylvania or other applicable political subdivision thereof, or any agency, court or body of the federal government, or the Commonwealth of Pennsylvania or any political subdivision thereof exercising executive, legislative, judicial, regulatory or administrative functions.

C.      **"Environmental Claim"** shall mean any investigative, enforcement, cleanup, removal, containment, remedial, or other private, governmental or regulatory action at any time that (i) is threatened, instituted or completed   pursuant to any Environmental Law or activity, on the Leased

Premises; (ii) arises or relates to Airline's operations at the Airport; or (iii) otherwise relates to damage, contribution, cost recovery, claims, causes of action, liabilities, fines, penalties, impairments, liens, compensation, loss or injury resulting from or in any way arising in connection with any Hazardous Substance or any Environmental Law.  Notwithstanding the foregoing, an Environmental Claim shall be limited in time to occurring during the Term of the Agreement to the extent:  (a) such Environmental Claim arises outside the Leased Premises; and (b) does not arise as a result of Airline operations on the Leased Premises.

       **D.**     **"Release"** shall mean any unlicensed or unpermitted spill, leak, emission, pumping, pouring, discharging, leaching, dumping, causing to become airborne, percolation or disposing into the environment.

       **E.**     **"Leased Premises"** shall mean the real estate covered by this Agreement, including soil, air, surface water and groundwater; all Improvements thereon; and all fixtures or personal property located on the Leased Premises, including, common areas, ramp areas at and about the concourse and loading bridges at which Airline's aircraft operate, any underground storage tanks, or other storage tanks, pumps, waste oil apparatus, pipes, or related lines.

       **1.**     "On" or "in" when used with respect to the Leased Premises, means on, in, under, above or about.

       **F.**     **"Contamination"** shall mean the uncontained presence of Hazardous Substances resulting from Airline's activities at the Leased Premises or arising from the Leased Premises.

       **G.**     **"Act 2"** shall mean the Pennsylvania Land Recycling and Environmental Remediation Standards Act (35 P.S. §6026.101 et seq.) and its implementing regulations.

       **H.**     **"Applicable Cleanup Standard"** shall mean in all cases the Nonresidential Statewide Health Standard promulgated under Act 2, unless the City, in its sole discretion, agrees to a less stringent "site specific standard" in a particular instance at a specific location.

       **I.**     **"Remediate" or "Remediation"** shall mean to properly cleanup, remove, repair, dispose and/or complete corrective actions to correct contamination in compliance with Environmental Laws and this Agreement.

       **J.**     **"Best Management Practices,"** when used in this Article 13, shall mean those practices and procedures employed by prudent operators at similar facilities regarding a particular matter of Environmental Law or as defined in Environmental Law and any applicable permit, as either may be amended from time to time.

**13.02**.  **Environmental Compliance**

       **A.**     Airline's conduct and operations at the Airport shall at all times be in compliance with all Environmental Laws. Except to the extent provided elsewhere in this Agreement with respect to the Airport Rules and Regulations, in the event of a conflict, the most stringent Environmental Law shall apply.  Airline shall obtain all permits, licenses, or approvals required under Environmental Law to conduct its operations at the Leased Premises or otherwise comply with its obligations under this Agreement. Airline shall at all times comply with the terms and conditions of any such permits, licenses,

approvals, or notifications.  Airline shall make all notifications and equipment modifications as required by applicable Environmental Laws or this Agreement.  Airline shall promptly correct any violation of Environmental Laws at the Airport in connection with its activities at the Airport.

**B.**       Unless otherwise provided below or previously provided, Airline shall within thirty (30) days, for ongoing matters, and within seventy-two (72) hours, for all other matters occurring after the execution of this Agreement, provide to City copies of:

    **1.**       Applications or other documentation submitted to any governmental agency pursuant to any Environmental Laws as related to any and all operations involving or arising from the Leased Premises;

    **2.**       Any notification submitted to a government agency pursuant to the Environmental Laws with respect to the existence of an adverse environmental impact at the Leased Premises or related proceedings;

    **3.**       Any permit, license, approval, or amendment or modification thereto as related to any operations involving or arising from the Leased Premises granted pursuant to Environmental Laws;

    **4.**       Upon request by the City, any record or manifest related to any operations involving or arising from the Leased Premises required to be maintained by Airline pursuant to Environmental Laws;

    **5.**       All known plans, specifications and registration or permitting applications relating to any Storage Tanks (as defined in Section 13.04.A) owned or leased by Airline at the Leased Premises; and

    **6.**       Any notice, violation, summons, order, complaint, or any correspondence, threatening or relating to any of the foregoing received by Airline pertaining to compliance with Environmental Laws as related to any operations involving or arising from the Leased Premises.

The contact for submitting such copies, unless otherwise informed, is the Airport's Planning and Environmental Service Manager.  Airline shall similarly provide (and maintain) to the Airport a single point of contact for any written notices or other information required to be provided to Airline pursuant to this Article 13.

**C.**       Airline shall see that its appropriate employees receive proper training regarding the specific requirements of all Environmental Laws concerning Airline's conduct and operations involving or arising from the Leased Premises.

**13.03.  Site Contamination**

**A.**       Airline shall not cause or permit those conducting operations on its behalf to cause Contamination at the Airport. Airline shall at all times handle Hazardous Substances in a manner consistent with Best Management Practices and Environmental Laws.

**B.**      In the event of a Release or threatened Release of Hazardous Substances into the environment relating to or arising out of Airline's use or occupancy of the Leased Premises and/or common use areas during the Term of this Agreement, where the Release is caused by the Airline or a third party, Airline, upon discovery, shall immediately notify City on the Airport's emergency number 215-937-3111, which shall be confirmed by Airline in writing within forty-eight (48) hours, unless such Release or threatened Release is less than a reportable quantity, and the total volume of the Release can be immediately and completely Remediated and poses no risk of harm to health, the environment or of permanent damage to City property including without limitation the Leased Premises; provided, however, that all Releases of jet fuel, aviation gasoline, other petroleum products, or placarded non-petroleum substances shall be reported to City by Airline in accordance with the reportable quantity requirements defined in the Division of Aviation's Spill Notification Procedure for the Airport and Northeast Philadelphia Airport.  Any Release entering a storm drain shall also be reported.  The reporting of a Release by the Airline's contractors or agents shall fulfill Airline's requirements under this Section 13.03.B. Airline acknowledges that its responsibility to Remediate Contamination applies to Contamination caused by its subleasees, agents, employees, contractors, fuelers, or invitees.

**1.**      Any correction of a violation or condition which requires a cleanup, proper disposal, removal, repair or other remedial action by Airline as noted herein, shall be completed as soon as practicably possible consistent with Best Management Practices. Airline shall Remediate any Contamination related to Airline's operations to at least the Applicable Cleanup Standard. Any such action lasting longer than sixty (60) days shall require a remediation action plan which shall require the prior approval of City.  Such approval shall not be unreasonably withheld.

**2.**      Upon stabilization of the Release site, Airline shall develop, within a reasonable time frame, a remediation action plan where required by Section 13.03.B.1, prepared by a licensed environmental firm or professional to be submitted to City for approval.  Such a plan, at a minimum, must comply with all Environmental Laws.

**3.**      Once approved by City, Airline shall proceed with execution of the remediation action plan as soon as reasonably possible and shall work expeditiously to fully Remediate the Contamination to the Applicable Cleanup Standard consistent with an appropriate schedule for the work as approved by City.  As to any such Remediation, Airline shall exercise prudent diligence and shall act with all due speed to complete any such project.  Airline shall submit to City copies of all test results, close out reports and related items for City's records.  Airline shall not be responsible for any pre-existing environmental conditions that were present at the time Airline or any predecessor in interest (i.e. U. S. Airways now American) first occupied the Leased Premises or any part thereof.  Notwithstanding the foregoing, Airline shall be responsible for such pre-existing conditions to the extent that Airline operations exacerbate, aggravate or otherwise adversely impact such pre-existing conditions.  If disagreement exists as to the pre-Release condition of the Leased Premises, Airline bears the burden of proof regarding any pre-existing conditions present at the time Airline took control of Leased Premises.

**4.**      If Airline is responsible for the Remediation of any Contamination, Airline shall have the right to propose a site specific cleanup standard pursuant to Act 2 to be used as the Applicable Cleanup Standard.  The City may at its sole discretion and prerogative grant or deny such request in whole or in part.  Such discretionary decision by City, if granted, shall apply only

to the specific Release in a specified instance and at the particularly designated location.Small spills, whether or not reportable, shall be cleaned up completely and in accordance with all Environmental Laws.

**C.**     If Airline fails to Remediate any Contamination to the Applicable Cleanup Standard or if Airline fails to correct a violation of Environmental Laws or this Agreement, City, after providing Airline with a reasonable opportunity to cure such failure, may (but shall not be required to) take all steps it deems necessary to properly complete such Remediation or correct such violation in accordance with the terms of this Article 13. Any such Remediation or correction shall be at Airline's sole cost and expense and Airline shall indemnify City for any such Remediation or correction pursuant to Section 13.07**.**

**1.**     If remedial action equipment needs to be stored in connection with City's actions as described above, Airline will provide to City storage (at no charge) and water and electrical service in connection with the Remediation.

## 13.04.  Storage Tanks

**A.**     In accordance with the approvals and notifications required under this Article, Airline shall not, without City's consent, install, modify or remove any Storage Tank on the Leased Premises.  As used in this Agreement "Storage Tank" means any aboveground or underground storage tank owned, operated, or used by Airline or any predecessor in interest (but excluding totes and other mobile containers), the associated underground or aboveground piping directly servicing such storage tank, any waste oil related apparatus, pumps servicing such storage tank, and one or more of the following which are associated with such storage tank: (i) ancillary equipment directly related to tank use or operation, (ii) foundation, (iii) containment structure or facility, (iv) corrosion protection system, (v) release detection system, or (vi) spill and overflow protection system, pumps, waste oil apparatus, related or associated appurtenances, pipes, or related lines (collectively referred to as a "Storage Tank" or "Storage Tanks").

**B.**     **Storage Tank Requirements**

**1.**     If Airline obtains City's consent to install or modify Storage Tanks, or if Airline is currently using Storage Tanks on the Leased Premises or common use areas, the Airline shall maintain such Storage Tanks in a safe, efficient and orderly manner and in a manner that conforms to all Environmental Laws.

**2.**     All Storage Tanks installed or used by Airline on the Leased Premises or common use areas during the Term of this Agreement shall be equipped with spill detection instruments and alarms as well as spill containment and overflow devices as required by Environmental Laws or pursuant to this Agreement, which Airline shall maintain in proper working condition in accordance with law, regulations and applicable industry standards.   Nothing contained herein shall diminish the obligation of Airline to remove the Storage Tanks during the Term to the extent required under Environmental Laws or otherwise pursuant to this Agreement, and to Remediate the presence of any Hazardous Substances Released from such Storage Tanks at the expiration or termination of this Agreement.  City may order removal of Storage Tanks for cause during the lease term.

**C.      Removal of Storage Tanks**

**1.**      City may order removal of Airline's Storage Tanks at the Leased Premises during the Term if such Storage Tanks are found to be Releasing or pose an imminent threat of Releasing Hazardous Substances into the environment.

**2.**      Upon termination of this Agreement, unless otherwise agreed to by the parties, Airline shall be responsible for the complete removal and disposal of any Storage Tanks on the Leased Premises, which removal and disposal shall commence within thirty (30) days of the notice to terminate this Agreement; *provided, however,* that upon agreement by the parties, such Storage Tanks may be transferred to a new tenant or closed in place, or such removal or closure in place of the Storage Tanks may be deferred to such later time as the parties may agree. If no mutual agreement to the contrary is reached any such Storage Tanks shall be removed by Airline as required herein.  Any such removal or closure in place (if agreed by the parties) shall be performed in accordance with all Environmental Laws and Airline shall be responsible for Remediation of any Contamination of the Leased Premises related to such Storage Tanks in accordance with Section 13.03.

**3.**      If Airline fails to remove, transfer, close in place, or defer action, if applicable under Section 13.04.C.2, the Storage Tanks that must be removed under the terms of this Agreement, City may, after providing Airline the opportunity to cure such default pursuant to Section 13.12, remove or close in place if applicable, the same, at Airline's expense, and take such other measures as required to Remediate any Contamination caused by such Storage Tanks to the Applicable Cleanup Standard.  Any such Storage Tank removal, closure in place or Remediation shall be at Airline's sole cost and expense and Airline shall indemnify City pursuant to Section 13.07.  In connection with City's actions under this Section 13.04.C, Airline agrees to cooperate with City or any other governmental agency in furnishing such information related to the Storage Tanks as is required by City or by any other governmental agency.

**13.05.  STORMWATER**

**A.**      Airline acknowledges that the Airport is subject to the National Pollution Discharge Elimination System ("NPDES") Program and its regulations relating to operational and industrial stormwater discharges, 40 CFR Part 122, for operations that occur at the Airport.   Airline further acknowledges that it is familiar with these NPDES stormwater regulations, and that it will conduct operations at the Airport in compliance with applicable provisions of 40 CFR Part 122 and any of the Airport's NPDES permit requirements, and any subsequent amendments, extensions or renewals thereto, to the extent such permits affect Airline's operations at the Airport. Upon request, City will provide to Airline copies of the Airport's NPDES permits and the Pollution Prevention Contingency (PPC) Plan, and agrees to provide a copy of any new NPDES permit application or major modification to the PAAC.  City and Airline will consult informally and reasonably prior to submission regarding appropriate requirements, and upon submission to the Pennsylvania DEP, City will consider any timely and reasonable comment received from the PAAC. City shall notify Airline of any changes to any portions of said permit and plan applicable to, or that affect, Airline's operations.  City shall provide Airline with a final copy of any changes to the permit or PPC Plan.

**B.**      City and Airline acknowledge that close cooperation is necessary to ensure compliance with stormwater discharge requirements. Airline acknowledges that it may be necessary for it to minimize the exposure of stormwater to materials generated, stored, handled or otherwise used by Airline by implementing and maintaining Best Management Practices.

**C.**      Airline agrees to participate in any reasonable manner requested by City in any City organized task force or other work group established to coordinate stormwater activities at the Airport.

**D.**      To ensure compliance with City's NPDES permit, Airline shall undertake the following responsibilities so as to not contaminate City's stormwater system:

        **1.**      Airline shall report to City, all reportable quantity spills of Hazardous Substances, and any other spills, including but not limited to lavatory waste spills that enter into any storm drain, waterway, or soil, regardless of quantity. In addition, spills of fuel or other petroleum products shall be reported by City or Airline, as applicable in accordance with the Division of Aviation's Spill Notification Procedure for the Airport and Northeast Philadelphia Airport. Airline is responsible for the cleanup and disposal of all spills caused by Airline, and any of its subleasees, agents, employees, contractors, fuelers or invitees. Airlines shall also at all times comply with the reporting requirements set forth in Section 13.03.B.

        **2.**      Airline shall maintain its vehicles to prevent Releases of Hazardous Substances from such vehicles to stormwater.  Airline shall not clean, degrease, or replace vehicle fluids of any aircraft or vehicle, including but not limited to ground service equipment (GSE), without incorporating proper containment and recovery methods, which prevent oil, or other vehicle fluids, or cleaning fluids or other potential contaminants from entering the soils or storm drains.  Such cleaning or maintenance activities may only be performed in City designated areas unless Airline obtains City's express authorization otherwise.

        **3.**      City may require Airline to remove vehicles that leak Hazardous Substances from service until properly repaired.  As a temporary measure, Airline shall place drip pans and/or DOA-approved absorbent under such leaking vehicles, promptly clean up all leaks and spills, and properly dispose of all material used to cleanup spills.

        **4.**      Airline shall allow City's designated representative access to its vehicle maintenance facilities, upon reasonable notice during regular business hours, and at any time in cases of emergency.

        **5.**      If any discharges from Airline vehicles or operations occur that enter or threaten to enter the Airport stormwater system, the Airline shall immediately stop the discharge and immediately report the discharge to the Airport using its emergency number (215.937.3111).  All Releases from any Airline vehicle must be properly and fully Remediated in accordance with Environmental Law and this Agreement.  Airline shall take all necessary measures to stop such discharge and report the Release as required by Section 13.03.B hereof.

**13.06.  Record of Hazardous Materials**

Within thirty (30) days of execution of this Agreement and annually thereafter, and when amended by Airline thereafter, Airline shall provide City with a copy of any completed Superfund Amendments and Reauthorization Act (SARA) forms (EPA Form 8700-30 etc.) required for its operation, on an annual basis, listing Hazardous Substances which were present on the Leased Premises or the common use areas and reported to a governmental agency within the last twelve (12) months; and any documentation to or from a governmental agency not previously submitted to City of all Releases of Hazardous Substances that occurred or were discovered on the Leased Premises or the common use areas during the term of this Agreement. Airline shall also complete, and provide copies to Airport annually, and when amended by Airline thereafter, a hazardous substance survey form created by the Pennsylvania Department of Labor and Industry under the Pennsylvania Worker and Community Right-to-Know Act (35 P.S. §7302 et seq., P.L. 734 No.159). Airline shall maintain such records of Hazardous Substances for not less than three (3) years.

**13.07.  Environmental Indemnification**

In addition to all other remedies available to City under this Agreement, at law or in equity, Airline shall indemnify, defend and save harmless City, its officials, officers, agents, boards, commissions, employees, successors and assigns (Indemnified Parties) from and against any and all Environmental Claims, whether known or unknown, foreseeable or unforeseeable, regardless of the source, to the extent permitted by law (collectively, "Indemnified Environmental Claims"), including, but not limited to:  (i) any and all expenses City may incur in complying with any Environmental Laws (including the costs of inspection, testing, or audit), penalties or fines imposed by any governmental agency, (including fines levied against City for Airline's failure to comply); (ii) the expense of Remediating any Contamination to achieve the Applicable Cleanup Standard at the Leased Premises; (iii) any claims by third-parties for any personal injury, death, natural resources or property damage (real or personal) arising out of or related to Hazardous Substances used (including storage or disposal) by Airline; (iv) all reasonable legal expenses and fees incidental to the investigation and defense of any Indemnified Environmental Claims, including but not limited to reasonable legal fees, court costs, expert witness and/or consultant fees, (and any costs related thereto); and (v) any diminution in value of the Leased Premises assuming its current use by Airline (or another similar tenant) under this Lease; and (vi) any costs relating to or arising from aggravation of or contribution to any pre-existing conditions that arise from or are caused by the acts or omissions of Airline, its agents, employees, licensees, invitees, or any other persons or entities acting by, through, under or on behalf of Airline on the Leased Premises, except to the extent arising primarily out of:  (a) the gross negligence or willful misconduct of City; (b) Releases of Hazardous Substances on or from the Leased Premises that are caused solely by the acts of third parties not contractually related to either Airline or the City; and (c) pre-existing Hazardous Substances that existed on the Leased Premises prior to the date on which the Airline first occupied the property, subject to the conditions, exceptions and proof requirements in Section 13.03.B.3 *and provided, however,* that with respect to any claims otherwise excluded under Section 13.07(b), Airline agrees to reimburse the City for its actual, usual and out-of-pocket attorney and investigative fees spent by City in pursuing any such third parties.  In addition, Airline shall defend the Indemnified Parties against any claim which could reasonably be expected to give rise to indemnification of the Indemnified Parties even if such claim alleges that the Indemnified Parties are wholly or partially at fault or strictly liable for causing the loss.  It is further expressly agreed that to the extent Airline is obligated to indemnify the City against any Indemnified Environmental Claims hereunder, the Airline also assumes any obligations to indemnify and defend all third parties against such losses to

the extent the City is obligated to indemnify and defend such third parties against such losses by contract. The foregoing indemnity shall survive the expiration or earlier termination of this Agreement.  City will use its best efforts to notify Airline promptly upon its discovery and verification of such a claim. Remediation of any Contamination that forms the basis of an Indemnified Environmental Liability shall be conducted in accordance with Environmental Laws and pursuant to this Agreement. Claims for environmental matters are limited to indemnification under this Section 13.07 and are not subject to the general indemnification provisions of Section 14.02 of this Agreement.

**13.08.   Waste Removal and Disposal by Airline**

**A.** Airline shall remove and dispose of all Hazardous Substances generated by Airline, or resulting or arising from Airline's activities or operations at the Leased Premises during the Term of this Agreement in full compliance with all Environmental Laws.  Such removal and disposal shall include, but not be limited to, Airline manifesting any hazardous wastes for disposal under Airline's assigned U. S. Environmental Protection Agency Identification Number and ensuring that removal of such hazardous wastes from the Leased Premises and the Airport is accomplished in accordance with Environmental Laws.  Airline shall be solely responsible for Contamination on the Leased Premises as a result of the storage, handling or leakage of any substances stored at or transported to the Leased Premises by Airline, its agents, employees, fuelers, licensees, invitees, or any other persons or entities acting by, through, under or on behalf of Airline.  Upon termination of this Agreement for any reason, Airline shall also be responsible for the safe and proper removal of all Hazardous Substances possessed, used and/or generated in connection with Airlines operations at the Leased Premises in full compliance with all Environmental Laws.  Airline shall be responsible for the Remediation of any Contamination of the Leased Premises arising from its operations in accordance with Section 13.03.

**B.** Upon termination of this Agreement for any reason unless otherwise agreed by the parties, ownership of any Storage Tanks, waste oil apparatus or related lines used, installed or operated on or under the Leased Premises during the term of this Agreement, shall remain with Airline and shall not pass to City.  Storage Tanks shall be removed in accordance with Section 13.04.

**13.09.   Lead-Based Paint**

Airline agrees that in conducting or managing any improvements on the Leased Premises Airline will be solely responsible for the abatement of lead-based paint hazards to the extent required by Environmental Laws, and Best Management Practices; provided, however, that Airline shall not be responsible for the abatement of lead-based paint hazards that are pre-existing Airline's occupancy of the Leased Premises only when Airline does not conduct or manage any improvements related to such hazards.  Upon request by Airline, City will provide any reports or other information in City's possession regarding the presence of lead-based paint.  City assumes no liability for damages for personal injuries, illness, disability, or death, to Airline or any other person including members of the general public arising from or incident to the purchase, transportation, removal, handling, use, disposition, or other activity causing or leading to contact of any kind whatsoever with lead-based paint on the Leased Premises in connection with Airline's completion of any such improvements, whether Airline and/or City has properly warned or failed to properly warn the individual(s) injured.

**13.10.  Environmental Audit**

A.      Not more than once every two (2) years, upon City's request, the Airline shall cause an audit to be conducted (at Airline's expense) to assess Airline's compliance with Environmental Laws at the Leased Premises.  If Airline fails to cause such an audit to be initiated within sixty (60) days after City's request, City shall have the right, but not the obligation, to conduct or cause to be conducted an audit to assess Airline's compliance with Environmental Laws on the Leased Premises (collectively, the "Compliance Audit").   City shall provide Airline reasonable opportunity to consult with and provide comments to City as to the design of the Compliance Audit before such audit is conducted.  No such Compliance Audit shall be conducted by City more than once every two (2) years, unless City has a reasonable basis to believe that Airline has materially breached the provisions of this Article 13. Airline shall have the right to have an Airline representative present during any such Compliance Audit.   In conducting any such Compliance Audit, City shall not unreasonably interfere with Airline's operations. Airline shall be responsible for the documented expense of such Compliance Audit undertaken by City through normal City rates and charges.

1.      If the resulting Compliance Audit report reveals non-compliance with any Environmental Laws at or affecting the Leased Premises related to Airline's operations, or indicates that a Release of Hazardous Substances has occurred on the Airport that was caused by Airline, its agents, employees, fuelers, licensees, invitees (not including passengers), or any other persons or entities acting by, through, under or on behalf of Airline, or elsewhere if such non-compliance or Release appears to have been attributable to Airline's use or operation at the Airport, then Airline shall be responsible for such non-compliance and shall deliver to City a report ("Compliance Report") within sixty (60) days of Airline's receipt of the Compliance Audit from its auditor or from the City, containing an explanation of the non-compliance and a corrective action plan that is consistent with this Agreement. Airline shall be responsible for the Remediation of any Contamination of the Leased Premises found during the Compliance Audit in accordance with Section 13.03.  The Compliance Report and corrective action plan shall be subject to City review and approval.

a.      minor violations found during Audit pursuant to this Agreement which can be corrected to the satisfaction of City prior to completion of the Audit shall not require a corrective action plan.

b.      Airline shall have reasonable opportunity to review and comment on findings or conclusions of the Audit before the Audit is finalized,

2.      Within forty-five (45) days after City's approval of the Compliance Report and corrective action plan, or as otherwise agreed by the parties, Airline shall commence and expeditiously proceed to complete at its sole cost and expense, subject to City's review and approval, the corrective action plan.  City approval shall not be unreasonably withheld.

3.      Notwithstanding the foregoing, if any local, state or federal agency with jurisdiction over the Airport establishes a remediation plan or schedule to address any confirmed Release of Hazardous Substances at the Airport, such agency's plan or schedule shall control, except to the extent it fails to return the Leased Property to the Applicable Cleanup Standard.  If disagreement exists as to the pre-Release condition of the site, Airline bears the burden of proof

regarding pre-existing conditions present at the time Airline took control of Leased Premises.

4.      If Airline does not complete the required Remediation as required by Environmental Laws or pursuant to the terms of this Agreement, in the time periods set forth in the corrective action plan or schedule, City shall have the right, but not the obligation, to implement such corrective actions to address such non-compliance.  If City implements any Remediation action pursuant to this Agreement or pursuant to any Environmental Laws, Airline shall reimburse City for its actual, usual and out-of-pocket costs (including administrative, investigative or attorney costs), without limiting any other claims or damages that City may have against Airline arising out of the terms of this Agreement or otherwise.

5.      In the event the Compliance Audit reveals non-compliance with any Environmental Laws or indicates that a Release of Hazardous Substances has occurred on the Airport, and it is not clear which Air Transportation Company is responsible for such non-compliance or Release, Airport shall investigate and where reasonably possible seek Remediation and/or costs from the responsible party or parties.  City shall prepare a compliance and Remediation plan consistent with this Article.   City shall provide Airline reasonable opportunity to consult with and provide comments to City as to the design of the compliance and remediation plan.  If, after investigation, the City cannot determine the responsible party or parties or said party(s) are not financially viable, the Airline and all other Air Transportation Companies shall be responsible for the actual and usual out-of pocket costs (including administrative, investigative and attorney costs) of such plan and resulting Remediation through normal City rates and charges.

B.      City shall keep the results of the Compliance Audit, any summaries of the Compliance Audit and any Compliance Reports confidential and shall not share them with any persons other than Airline and its representatives unless it is required to disclose such results, summaries, and reports pursuant to applicable law, in which case City will provide Airline with sufficient advance notice to the extent allowed by law prior to disclosure to allow Airline to seek protection of confidential business information or trade secrets.

## 13.11.  Inspection

City may at all reasonable times after reasonable advance notice and in the presence of an employee or agent of Airline, except in the event of an emergency which access shall be unlimited, or as may be required by any federal, state or local agency having jurisdiction and requesting such inspection, enter the Leased Premises to conduct inspections, tests, samplings, split samples or other investigations in connection with Airline's obligations under the provisions of this Article.   City will not unreasonably interfere with Airline operations.

## 13.12.  Remedies

Airline's breach of any provision of this Section or Article (including, without limitation, any uncorrected violation of Environmental Law or Release of Hazardous Substances) shall be an Event of Default under Article 11 of this Agreement and in such case, City shall be entitled to exercise any and all remedies as set forth in this Agreement, at law or equity, if such breach continues for thirty (30) days, after notice thereof to Airline; provided, however, that if the nature of the default is such that the same cannot

reasonably be cured within such thirty (30) day period, Airline shall not be deemed to be in default if Airline shall within such period commence such cure and thereafter diligently prosecutes the same to completion, and advises City of same, but in no event for longer than sixty (60) days after notice to Airline without the written consent of the City.  Except as set forth in Article 11, nothing in this Section or Article shall be construed or deemed to limit any remedies which City may have against Airline hereunder, at law or equity.

### 13.13.   No Third Party Rights

This Article shall create no third party interests or causes of action and City expressly reserves the right to compel any third party responsible for pre-existing environmental conditions to Remediate at its own cost and expense.

### 13.14.   Survival

The provisions of this Article shall survive the termination of Airline's tenancy or of this Agreement.  No subsequent modification or termination of this Agreement, by agreement of the parties, or otherwise, shall be construed to waive or modify any provision of this Article unless the termination or modification agreement or other document so states in writing.

### 13.15.   End of Occupancy

At least thirty (30) days prior to the final vacating of Leased Premises in connection with the termination or expiration of this Agreement, City shall obtain an environmental assessment sufficient to assess site impacts associated with Airline's occupancy, operations or activities on Leased Premises.  The documented cost of the end of occupancy audit shall be paid through normal City rates and charges.  City shall provide Airline reasonable opportunity to consult with and provide comments to City on any such environmental assessment.  Any Contamination on Leased Premises that is caused by Airline's occupancy, operations, or activities at the Airport disclosed in the environmental assessment prepared at the termination of this Agreement shall be the responsibility of Airline, and Airline shall be obligated promptly to effect the Remediation of such environmental contamination in accordance with this Article, as provided for in Section 13.03.

### 13.16.   Airport Rules and Regulations

In the event of a conflict between the Airport Rules and Regulations and any provision of this Article 13 (including without limitation any Applicable Cleanup Standard), the provisions of this Article 13 shall govern.

**Article 14**

**INSURANCE AND INDEMNIFICATION**

**14.01.  Insurance Requirements**

      **A.      Insurance Requirements.**  During the Term and any extension thereof, Airline shall, at its sole cost and expense, obtain and maintain in full force and effect, and promptly pay all premiums, when due, for, the following types of insurance in the amounts specified and in the form heretofore provided for:

          **1.      All Risk Property Insurance.**  All Risk property insurance including the perils of flood, earthquake and wind, covering all improvements, betterments, equipment, trade fixtures, merchandise, business personal property and any other property in Airline's care, custody or control, (other than aircraft hull, spaces, cargo and passenger baggage and personal effects) in an amount equal to the full replacement cost and with no penalty for coinsurance.  Said policy may take into consideration any limitations on liability that may exist in favor of Airline for customer goods.

          **2.      Boiler and Machinery.**  Boiler and machinery insurance against loss or damage from explosion, electrical injury or arcing, erupting, collapsing or mechanical breakdown of boilers or pressure vessels and all equipment parts thereof and appurtenances attached thereto to the extent applicable to the space leased to Airline.

          **3.      Automotive Liability.**  Automotive liability insurance covering liability arising from the ownership,  maintenance and use of all owned, non-owned, hired, leased and rented trucks, automobiles, with a combined single limit of $1,000,000 which requirement shall be $10,000,000 for those vehicles with access to the Airfield Area.

          **4.      Worker's Compensation and Employer's Liability.**  Worker's compensation and employer's liability insurance affording statutory coverage and containing statutory limits with the employer's liability insurance at limits of $1,000,000 each accident/$1,000,000 each employee/$1,000,000 policy limit. In addition, such policy shall include Waiver of Right to Recover From Others endorsement in favor of the City of Philadelphia, its respective officials, employees, agents, representatives, successors and assigns.

          **5.      General Liability Insurance/Aviation Liability.**  General liability insurance/aviation liability insurance in amounts not less than $100,000,000 per occurrence combined single limit for bodily injury (including death) and property damage liability; $100,000,000 general aggregate.  Coverage shall include but not be limited to Premises operations; contractual liability; passenger liability; War Risk and other perils which coverage shall be $50,000,000;  personal injury and advertising liability ( contractual exclusion deleted) which coverage shall be $10,000,000; Fire, legal liability which coverage shall be $1,000,000; products and completed operations; and liability for vehicles on the restricted access areas of the Airfield Area including baggage tugs, aircraft pushback tugs, provisioning trucks, air stair trucks,

belt loaders and ground hangar keeper's liability.  Explosion, collapse and underground property damage liability coverages shall not be excluded from such insurance coverage.

      **a.**    **Aircraft Liability Insurance.** Airline shall maintain aircraft liability insurance with a limit of not less that (A) $50,000,000, with respect to Airline that operates aircraft with a passenger capacity not in excess of 20 persons, or (B) $100,000,000, with respect to all other Airlines, in any case with aggregates where applicable, for bodily injury or death, and property damage for all owned, operated, maintained, non-owned, leased, or hired aircraft.   The aircraft liability insurance may be included in the General Liability/Aviation Liability insurance.

    **6.**    **Contractors' Insurance.**  Any (i) contractor, construction manager or other party engaged by Airline or (ii) subcontractor or other party engaged by a contractor, construction manager or other party that is engaged by Airline, in either case, to perform any construction, renovations or repairs at the Airport shall obtain and maintain in full force and effect during any construction period:

      **a.**    A commercial general liability insurance policy for premises operations, products/completed operations, personal and advertising injury, broad form property damage, contractual liability, in minimum limits, unless otherwise specified, of $1,000,000 per occurrence for bodily injury and $2,000,000  General Aggregate.

      **b.**    Automotive liability insurance covering liability arising from the ownership, maintenance, and/or use of all owned, non-owned and hired, leased and rented trucks and/or automobiles, with a combined limit of $1,000,000 which requirement shall be $10,000,000 for those vehicles with access to the Airfield Area..

      **c.**    A worker's compensation policy affording statutory coverage and containing statutory limits and employer's liability insurance at limits of $1,000,000 per accident/$1,000,000 each employee/$1,000,000 policy limit. In addition, such policy shall include Waiver of Right to Recover From Others Endorsement in favor of the City of Philadelphia, its respective officials, employees, agents, representatives, successors and assigns.

      **d.**    Professional liability insurance shall be maintained when any architect or engineer performs, directly or indirectly, work for or on behalf of Airline at Airport or involving Airline's operations and/or the Total Airline Leased Premises with a $1,000,000 policy limit.

If coverage is written on a Claims-made basis, the retroactive date applicable to the coverage shall precede the effective date of this Agreement; and that continuous coverage will be maintained for a period of at least two (2) years after final payment to provide two (2) years of completed operations coverage.

    **7.**    **Environmental Impairment or Pollution Liability.**  Environmental impairment or pollution liability insurance covering a minimum limit of $5,000,000 per occurrence for bodily injury (including death) and property damage.  Coverage shall include sudden, accidental and

gradual occurrences, as well as, coverage for receiving, dispensing, transporting, removing, handling or storing aviation fuels or any other pollutants, and may be written on a claims-made basis provided that coverage for occurrences happening during the term of this Agreement shall be maintained in full force and effect under the policy of "tail" coverage for a period of at least two (2) years after expiration or termination of this Agreement.  Airline, with the concurrence of City, may self-insure this risk.

       **8.**      **Self-Insurance.** In the event that Airline wants to self-insure any of the coverage listed in this Agreement, it shall make available its public financial statements on-line. In the event the City grants its approval, Airline understands and agrees that the City, its officers, employees and agents shall be entitled to receive the same coverage and benefits under Airline's self-insurance program that they would have received had the insurance requirements been satisfied by a reputable insurer. The insurance (including self-insurance) requirements set forth herein are not intended and shall not be construed to modify, limit or reduce the indemnifications made in the Agreement by Airline to the City, or to limit Airline's liability under the Agreement to the limits of the policies of insurance (or self-insurance) required to be maintained by Airline hereunder."

       **9.**      **Liquor Liability Insurance.**  If alcoholic beverages are served or sold on the Airline's Leased Premises, liquor liability insurance coverage shall be maintained in an amount of $5,000,000; provided, however, that no alcoholic beverages shall be served or sold unless approved in writing by City.

  **B.**      **Additional Requirements.**  All policies of insurance provided for in this Article 14 shall be issued in form reasonably acceptable to City by insurance companies accepted in the United States or International airline industry which shall include Airline's captive, if applicable, and otherwise acceptable to City.  At no time may Airline cancel any insurance without thirty (30) days (ten [10] days in the case of a cancellation due to non-payment of premium) prior written notice to City.  Airline may change insurance carriers as long as the obligations under this Article 14 are met and notice of such change is provided to City within ten (10) days.  Each and every such policy:

       **1.**      except for worker's compensation, employer's liability, professional liability, boiler and machinery and property insurance, shall be issued in the name of Airline and shall name City, its respective officers, employees, agents, successors and assigns and any other parties in interest from time to time designated in writing by notice from City to Airline as additional insureds to the extent covered and indemnified herein.  The coverage offered to the additional insureds shall be primary coverage to any coverage maintained by the additional insureds and shall not permit or require such other coverage to contribute to the payment of any loss.  In addition, the additional insureds shall also be provided the same completed operations coverage as detailed under the General Liability/Aviation Liability Coverage section herein;

       **2.**      with respect to liability insurance, shall be for the mutual and joint benefit and protection of City and Airline and  additional insureds;

       **3.**      shall (or certificates thereof shall) be delivered to City's Risk Manager (One Parkway, 1515 Arch Street, 14th Floor, Philadelphia, PA 19102) with a copy to the Division of Aviation, and additional insureds prior to the commencement of the Term and thereafter as soon as practical prior to the expiration of each such policy, and, as often as any such policy shall

expire or terminate.  Renewal or additional policies shall be procured and maintained by Airline in like manner and to like extent;

4.      shall be on an "occurrence" basis and not a "claims made" basis, except for pollution and professional liability which may be on a claims made basis with a tail. If coverage is written on a claims-made basis, the retroactive date applicable to the coverage shall precede the effective date of this Agreement; and that continuous coverage shall be maintained for a period of at least two (2) years after final payment.

C.      **Inspection of Policies**.  Airline will submit certificates of insurance.  If the City has questions concerning Airline's required coverage herein, the City may require Airline to furnish written responses from its authorized insurance carrier, broker or airline representatives at any time upon ten (10) business days written notice to Airline.

D.      **Waiver**.  To the extent permitted by law, Airline hereby waives all claims against the City for any loss or damage to Airline's property which loss or damage is covered by insurance or required to be insured against pursuant to this Article 14, except for such claims which arise due to the willful misconduct or sole negligence of City.

E.      **Failure to Maintain.**  In the event Airline fails to cause such insurance to be maintained, City  (i) shall not be limited in the proof of any damages which City may claim against Airline or any other person or entity to the amount of the insurance premium or premiums not paid or incurred and which would have been payable upon such insurance, but City shall also be entitled to recover as damages for such breach the uninsured amount of any loss, and damages, expenses of suit and costs, including without limitation reasonable cancellation fees, suffered or incurred during any period when Airline shall have failed or neglected to provide insurance as required herein and (ii) City may, after advance written notice,  provide such insurance by taking out policies from companies satisfactory to City in amounts which may be lesser than or equal to those specified herein.  The amount of the premiums paid for such policies by City shall be payable by Airline on receipt of City's billing therefore with interest at the Default Rate per year, accrued and compounded on a monthly basis, commencing from the date of payment by City.  Further, if Airline fails to comply with the insurance requirements set forth herein, City may terminate this Agreement upon seven (7) days prior written notice to Airline.

F.      **Increases.**  Airline may not use the Airport or conduct any additional, non-standard airline operations in any manner that will increase City's insurance rates with respect to the Airport.  If Airline's additional, non-standard operations activities at the Airport result in increased insurance costs for City at the Airport or in the cancellation of a City insurance policy, then City may, after advance written notice, charge the increased cost or the cost of obtaining new insurance to Airline as additional rent hereunder.

G.      **Minimums.**  The policy dollar amounts stated herein are minimums only; City shall be entitled to the full benefit and protection of any higher dollar amount of coverage stated in an insurance policy actually carried by Airline.  The insurance requirements set forth herein shall not be construed as a representation by City that the satisfaction of such requirements will be sufficient to protect Airline.

**H.    No Limitation.**  The insurance requirements set forth herein shall in no way be intended to modify, limit or reduce the indemnifications made in this Agreement by Airline to City or to limit Airline's liability under this Agreement to the limits of the policies of insurance required to be maintained by Airline.

**I.    Sublessees.**  No subleasing of any interest in any part of this Agreement shall be effective unless and until City in writing acknowledges that it has received satisfactory evidence of a sub-lessee's insurance policies and/or coverage.

**J.    Changes to Insurance Requirements.**  The parties acknowledge and agree that circumstances affecting, among other things, the Airport, City, Airline, the aviation industry and the insurance market may occur during the Term hereof and, as a consequence, City may, upon written notice and after consultation with Signatory Airlines, adjust the insurance requirements set forth in this section at any time during the Term if, in City's judgment, the insurance requirements of this Agreement are deemed inadequate to properly protect City and/or the Airport and Airline shall promptly comply with such adjustment(s).  Any changes to insurance requirements will be implemented at the next applicable insurance policy renewal term.

**K.    Incidents.**  If any accident or event occurs during the Term which results in or may have resulted in bodily injury, personal injury, property damage, or a loss of any kind or is otherwise covered or should be covered by the insurance coverage provided for herein and such accident or event occurs in or about the Airport, then such accident or event in excess of $25,000 filed against or involving Airline and City based upon accidents or events at the Airport or involving Airline's operations in or around the Airport is to be reported  promptly to City (in any case no later than twenty-four hours after Airline has knowledge of the occurrence thereof) and a written report thereof shall be submitted to City within three days after the occurrence of the accident or event.  Further, any individual claim for damages in excess of twenty-five thousand dollars ($25,000) filed against or involving Airline and City based upon accidents or events at the Airport or involving Airline's operations in or around the Airport shall be reported to City within ten (10) days following receipt of such claim by Airline.    Airline is not required under this Section 14.01.K to report worker's compensation claims against Airline.

**L.    Deductibles.**  The payment of deductibles under any insurance policy required herein shall be made solely by Airline and City shall not have any liability for payment thereof. Any deductible amounts in excess of $500,000 shall be disclosed to the City.

**14.02   Indemnification.**

**A.    General.**  To the fullest extent provided by law, Airline shall indemnify, defend and hold harmless City, its officials, agents, employees, representatives, successors and assigns (the "Indemnified Parties") from and against all liability for claims, suits, causes of action, liabilities, losses, costs and expenses (including reasonable attorneys fees),  for which the Indemnified Parties may be held liable by reason of injury (including death) to any person (including Airline's employees) or damage to any property whatsoever kind or nature except to the extent caused by City's sole negligence or willful misconduct of every kind relating to or arising in connection with:

      **1.**    Any act or negligent omission of Airline, its agents, directors, officers, employees, contractors or sublessees arising out of or in any manner connected with the Total Airline Leased Premises (including, but not limited to, Airline's use or occupancy of Total Airline Leased

Premises, ingress or egress to Total Airline Leased Premises, access or use of parking lots, walkways or common areas and any alterations or work done in or about the Total Airline Leased Premises by the Airline or on the Airline's behalf);

  **2.**   Any breach, violation or nonperformance of any covenant, term or condition of this Agreement to be performed or observed by Airline, or of any restrictions of record or of any applicable laws, ordinances, statues, rules, codes or regulations, affecting the Total Airline Leased Space, Proprietary Equipment (unless such Proprietary Equipment was purchased or constructed by City in contravention of such applicable laws and/or regulations) or Airline Equipment, or any part of the Total Airline Leased Space, Proprietary Equipment or Airline Equipment, or the ownership, occupancy or use thereof;

  **3.**   Any encroachment of improvements made by Airline upon property adjoining the Total Airline Leased Premises.

The indemnification contained in this Section 14.02 applies to this Section 14.02 only.   Said indemnification does not apply to City-maintained equipment or property, unless caused by Airline's negligence.   Nothing herein shall prevent the Signatory Airline(s) to which City has tendered a matter covered by any indemnification provision of its/their Use and Lease Agreement from joining as a defendant any Air Transportation Company to the extent permitted by applicable law.

  **B.**   **Defense of Proceedings.**   In case any action or proceeding is brought against City by reason of any matter referred to in this Article 14 or any other Article herein to defend City, Airline, upon written notice from City (which shall be promptly given), shall at Airline's sole cost and expense, resist or defend such action or proceeding by counsel approved by City in writing (which approval shall not be unreasonably withheld), provided that no approval of counsel shall be required in each instance where the action or proceeding is resisted or defended by counsel of an insurance carrier obligated to resist or defend such action or proceeding, and further provided that City may engage at its own expense its own counsel to participate in the defense of any such action.

  **1.**   If Airline determines that the defense of such action is not covered by this Agreement, Airline shall immediately give City notice thereof.

  **2.**   If Airline fails to defend such action as required by this Article 14, Airline will be responsible for all defense costs and usual expenses incurred by City insofar as permitted by law as well as any settlement amounts paid or payable by City and/or damages awarded against the City by a court of competent jurisdiction.

  **3.**   City shall be notified in advance of any potential settlements of any action defended herein and Airline shall also be notified of any potential settlements in the event of a City defense of said action.

  **4.**   The provisions of Article 14 as they apply to occurrences or actual or contingent liabilities arising during the Term of this Agreement shall survive the expiration or any earlier termination of this Agreement for the applicable statute of limitations, but no longer than six (6) years, with the exception of losses involving minor children or the construction on real property.

    **C.**    **Non-Waiver of Tort Claims Act.**  Nothing contained in this Agreement shall be construed as a waiver by City of rights under the Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat. Ann. Section 8541 et seq., as may be amended from time to time, nor as a limitation on the rights and defenses available to City under law.

**Article 15**

**NON-DISCRIMINATION**

**15.01.  Local Requirements**

    **A.**    This Agreement is entered into under the terms of the Philadelphia Home Rule Charter, the Fair Practices Ordinance (Chapter 9-1100 of the Philadelphia Code) and the Mayor's Executive Order No. 04-86 (the "Executive Order"), as they may be amended from time to time, and in performing this Agreement, Airline shall not discriminate or permit discrimination against any individual because of race, color, religion, ancestry, national origin, sex, gender identity, sexual orientation, age or disability. Nor shall Airline discriminate or permit discrimination against individuals in employment, housing and real property practices, and/or public accommodation practices whether by direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation or preference in the treatment of a person on the basis of actual or perceived race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status,  source of income, familial status, genetic information or domestic or sexual violence victim status, Human Immunodeficiency Virus (HIV) infection, or engage in any other act or practice made unlawful under the Philadelphia Home Rule Charter, Chapter 9-1100, the Executive Order, or under the non-discrimination laws of the United States or the Commonwealth of Pennsylvania. In the event of any breach of this Section 15.01, the City may, in addition to any other rights or remedies available under this Agreement, at law or in equity, suspend or terminate this Agreement forthwith.

    **B.**    In accordance with Chapter 17-400 of the Philadelphia Code, Airline agrees that its payment or reimbursement of membership fees or other expenses associated with participation by its employees in an exclusionary private organization, insofar as such participation confers an employment advantage or constitutes or results in discrimination with regard to hiring, tenure of employment, promotions, terms, privileges or conditions of employment on the basis of race, color, sex, sexual orientation, religion, national origin or ancestry, constitutes, without limiting the applicability of any other provision of this Agreement, a substantial breach of this Agreement entitling City to all rights and remedies provided in this Agreement or otherwise available at law or in equity.

    **1.**    Airline agrees to include the immediately preceding paragraph, with appropriate adjustments for the identity of the parties, in all subcontracts which are entered into for work to be performed pursuant to this Agreement.

    **2.**    Airline further agrees to cooperate with the Commission on Human Relations of City of Philadelphia in any manner which the Commission deems reasonable and necessary for the Commission to carry out its responsibilities under Chapter 17-400 of the Code.  Airline's failure to so cooperate shall constitute, without limiting the applicability of any other provision of this Agreement, a substantial breach of this Agreement entitling City to all rights and remedies provided in this Agreement or otherwise available in law or equity.

**15.02.  Federal Requirements**

    **A.**    Airline covenants and agrees that in order to confirm the assurance required by City of Philadelphia by Federal non-discrimination laws, statutes and regulations, including, but not limited to, Title VI of the Civil Rights Act of 1964 and 49 C.F.R. Part 21 of the regulations governing the U.S. Department of Transportation ("DOT"), as amended, (a) no person on the grounds of race, religion, color, national origin, sex, age or disability shall be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of any space leased to it hereunder and (b) Airline shall use the premises in compliance with all other requirements imposed by or pursuant to 49 C.F.R. Part 21 and Title VI of the Civil Rights Act of 1964, and as said regulations may be amended. Noncompliance with this clause will constitute a material breach of this Agreement; therefore, in the event of such noncompliance, Airline hereby authorizes Airport to take such action as the Federal government may direct to enforce this covenant, and Airline also authorizes the Federal government to take appropriate action to enforce compliance, including the right to seek judicial enforcement.

    **B.**    Airline will undertake any affirmative action program as required by 14 C.F.R. Part 152, Subpart E, as amended from time to time, to ensure that no person is excluded from participating in any employment, contracting, or leasing activity on the grounds of race, religion, color, national origin or sex. Airline agrees that no person may be excluded on those grounds from participating in or receiving the services or benefits of any program or activity covered by the regulation. Airline will require its covered sub-organizations to provide assurance that they will also undertake affirmative action programs and require assurances from their sub-organizations, as required by 14 C.F.R. Part 152.

**Article 16**

**MISCELLANEOUS PROVISIONS**

**16.01.   Taxes and Assessments**

  **A.** **Payment of Taxes.** Airline agrees to pay all applicable sales, use, intangible and ad valorem taxes or excises of any kind which may accrue as to the operations of Airline, the leasehold estate of Airline, or the personal property of Airline situated at the Airport, whether levied against Airline or City.   Airline shall be entitled to seek whatever tax exemptions may be available, but City makes no representations whatsoever concerning the current or future tax-exempt status of the leasehold estate or any other taxable property, taxable sales, or taxable income.   Airline may, at its expense, contest the amount or validity of any tax or assessment, or the inclusion of the Airline's Leased Premises as taxable or assessable property, directly against the taxing or assessing authority, so long as any non-payment of such taxes by Airline does not result in a lien against the real property or any improvement thereon or a direct liability on the part of City.   Airline shall indemnify and hold City harmless from all liability and expense arising from such contest, including all taxes, penalties, costs, expenses and attorney fees incurred by City resulting directly or indirectly from all such tax contests, and provide an escrow or bond in the amount of City tax claim or security satisfactory to such other taxing authority with respect to the performance by Airline of such indemnification obligation.   The indemnification contained in this Section 16.01 applies to this Section 16.01 only.

  **B.** **No Liens.** Airline shall not permit a lien or encumbrance to attach to the Airline's Leased Premises by reason of any failure of tax payment.

  **C.** **Tax Payment Verification.** Airline shall provide to City, upon ten (10) days prior notice and at no cost, any information deemed necessary by them to verify taxes paid on the Airline's Leased Premises with respect to City or to the municipality or authority with taxing jurisdiction of the Airline's Leased Premises.

  **D.** **Tax Proration.** Upon any termination of this Agreement, all lawful taxes then levied as a lien upon any of such property or taxable interest therein, as appropriately prorated if applicable, shall be paid in full by Airline immediately, or as soon as a statement of taxation has been issued by the appropriate taxing authority if termination occurs during the interval between the attachment of the lien and the issuance of a statement.

**16.02.   Condemnation / Eminent Domain**

  **A.** **Total Taking.** During the term of this Agreement, if the whole, or, if such a portion of the Airline's Leased Premises as will materially interfere with Airline's conduct of its business be taken or acquired or be sold to a government in lieu thereof under threat of such a taking (each event hereinafter called a "taking") for any public or quasi-public use or purpose under any power of eminent domain or condemnation, then, and in any of such events, the term of the Agreement shall cease and terminate on the date that title vests in the condemning authority pursuant to such proceedings or under such sale in lieu thereof.   Airline shall pay all required payments apportioned to the date of such termination and shall

promptly vacate the Airline's Leased Premises.  All sums representing prepaid rents, fees or charges, if any, shall be promptly repaid to Airline.

**B.**    **Partial Taking.**  If the taking of the Airline's Leased Premises is not the whole and not such a portion as will materially interfere with Airline's conduct of its business, then the Agreement shall expire as to that portion of the Airline's Leased Premises taken but shall continue in full force and effect as to that portion of the Airline's Leased Premises not taken.

### 16.03.  Energy Conservation and Recycling

City and Airline shall become familiar with and comply with all applicable local, state, and federal environmental laws and policies regarding recycling, green building, water conservation, energy conservation, renewable energy, and air quality.  City has established and implemented environmental policies and principles that reflect the City's priorities with respect to environmental sustainability.[1]  Such policies and procedures outline recommended criteria to efficiently manage environmental issues, establish a commitment to pollution prevention and regulatory compliance, and increase environmental awareness and stewardship by City and by all Airport tenants.  These policies and principles are subject to revision in the future and the Airline shall be notified in writing of revisions in a timely manner and provided an opportunity to comment on any such proposed revision prior to finalizing such changes.

Airline shall use reasonable and customary efforts to comply with City's policies and programs. to the extent such policies and programs are consistent with the terms and conditions of this Agreement.  Airline shall have the right to participate in the development of such policies and programs and City shall fully consider for incorporation Airline's comments. In furtherance of the Airport's sustainability and environmental stewardship goals, the Airlines shall appoint and maintain at least one representative to the PHL Sustainability Committee or any successor working group.

### 16.04.  Alternative Minimum Tax Issues

**A.**    **Agreement Integrity.**  It is the intention of the Signatory Airlines and City that the terms and conditions of this Agreement shall not serve as an impediment to addressing any alternative minimum tax issues as currently in the Code or as such Code provisions may be amended from time to time.  Those modifications of a term or terms of this Agreement as may be necessary to specifically address any alternative minimum tax issue affecting this Agreement may be made during the term of this Agreement and without amendment to this Agreement subject to the provisions contained in Section 16.04.B and Section 16.04.C.

**B.**    **Consultation.**  City is hereby authorized to consult with bond and/or tax counsel from time to time during the term of this Agreement with respect to the classification "specified private activity bonds" and the effects of alternative minimum tax as set forth in the Code on the terms and conditions of this Agreement, and to further determine the necessity of a modification of a term or terms contained herein to satisfy the intention of the Signatory Airlines and City to (1) minimize the risk of future Bonds

---

1   The City's policies and principles including the following:  City of Philadelphia Executive Order 1-07 "Climate Protection, Environmental Stewardship and the Office of Sustainability and Environment" (2007),the City of Philadelphia Greenworks Plan (2009) and the Philadelphia International Airport Environmental Policy (2006)

being classified as "specified private activity bonds" and (2) insure that this Agreement shall not be affected by the alternative minimum tax provisions.

**C.      Signatory Airline Approval.**  Signatory Airlines and City agree that City shall provide notification to the Signatory Airlines of any required modification to a term or terms of this Agreement to satisfy the requirements set forth in Section 16.04.B.  The notification shall include the date, time and location of a consultation meeting between the Signatory Airlines and City, which consultation meeting shall occur not sooner than fifteen (15) days after delivery of the notification.  Within thirty (30) days following the consultation meeting, each Eligible Signatory Airline shall notify City in writing of its approval or disapproval of the proposed modification of any term or terms of this Agreement to satisfy the requirements as set forth in Section 16.04.B.  Failure by any Eligible Signatory Airline to notify City of its approval or disapproval on or before the date as provided herein shall be deemed to be an approval of the modification by such Eligible Signatory Airline.  The modification to this Agreement shall be effective upon receipt by City of approval notifications or, (30) days following the consultation meeting, deemed approvals from at least fifty percent (50%) plus one (1) of the number of Eligible Signatory Airlines representing at least sixty-five percent (65%) of the Total Maximum Landed Weight, based on the most recent Calendar Year for which such data is available.

**D.      Limited Rights and Parties Bound.**  The modifications of any term or terms of this Agreement pursuant to the provisions contained in this Section 16.04 are specifically limited to any required modification to a term or terms of this Agreement to satisfy the requirements set forth in Section 16.04.B.  City and all Signatory Airlines agree to be bound by any modifications to this Agreement made pursuant to the provisions contained in this Section 16.04.

## 16.05.  Certification of Non-Indebtedness

**A.      Airline Not Indebted.**  Airline hereby certifies and represents pursuant to Chapter 17-1000 et seq. of the City Code that Airline and Airline's parent company(ies) and Subsidiary Airline(s) are not currently indebted to City, excluding Division of Aviation, and will not at any time during the Term of this Agreement (including any extensions or renewals thereof) be indebted to City, excluding Division of Aviation, for or on account of any delinquent taxes (including, but not limited to, taxes collected by City on behalf of the School District of Philadelphia), liens, judgments, fees or other debts for which no written agreement or payment plan satisfactory to City has been established.   In addition to any other rights or remedies available to City at law or in equity, Airline acknowledges that any breach or failure to conform to this certification may, at the option of City, result in the withholding of payments otherwise due to Airline and, if such breach or failure is not resolved to City's satisfaction within a reasonable time frame specified by City in writing, may result in the offset of any such indebtedness against said payments and/or the termination of this Agreement for default (in which case Airline shall be liable for all excess costs and other damages resulting from the termination).

**B.      Requirement for Subcontractors.**  Airline shall require all subcontractors performing work in connection with this Agreement or subleases, with appropriate modifications to the language regarding the parties, to be bound in writing by the following provision and Airline shall cooperate fully with City in exercising the rights and remedies described below or otherwise available at law or in equity:

Subcontractor hereby certifies and represents that Subcontractor and Subcontractor's parent company(ies) and subsidiary(ies) are not currently indebted to City and will not at any time during the term of Airline's Agreement with City, including any extensions or renewals thereof, be indebted to City, for or on account of any delinquent taxes (including, but not limited to, taxes collected by City on behalf of the School District of Philadelphia), liens, judgments, fees or other debts for which no written agreement or payment plan satisfactory to City has been established.  In addition to any other rights or remedies available to City at law or in equity, Subcontractor acknowledges that any breach or failure to conform to this certification may, at the option and direction of City, result in the withholding of payments otherwise due to Subcontractor for services rendered in connection with the Agreement and, if such breach or failure is not resolved to City's satisfaction within a reasonable time frame specified by City in writing, may result in the offset of any such indebtedness against said payments otherwise due to Subcontractor and/or the termination of Subcontractor for default (in which case Subcontractor will be liable for all excess costs and other damages resulting from the termination).

## 16.06.  Northern Ireland Provision

City urges companies doing business in Northern Ireland to move towards resolving employment inequities and encourages such companies to abide by the MacBride Principles as expressed in Section 17-104 of the Philadelphia Code.  City urges Philadelphia companies to do business with corporations that abide by the MacBride Principles.  Airline acknowledges that it has read and understands the above statement of City concerning doing business in Northern Ireland.

## 16.07.  No Recordation

This Agreement shall not be recorded in any office of public record, and the recordation hereof by Airline shall be deemed an event of default hereunder.

## 16.08.  Supervening Law / Agreement with Government

**A.**     **No Exclusive Right.**   Nothing herein contained shall be construed as granting or authorizing the granting of an exclusive right within the meaning of Section 308 of the Federal Aviation Act or any other statute, ordinance, regulation or policy of any governmental agency having jurisdiction over the Airport and/or the activities that take place at the Airport.  Further, nothing contained herein shall be construed as violating PFC Assurance Number 7.

**B.**     **Subordination to Agreements with United States**

**1.**     This Agreement is subject and subordinate to the provisions of any existing or future agreement made between City and the United States relative to the operation or maintenance of the Airport, the execution of which has been made or may be required by the provisions of the Federal Aviation Act of 1958, as amended, or any future act affecting the operation or maintenance of the Airport.

**2.**     All provisions of this Agreement shall be subordinate to the rights of the United States to lease, occupy, use, operate or otherwise assume control of the Airport, or any part

thereof, during time of war or national emergency, and any provisions inconsistent with the provision of such lease to, or assumption of control by, the United States shall be suspended.

       **C.**      **Restrictions of Record.**  This Agreement is subject to all restrictions of record affecting the Airport and the use thereof and all federal statutes and regulations affecting the same, and shall be subject and subordinate to the provisions of any and all existing and future agreements made between City and the Commonwealth of Pennsylvania and/or the United States relative to the operation and management of the Airport, the execution of which has been or will be required as a condition precedent to the transfer of Commonwealth or federal rights or property to City for Airport purposes, or to the granting or expenditure of Commonwealth or federal funds or PFCs for the extension, expansion, or development of the Airport, including the expenditure of federal funds for the development of the Airport in accordance with the provisions of the Airport and Airway Development Act, as it has been amended from time to time.

       **D.**      **Assurance Agreements.**  This Agreement is subject and subordinate to the terms of any "Sponsor's Assurance Agreement" or like agreement that has been or may be furnished to the FAA by City or required by law.  In the event that the FAA or its successors require modification or changes in this Agreement as a condition precedent to the granting of its approval or to the obtaining of funds for improvements at the Airport or as a requirement of any prior grants, Airline hereby approves any and all such modifications, amendments, revisions, supplements or deletions of any of the terms, conditions or requirements of this Agreement as may reasonably be required.

## 16.09.  Compliance with Law

Airline agrees to observe and comply with all applicable current and future Federal, State and municipal laws, statutes, ordinances and regulations, including such ordinances, resolutions, and rules and regulations as City may from time to time promulgate or adopt relative to the use of any property owned by City, including the premises that are the subject of this Agreement and the conduct of persons in, on and about such City property in order to preserve such property and to protect the public health, safety and welfare.  Airline agrees to cooperate with City in the enforcement of Airport rules, regulations and policies.  Nothing in this Agreement shall waive, or be construed to waive, any power or authority of City under all applicable laws, ordinances, statues, rules and regulations.  The City agrees with the Airline that, pursuant to Section 3 of the Ordinance (Bill No. 150531), effective June 18, 2015, the provisions of Section 16.16 of this Agreement satisfy the provisions of Section 18-201(8) of the Philadelphia Code. Accordingly, compliance with Section 16.16 of this Agreement effectively complies with applicable local law.  Airline will require providers of Ground Handling Services as defined in Section 18-201 of the Philadelphia Code to comply with applicable and lawful regulations issued by the Department of Commerce.

## 16.10.  Governing Law

Unless preempted by federal law, this Agreement is to be read, construed, governed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

## 16.11.  Waiver of Jury Trial

It is mutually agreed that City and Airline hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other as to any matters arising out of or in any way connected with this Agreement.

### 16.12.   Notices

Notices or communications required herein shall be in writing and given by personal delivery or sent by overnight delivery or United States mail, postage prepaid.  Unless otherwise provided in this Agreement, any notice shall be effective upon its actual receipt, but, in any event, shall be presumed to have been received by the addressee no later than forty-eight (48) hours after deposit of same in mail, or on the first working day after said forty-eight (48) hour period, whichever occurs later.  Either party shall have the right, by giving notice to the other, to change the address at which its notices are to be received.  Until any such change is made, notices shall be addressed and delivered as follows:

> **A.**      If intended for City:
>
> Department of Commerce
> 1515 Arch Street, 12th Floor
> Philadelphia, PA 19102
> Attn: Director of Commerce
>
> Division of Aviation
> Terminal E
> Philadelphia International Airport
> Philadelphia, PA 19153
> Attention: Chief Executive Officer
>
> With a copy to:
>
> City of Philadelphia Law Department
> 1515 Arch Street, 16th Floor
> Philadelphia, PA 19102
> Attention: Divisional Deputy City Solicitor, Transportation Division

B.      Notices to Airline shall be mailed to:
>      Frontier Airlines, Inc.
>      7001 Tower Road
>      Denver, Colorado 80249
>      Attn: William Rowsell

### 16.13.   Force Majeure

Neither City nor Airline shall be deemed to be in default hereunder if either party is prevented from performing any of the obligations imposed under this Agreement by reason of strikes, boycotts, labor disputes, embargoes, shortage of energy or materials, acts of God, acts of the public enemy, acts of superior governmental authority, weather conditions, riots, rebellion, sabotage, or any other circumstances for which it is not responsible or which is beyond its control.  City shall be under no obligation to furnish any service or supply any utility if and to the extent and during any period that the furnishing of any such service or the supplying of any such utility, or the use of any device or component necessary therefore, shall be prohibited or rationed by any federal or state law, rule, regulation,

requirement, order or directive.  Under no circumstances shall the happening of any event provided for in this section excuse Airline from paying the rentals, fees and charges payable to City by Airline, pursuant to the terms of this Agreement and during the term of this Agreement.

**16.14.  Most Favored Nation**

  **A.**  City covenants and agrees not to enter into any lease, contract or any other agreement with any other Air Transportation Company containing substantially more favorable terms than this Agreement, or to grant to any tenant engaged in Air Transportation Business, rights or privileges with respect to the Airport that are not accorded Airline hereunder, unless the same rights, terms and privileges are concurrently made available to Airline.

  **B.**  If any aircraft operator shall undertake any operations at the Airport for the carriage of passengers, cargo and/or mail by air, City shall require, to the extent legally permissible, such other aircraft operator to execute and deliver an agreement, permit, license, lease or contract with City providing for:

    **1.**  The payment of Landing Fees at rates and on such other terms and conditions as are not more favorable to the other party than those rates or terms and conditions then in effect for Airline.

    **2.**  The payment of rentals for any space leased from City in the Terminal Area at rates not less than those rental rates then payable by Airline for similar space.

    **3.**  The payment for use by such aircraft operator of all Joint Use Space and operating costs of all baggage handling or other passenger service systems calculated and billed to such party as in the case of Airline.

**16.15  21st Century Minimum Wage and Benefits Standard**

Chapter 17-1300 of the Philadelphia Code ("Code"): Philadelphia 21st Century Minimum Wage and Benefits Standard. Airline acknowledges that Airline is subject to Chapter 17-1300 of the Code. Any Subcontract between Airline and a Subcontractor to perform Services under this Agreement is a "Service Contract," as that term is defined in Chapter 17-1300 of the Code, and such Subcontractors are also "Service Contractors" for purposes of Chapter 17-1300, as are any subcontract and subcontractor at any tier providing Services under this Agreement. (Chapter 17-1300 is accessible at http://www.amlegal.com/library/pa/philadelphia.shtml.) If such subcontractor at any tier is also an "Employer," as that term is defined in Section 17-1302 (more than 5 employees), and further described in Section 17-1303 of the Code, then absent a waiver, during the term of this Agreement, in addition to any applicable state and federal requirements, Airline shall provide, and shall enter into Subcontracts and otherwise cause any subcontractors at any tier that are also Service Contractors to provide, their respective covered Employees (persons who perform work for a covered Employer that arises directly out of a Service Contract), with at least the minimum wage standard and minimum benefits standard, and required notice thereof, stated in federal and state law and in Chapter 17-1300 of the Code. A summary of the current requirements is as follows:

  **A.**  **Minimum Wage.**

    **1.**  As of July 1, 2015 provide covered Employee with an hourly wage, excluding benefits, that is no less than $12 per hour.

**2.** As of January 1, 2016 and during each year thereafter, provide covered Employees with an hourly wage, excluding benefits, that is no less than the result of multiplying $12 by the then current CPI Multiplier as annually adjusted, as described in the paragraph below:

For purposes of determining the minimum hourly wage required under the paragraph above, the CPI Multiplier is an annual calculation made by the City's Director of Finance to take effect as of January 1 of each year. The CPI Multiplier is calculated by dividing the most recently published Consumer Price Index for all Urban Consumers (CPI-U). All Items Index, Philadelphia, Pennsylvania, as of January 1st of each year, by the most recently published CPI-U as of January 1, 2015. The then current minimum hourly wage applicable to City contractors and Subcontractors will be posted on the City's web site.

**B.     Minimum Benefits.**  To the extent an Employer provides health benefits to any of its employees, provide each full-time, non-temporary, non-seasonal covered Employee with health benefits at least as valuable as the least valuable health benefits that are provided to any other full-time employees of the Employer; and provide to each full-time, non-temporary, non-seasonal covered Employee at least the minimum number of earned sick leave days required by Code Section 17-1305(2) – generally fifty-six (56) hours/year if the Employer has 11 or more employees or thirty-two (32) hours/year if the Employer has 6 to 10 employees.

If covered, absent a waiver, Airline shall promptly provide to the City all documents and information as the City may require verifying its compliance, and that of all Service Contractors providing Services under this Agreement, with the requirements of Chapter 17-1300. Each covered Employer shall notify each affected Employee which wages are required to be paid pursuant to Chapter 17-1300.

Absent a waiver, Airline shall comply with all the requirements of Chapter 17-1300 as they exist on the date the Airline entered into this Agreement with the City or into an amendment thereto. Airline shall take such steps as are necessary to notify its Subcontractors of these requirements, and to cause such Subcontractors to notify lower-tier subcontractors that are Service Contractors of these requirements, including, without limitation, by incorporating this Section 16.15, with appropriate adjustments for the identity of the parties, in its Subcontracts with such Subcontractors. Should Airline or its subcontractor at any tier fail to comply with Chapter 17-1300, after notice and hearing before the Director of Finance or such other officer or agency designated by the Mayor, the Airline or subcontractor may be suspended from receiving financial assistance from the City or from bidding on and/or participating in future City contracts for up to three (3) years. The Philadelphia City Council may also initiate a similar suspension or debarment process. Such suspension or debarment shall be in addition to any of the other sanctions or remedies set forth in Chapter 17-1300 or this Agreement.

Notwithstanding anything to the contrary contained in this Agreement, (i) Airline's covered employees shall be deemed third-party beneficiaries of Airline's representation, warranty, and covenant to the City under this Section 16.15 only, and (ii) the covered employees of a subcontractor at any tier that is also a covered Employer performing Services directly or indirectly under a subcontract at any tier shall be deemed third-party beneficiaries of their Employer's representation, warranty and covenant to Airline, or such subcontractors at any tier, as the case may be, under this Section 16.15.

The City's Office of Labor Standards may grant a partial or total waiver of Chapter 17-1300 based on specific stipulated reasons elaborated in Section 17-1304 of the Code. An overview offered guidance on

the applicability of, and requirements placed on City contractors and subcontractors by, Chapter 17-1300 of the Code is available on the City's website at https://secure.phila.gov/eContract/ under the "About" link; see "Minimum Wage and Equal Benefits Ordinances Impacting Some City Contractors."

**16.16 Labor Peace**

Airline will require providers of Ground Handling Services as defined in Section 18-201 of the Philadelphia Code to comply with applicable federal labor law in the provider employees' selection of union representative in order to avoid disruption to the City, Airport, Air Transportation Companies, airport tenants or members of the public arising from labor disputes. Airline will also require any provider that enters into a Labor Peace Agreement with a union representative selected in accordance with applicable federal law to include in such agreement a prohibition against strikes or other work stoppages or disruptions.

**16.17.  Invalid Provisions**

If any covenant, condition, or provision herein contained is held to be invalid by any court of competent jurisdiction, the invalidity of such covenant, condition, or provision shall in no way affect any other covenant, condition, or provision herein contained, provided that the invalidity of any such covenant, condition, or provision does not materially prejudice either party hereto in its respective rights and obligations contained in the valid covenants, conditions or provisions in this Agreement. The City agrees with Airline that the invalidity of Section 16.09 or Section 16.16 of this Agreement or of Section 3 of Ordinance (Bill No. 150531), effective June 18, 2015, will so materially prejudice Airline in its rights and obligations contained in the valid covenants, conditions, or provisions in this Agreement that, sixty (60) days following entry of a final unappealable order determining such invalidity, this Agreement shall terminate without penalty, unless notice, from a Majority in Interest calculated in accordance with the Majority in Interest Formula of Eligible Signatory Airlines, is given to the City within sixty (60) days following the entry of such order, that the Agreement will continue in effect.

**16.18.  Non-Waiver of Rights**

No waiver of rights or of default by either party of any of the terms, covenants and conditions herein to be performed, kept and observed by the other party shall be construed as, or shall operate as, a subsequent waiver of rights or a waiver of any subsequent default of any of the terms, covenants or conditions herein contained, to be performed, kept and observed by the other party.  No failure by City or Airline to insist upon the strict performance by the other of any agreement, term, condition or covenant hereof, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any subsequent breach or of such agreement, term, condition or covenant.  No waiver of any breach shall affect or alter this Agreement, but each and every agreement, term, condition and covenant hereof shall continue in full force and effect with respect to any existing or subsequent breach thereof.

**16.19.  Successors and Assigns**

All of the covenants, conditions and agreements contained herein shall extend to and be binding upon the legal representatives, successors and assigns of the respective parties hereto; provided, however, that except as otherwise provided herein, no rights shall inure to the benefit of any successors of Airline unless City's prior approval for the transfer to such successor has first been obtained as herein provided.

FINAL

**16.20.  No Personal Liability**

No member, officer, agent, director or employee of City or Airline shall be charged personally or held contractually liable by or to the other party hereinunder, for the terms or provisions of this Agreement or because of any breach thereof or because of its or their execution or attempted execution of this Agreement.

**16.21   Headings**

The headings of the articles and sections of this Agreement are inserted only as a matter of convenience and for reference and shall not constitute a part of this Agreement and in no way define, limit, or describe the scope or intent of any provisions of this Agreement and shall not be construed to affect in any manner the terms and provisions of this Agreement, or the interpretation or construction thereof.

**16.22.  Appendices, Exhibits and Schedules**

All appendices, exhibits and schedules referred to in this Agreement are intended to be and hereby are specifically made a part of this Agreement.

**16.23.  Approval of City Council**

It is agreed by the Parties hereto that all or portions of this Agreement are specifically made subject to the approval of City Council of City of Philadelphia.

**16.24.  General Rights / No Partnership Formed**

Insofar as this Agreement grants, permits or contemplates the use of space or facilities or the doing of any other act or thing at the Airport by Airline, such use or the doing of such act or thing is to be in connection with the operation of the Air Transportation Business of Airline for the carriage by aircraft of persons, property, cargo, and/or mail on scheduled or nonscheduled flights, whether as a joint carrier, a contract carrier, a private carrier or otherwise.  City does not become a partner of Airline in the conduct of its business or otherwise, or a joint venture or a member of a joint enterprise with Airline by virtue of this Agreement.  Each of the parties has entered into this Agreement solely for its own benefit; and (without limiting the right of either party to maintain suits, actions, or other proceedings because of breaches of this Agreement) the Agreement does not grant to any third person (excepting a successor party to City) a right to claim damages or bring any suits, action, or other proceeding against either City or Airline because of any breach hereof.

**16.25.  Reasonableness of City and Airline**

Unless otherwise specifically set forth in this Agreement, whenever City or Airline approval or consent is required herein, such approval or consent will not be unreasonably withheld, conditioned or delayed.

**16.26.   Entire Agreement**

**A.      Agreement in Writing.**  It is understood and agreed that this instrument contains the entire agreement between the parties hereto.  It is further understood and agreed by Airline that City and City's agents, and by City, that Airline and Airline's agents have made no representations or promises with respect to this Agreement or the making or entry into this Agreement, except as in this Agreement expressly set forth, and that no claim or liability or cause for termination shall be asserted by Airline against City or by City against Airline for, and City and Airline shall not be liable by reason of, the breach of any representations or promises not expressly stated in this Agreement.   It is understood that the Home Rule Charter of City requires all agreements with City to be in writing and approved by ordinance.

**B.      Parties.**  City and Airline are the only parties to this Agreement and as such are the only parties to enforce its terms.  Nothing in this Agreement gives, or shall be construed to give or provide any benefit, direct or indirect, to third parties unless a third party is expressly described as an intended beneficiary of its terms.

**C.      Legal Review.**  The parties hereto acknowledge that they have thoroughly read this Agreement, including any exhibits or attachments hereto, and have sought and received whatever competent advice and counsel was necessary for them to form a full and complete understanding of all rights and obligations herein.

**16.27.  Exculpation**

**IN  WITNESS  WHEREOF**, the parties hereto have caused this Airport-Airline Use and Agreement between Airline and City to be executed as of the dates provided on the following page.

111

**CITY OF PHILADELPHIA** appearing herein through its duly authorized representative.

Signature

Alan Greenberger
Director of Commerce

Date

**Frontier Airlines, Inc.,** by its duly authorized representative

Signature

Howard Diamond
Printed Name

SVP, General Counsel
Title

11. 30. 15
Date

Approved as to form:

Shelley R. Smith, City Solicitor
By Joseph F. Messina
Divisional Deputy City Solicitor

FINAL